Douglas E. Spelfogel
Richard J. Bernard
Mark Wolfson
Katherine R. Catanese
**FOLEY & LARDNER LLP**
90 Park Avenue
New York, NY 10016-1314
Telephone: 212-682-7474
Facsimile: 212-687-2329

*Attorneys for the Stillwater Liquidating LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| STILLWATER ASSET BACKED OFFSHORE FUND LTD., | Case No. 12-14140 (ALG) |
| Debtor. | |
| Stillwater Liquidating LLC | |
| Plaintiffs, | Adv. Pro. No. _____ |
| -against- | |
| Net Five at Palm Pointe, LLC; Net Five Holdings LLC; Planet Five Development Group LLC; Net Five South Beach LLC; Net Five at Kings Hotel LLC; Planet Five at Gerova LLC; Paul Rohan; Eric Halter; Gregory Laubach; Paradigm Credit Corporation; Camden Real Estate Opportunity Fund LLC; ASGAARD FUND, LP; Saunders Capital LLC; Duval Partners LLC; Calhoun Commercial Construction LLC; WAMOJ LLC; Judge Street Realty LLC; EHM Investments LLC; FTTD3 LLC; SFN Dekalb Holdings LLC; Memphis Blues Acquisition Group, LLC; Shreeji Hospitality of Charlotte, LLC; Redrock Kings, LLC; John R. and Yvette Daniel III; Stephen J. and Vicki McDonald; | |
| Defendants. | |
| Gerova Financial Group Ltd. | |

| Nominal Defendant. |
| --- |

## COMPLAINT

Plaintiff Stillwater Liquidating, LLC (the "Plaintiff"), by its counsel, in support of its complaint against the above captioned defendants (collectively, the "Defendants"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    As detailed below, Gerova Financial Group, Ltd. (together with Gerova Holdings Ltd., "Gerova") and Net Five Holdings, LLC and its related SPE entities, engaged in a fraudulent scheme to strip the Stillwater Funds (as defined below) of tens of millions of dollars of real estate assets and transfer and divert such stolen assets, without consideration (let alone fair consideration), and then Net Five overleveraged these assets, pledged them as collateral for other assets, and/or sold or transferred the assets, ultimately enriching the management and insiders of Net Five, while the Stillwater Funds and its creditors and investors claims were left unsatisfied. The scheme started when the Stillwater Funds were induced to transfer substantially all of their assets to Gerova in exchange for Gerova's promise to provide the Stillwater Funds with shares of its publically traded stock. The shares were never transferred to the Stillwater Funds and the Stillwater Funds' assets were retained by Gerova without payment or consideration to the Stillwater Funds. Thereafter, Gerova paired with Planet Five Development Group, LLC ("Planet Five") to create Net Five and within months of the initial diversion of assets, further transferred the Stillwater Funds' real estate interests to Net Five, through a complex web of deceit orchestrated by Net Five and its insiders and co-conspirators, in an effort to hide the converted property from creditors and investors. Net Five used these real estate interests as collateral for large loans and sold or transferred the property to third parties for the personal benefit of Net

Five and its insiders/related parties, while the Stillwater Funds and their creditors/investors were wiped out, receiving no consideration.

2.      Indeed, Net Five attempted to conceal its fraud by creating elaborate transfer documents, by creating numerous "special vice presidents" to execute such real property transfer documents, and by not transferring the properties into its name unless and until it was necessary to do so in order to promulgate a sale or an encumbrance on the asset.

3.      The third party transferees, generally sophisticated commercial entities, who subsequently purchased or encumbered the real property transferred by Net Five, either knew of the scheme and aided and abetted Net Five and the co-conspirators or should have known of the scheme given the notoriety of the fraud, which received extensive publicity as a result of the several lawsuits that were filed by both Stillwater and Gerova shareholders and the plummeting and delisting of Gerova's stock.  The third parties were also aware or should have known by virtue of the specific injunction enjoining Net Five from transferring assets to related parties without first giving notice, and from the suspect real property documents used by Net Five to effectuate the transfers, or, in some cases, from their previous dealings with Net Five.  Indeed, their participation in the obfuscation of the identity of the parties and relationships behind the transfers and the true purpose of the transactions rendered the third parties at least fully aware, if not complicit, in the illicit scheme, which included use of "Special Vice Presidents."  These third parties, by continuing to loan to Net Five, enabled Net Five's continuing fraud and scheme to defraud.

4.      In the end, the Stillwater Funds were left with no assets and no consideration, monetary or otherwise, for their converted assets. Through the filing of this complaint, the Plaintiff, the entity created pursuant to a global settlement agreement described below and which

owns the within causes of action, seeks recovery from Net Five, Planet Five, Paul Rohan (one of

the apparent masterminds working with Gerova behind the scheme), certain related parties and

insiders who acted as co-conspirators, and various third party mediate transferees who either

acted as co-conspirators, aiding and abetting the fraud, and/or purchased or encumbered the

Stillwater Funds' real property with actual and/or constructive knowledge of the irregularities,

red flags, insolvency and fraud of the various entities, *to wit*, the Stillwater Funds, Gerova, and

Net Five.  Specifically, Plaintiff seeks damages and entry of judgment for, among other things:

(a) avoidance of the improper transfers and encumbrances of the Stillwater Funds' real estate

assets which were transferred first to Gerova, and thereafter, within months to Net Five, as actual

and constructive fraudulent transfers and/or judgment for the value of the Stillwater Funds' real

estate assets stolen and converted; (b) breach of fiduciary duties and fraud by Net Five, Planet

Five, and Rohan, Halter and Laubach for the value of Stillwater Funds' real estate assets stolen

and converted; (c) fraud, aiding and abetting fraud, and/or civil conspiracy against Net Five,

Planet Five, and Rohan, Halter and Laubach, together with certain third party defendants as

detailed more fully below, who acted in concert with Net Five and its insiders to convert or help

facilitate the conversion of the Stillwater Funds' real estate assets; (d) avoidance of transfers and

encumbrances of the Stillwater Funds' real estate assets, recovery of the property and/or

proceeds transferred or encumbered, and/or judgment for the value of the property transferred or

encumbered as actual and/or constructive fraud, from the third party defendants who ultimately

received the property or encumbered such property with knowledge of the fraud and insolvency

as referenced herein and in certain cases, in violation of a restraining order entered against Net

Five; (e) breach of contract against Net Five, Paul Rohan and Gregory Laubach; (f) unjust

enrichment against all Defendants; (g) imposition of a constructive trust against all Defendants;

and (h) an accounting against all Defendants.

## II.   JURISDICTION & VENUE

5.      This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§ 1334(b).

6.      This adversary proceeding has been referred to this court pursuant to 28 U.S.C.

§ 157(a).

7.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(F).

8.      Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C.

§ 1409(a).

## III.   PARTIES

### A.   The Plaintiff

9.      The Plaintiff is a Delaware limited liability company that was formed pursuant to

that certain settlement (the "Settlement") memorialized in the Global Settlement Agreement (the

"GSA"), the Stillwater Agreement ("SW Agreement"), the Stillwater Liquidation LLC

Agreement (the "LLC Agreement"), and the Joint Chapter 11 Plan Proposed by the Debtor and

Official Committee of Unsecured Creditors (the "Plan"), confirmed in the chapter 11 case of the

Stillwater Asset Backed Offshore Fund Ltd. (the "Debtor"), pending in the U.S. Bankruptcy

Court for the Southern District of New York (the "Bankruptcy Court"), Chapter 11 Case No. 12-

14140 (the "Bankruptcy Case"), filed on October 3, 2012 (the "Petition Date").    The Settlement

was approved by the United States District Court for the Southern District of New York, the

Bankruptcy Court, and the Bermuda court where Gerova's liquidation is pending.

10.     Under the Settlement, the Debtor and certain other Stillwater fund entities

(collectively, the "Stillwater Funds"),[1] amongst other things, agreed to consolidate all of the

Stillwater Funds' assets.  In this regard, the Settlement provides, among other things, for: (a)

transfer of Gerova's ownership interest in the assets formerly belonging to the Stillwater Funds

to the Plaintiff, (b) transfer of Gerova's interest in Net Five and any rights attendant thereto, to

the Plaintiff; (c) transfer of the Stillwater Funds' ownership interests of all of the tangible and

intangible assets and claims formerly belonging to the Stillwater Funds to the Plaintiff, and (d)

transfer of claims against third parties related to the Gerova Transfer (defined below).

11.     On July 11, 2014, the Settlement went effective and the Plaintiff was formed.  In

addition, on August 8, 2014, the Debtor's bankruptcy plan (the "Plan") went effective.  Pursuant

to the GSA, the Stillwater Agreement, and the LLC Agreement, all of the claims owned by

Gerova relating to the assets at issue hereunder and formerly owned by the Stillwater Funds and

all of the claims owned by the Stillwater Funds, were transferred to Plaintiff.  Pursuant to the

Plan, this Court retained jurisdiction over any matters effecting or related to the GSA, the

Stillwater Agreement, and the LLC Agreement, including, but not limited to, the commencement

and prosecution of causes of action owned by the Plaintiff.  The Debtor's bankruptcy estate

receives approximately 40% of any net recoveries related to these causes of action.

### B.    The Defendants

12.     Nominal Defendant Gerova is a debtor in a Chapter 15 bankruptcy proceeding

styled *In re Gerova Financial Group, Ltd., et al*., Case No. 12-13641 (ALG) filed in this

---

[1]  These entities are Stillwater Asset Backed Fund LP; Stillwater Asset Backed Fund II, LP; SABF II Onshore SPV;
Stillwater Asset Backed Offshore Fund Ltd.; Stillwater Asset Backed Fund SPV; Stillwater Market Neutral Fund II,
LP; Stillwater Market Neutral Fund Ltd; Stillwater Matrix Fund LP; Stillwater Real Estate Partners LP; Stillwater
WPB Venture LP; Stillwater WPB Venture II L.P; and these funds together with any other funds controlled by any
or a combination of these entities.

Bankruptcy Court on August 24, 2012, and an involuntary debtor in a corresponding insolvency petition pending in Bermuda (the "Bermuda Proceeding") that was filed on October 7, 2011. Gerova is named only as a nominal defendant as it has settled with the parties pursuant to the GSA and is named for the purposes of avoiding the transfers described herein.

13.     Defendant Net Five Holdings LLC ("Net Five Holdings") is a Florida limited liability company with a principal address at 822 Hwy A1A North, Suite 208, Ponte Verde Beach, Florida.  Net Five Holdings created a series of single purpose entities ("SPEs", including, but not limited to Net Five at Palm Pointe, LLC, Net Five at South Beach, LLC, and Net Five at Kings Hotel, LLC, and together with Net Five Holdings, collectively, "Net Five") to hold various real estate and real estate interests as discussed below.

14.     Defendant Planet Five Development Group, LLC ("Planet Five") is a Florida limited liability company with a principal address at 822 Hwy A1A North, Suite 208, Ponte Verde Beach, Florida.  Planet Five was an original member of Net Five.

15.     Defendant Net Five at Palm Pointe, LLC ("Net Five Palm") is a Florida limited liability company with a principal address at 4540 Southside Boulevard, Suite 603, Jacksonville, Florida.

16.     Defendant Net Five at South Beach LLC ("Net Five SB") is a Florida limited liability company with a principal address at 822 A1A North, Suite 208, Ponte Vedra Beach, Florida.

17.     Defendant Net Five at Kings Hotel LLC ("Net Five Kings") is a New York limited liability company with a principal address at 900 Regency Square Boulevard, Suite 200, Jacksonville, Florida.

18.    Defendant Planet Five at Gerova LLC ("Planet Five Gerova") is a Florida limited liability company with a principal place of business at 822 A1A North, Suite 208, Ponte Vedra Beach, Florida.

19.    Defendant Paul Rohan ("Rohan")  is an individual residing at 95 N. Roscoe Blvd., Ponte Vedra, Florida.  Rohan is the founder and current manager of Net Five and a founder of Planet Five.

20.    Defendant Eric Halter ("Halter") is an individual residing at 99 North Roscoe Boulevard, Ponte Verde, Florida. Halter was the Chief Operations Officer ("COO") and a member and/or insider of Net Five at all relevant times.

21.    Defendant Gregory Laubach  ("Laubach", and together with Halter and Rohan, the "Insider Defendants")) is an individual residing at 3 Savannah Court, Bethesda, Maryland. Laubach was a member and/or insider of Net Five at all relevant times.

### 1.    The Lien Defendants

22.    The following defendants (the "Lien Defendants" or "Hard Money Lenders") received liens on the Real Property Interests (defined below) in connection with various suspect transactions with Net Five after they were transferred to Net Five.  Upon information and belief, the Lien Defendants were also so-called hard money lenders, who lent to Net Five often in multiple transactions when the traditional banks and lenders refused to loan on real property interests.

23.    Paradigm Credit Corporation ("Paradigm"),  located at 380 Lexington Avenue, Suite 2020, New York, New York, encumbered at least the St. Augustine Property and the Kings Hotel Property.

24.    Camden Real Estate Opportunity Fund LLC ("Camden"), located at 9595 Wilshire Blvd, Suite 801, Beverly Hills, California,  encumbered the St. Augustine Property.

25.    ASGAARD Fund, L.P. ("ASGAARD"), located at 11111 Santa Monica

Boulevard, Suite 1888, Los Angeles, California, encumbered the Calhoun Property.

26.    Saunders Capital LLC, ("Saunders") located at  106 Mariomi Road, New Caanan,

Connecticut, encumbered at least the Boggy Creek Property.

27.    Duval Partners LLC ("Duval"), located at 11717 Providence Road West,

Charlotte, North Carolina, encumbered at least the Life Policy and the East Lyme Property.

### 2.    The Purchaser Defendants

28.    The following defendants (the "Purchaser Defendants") all purchased the Real

Property Interests (defined below) from Net Five after they were transferred from Gerova to Net

Five.

29.    Camden purchased the St. Augustine Property.[2]

30.    Calhoun Commercial Construction LLC ("Calhoun Commercial"), located at P.O.

Box 2372, Calhoun, Georgia, purchased Tract 6 of the Calhoun Property.

31.    WAMOJ LLC ("WAMOJ"), located at 131 Mt. Carmel, Valrico, Florida,

purchased the Boggy Creek Property.

32.    Judge Street Realty LLC ("Judge Realty"), located at 134 Broadway, Suite 517,

New York, New York, purchased the Judge Street Property.

33.    EHM Investments LLC ("EHM"), located at 10405 Old Alabama Road,

Connector Suite 201, Alpharetta, Georgia, purchased the Hillandale Property.

34.    FTTD3 LLC ("FTTD") located at P.O. Box 420253, Atlanta, Georgia 30342,

purchased the Hillandale Property.

35.    SFN Dekalb Holdings LLC ("SFN"), located at 1855 Satellite Boulevard, Suite

100, Duluth, Georgia, purchased the Hillandale Property.

---

[2] Camden is also a Lien Defendant/Hard Money Lender.

36.     Memphis Blues Acquisition Group, LLC ("Memphis Blues"), located at 280 Spring Run Drive, Eads, Tennessee, purchased the loan interests in the 17 of

37.     Kesef PA Properties.  The Insider Defendants are all members of Memphis Blues.

38.     Shreeji Hospitality of Charlotte, LLC ("Shreeji Hospitality"),  located at 212 West Woodlawn Rd., Charlotte, NC, purchased the Carowinds Property.

39.     Redrock Kings, LLC ("Redrock"), located at c/o Rossrock LLC, 150 East 52nd Street, New York, New York, purchased the Kings Hotel Property.

40.     John R. and Yvette Daniel III (the "Daniels") reside at 875 Gettysburg Trail, Suite 120, Kennesaw, Georgia and purchased Tract 1 and Track 3 of the Calhoun Property.

41.     Stephen J. and Vickie McDonald (the "McDonalds") reside at 10340 Shallowford Road, Roswell, Georgia and purchased Tract 5 of the Calhoun Property.

## IV.   GENERAL ALLEGATIONS

### A.   The Stillwater Assets

42.     Stillwater Capital Partners, LLC ("SW General Partner"), the general partner of the Stillwater Funds, was responsible for the day-to-day operation and administration of the Stillwater Funds.  Stillwater Capital Partners, Inc. ("SW Asset Manager," and together with SW General Partner and the Stillwater Funds, "Stillwater") was the Stillwater Funds' investment manager.  Richard Rudy ("Rudy") and Jack Doueck ("Doueck") were principals of Stillwater.

43.     The real property and other assets subject to the within lawsuit were originally owned directly or indirectly by the Stillwater Funds (any and all of the assets held by the Stillwater Funds, hereinafter, the "Stillwater Assets"), including, the Stillwater Asset Backed Fund LP (the "SABF").  The Plaintiff owns all of the claims and assets formerly belonging to the Stillwater Funds pursuant to the Settlement, which, to the extent of recovery, would be available

for distribution to the creditors and investors who were defrauded as part of the illicit scheme detailed herein.

44.    Among the Stillwater Assets owned by the Stillwater Funds (either directly or indirectly through special purpose entities) are certain real property interests (the "Real Property Ownership Interests") as well as certain mortgage interests held on several parcels of real property (the "Real Property Loan Interests," and together with the Real Property Ownership Interests, the "Real Property Interests").

45.    The Stillwater Funds also owned interests in certain life insurance policies (the "Life Assets"), and, specifically, held an interest in a $15 million life policy for insured Morris Schnitzer (the "Life Policy").[3]

46.    Upon information and belief, many of the Stillwater Funds' investments became illiquid at the end of 2008 and in 2009 as a result, in part, of the financial crisis, the drying up of lending facilities, and the collapse of the real estate and other markets.

47.    As a result, amongst other things, the Stillwater Funds were unable to pay their creditors to meet redemptions submitted by investors.  Upon information and belief, at the end of 2009, over $575 million in redemptions were outstanding to redemption creditors of the Stillwater Funds.

**B.    Substantially All of the Stillwater Assets Were FraudulentlyTransferred to Gerova**

48.    Gerova, initially called Asia Special Situations Acquisitions Company, was organized as a special purpose acquisition company ("SPAC"), and was formed in 2007 for the purpose of acquiring operating businesses through a capital stock exchange, stock purchase, asset

---

[3] Gerova retained a 50% interest in the Life Assets under the Settlement, and the other 50% was assigned to the Plaintiff hereunder.

acquisition or some other mechanism. Gerova purported to focus its business on the life and

annuity reinsurance market and purported to have a niche property and casualty business.

49.     Thereafter, according to documents, Gerova, after a very short diligence period,

closed a deal with Stillwater on January 20, 2010 and all of the Stillwater Assets, including the

Real Property Interests, with an asserted value in December 2009 of between approximately $92

million and $143 million (according to documents prepared by Houlihan Smith & Co., the

"Houlihan Report"), and the Life Assets, were transferred to Gerova as part of a so-called

combined merger and asset sale (the "Gerova Transfer").[4]

50.     The alleged purpose of the Gerova Transfer was to provide liquidity to the

Stillwater Funds' investors and/or creditors in the form of restricted Gerova stock that would

convert, over a six-month period, to unrestricted common shares of Gerova that would be

tradable on a public exchange.

51.     Therefore, in exchange for the Stillwater Assets, investors and/or creditors of the

Stillwater Funds were to receive shares of Gerova's restricted stock, convertible to publically

traded common stock over a six month period. According to documents, the "so-called"

purchase price for all of the Stillwater Assets was approximately $540.0 million payable in

Gerova stock.

52.      Gerova, however, never issued the stock to the Stillwater Funds, even though at

the time of the transfer of Stillwater Assets to Net Five, and subsequent to the Gerova Transfer,

the Gerova stock was trading at over $15 per share. Ultimately, Gerova never provided any

consideration to the Stillwater Funds for the transfer of the Stillwater Assets.

---

[4] Upon information and belief, even assuming inflated values in the Houlihan Report, the magnitude of the assets
transferred was clearly into the tens of millions of dollars or more.

53.    At the time of the Gerova Transfer, as discussed further below, the Stillwater

Funds were insolvent or rendered insolvent, unable to pay their creditors and investors, and

otherwise left with unreasonably small (or no) capital.

54.    Upon information and belief, on January 1, 2010, Marshall Manley was named

CEO of Gerova.  He resigned, however, effective April 8, 2010, after only a few months and less

than four months after the Gerova Transfer.[5]

55.    Only one month after the Gerova Transfer, the New York Stock Exchange

informed Gerova that it was going to delist its shares.  Upon information and belief, on April 23,

2010, Gerova provided some information to the New York Stock Exchange which agreed to

postpone the delisting hearing.  Thereafter, according to published reports, on February 23, 2011,

the New York Stock Exchange halted trading of Gerova's shares after the stock value

plummeted, and Gerova subsequently delisted its stock.

56.    As part of the Gerova Transfer, Gerova hired the SW Asset Manager to continue

to manage certain of the Stillwater Assets and Doueck was appointed to sit on the Gerova board

of directors.  Doueck has asserted that notwithstanding the foregoing, he was kept in the dark

about Gerova's management of the Stillwater Assets.

57.    Upon information and belief, as a result of, amongst other things, the Stillwater

Funds never having received any value or other consideration for the Stillwater Assets and the

Gerova Transfer coming under scrutiny through numerous lawsuits filed in New York by

investors and creditors who had received no value for their interests in the Stillwater Funds, in

---

[5] In December 2010, Gerova announced a merger with London brokerage firm Seymour Pierce and Ticonderoga
Securities, and publicly announced that Seymour Pierce's CEO would become Gerova's new CEO.  Gerova then
announced that the "new" CEO had "delayed" his appointment as CEO.  Shortly thereafter, Gerova announced that
the majority of its board members were resigning, and that Dennis Pelino, an entrepreneur from the logistics
industry, would serve as CEO.  Days later, Gerova backtracked and announced that Pelino would not be its CEO
after all.  Shortly after that, Seymour Pierce announced that its merger with Gerova would not go forward.
Ticonderoga also announced that its deal with Gerova was off.

May, 2011, as further described below, Stillwater and Gerova contemplated an unwind of the

Gerova Transfer.  However, the unwind agreement was never completed and the Stillwater

Assets were never returned to the Stillwater Funds.

C.    The Stillwater Funds Received No value for the Transfer
of the Stillwater Assets to Gerova

58.    The Gerova Transfer failed to provide any value or benefit to any of the creditors

and investors of the Stillwater Funds.[6]   Thereafter, the Stillwater Assets were further transferred

to Net Five, within a matter of months of the Gerova Transfer, with Net Five further transferring

and pledging such assets for the benefit of Net Five and its insider co-conspirators, while

creditors and investors of the Stillwater Funds' claims and interests remained unsatisfied.

59.    Specifically, in May, 2010 – just four months after receipt of the Stillwater Assets

pursuant to the Gerova Transfer--Gerova entered into an agreement with Planet Five, a Florida-

based alleged real estate developer, to "contribute" the Real Property Interests to the joint

venture.

60.    Upon information and belief, leading up to entry of an agreement with Planet

Five, as early as March, 2010 (within little more than two months after the Gerova Transfer),

Jason Galanis, affiliated with Gerova, approached Robert Willison, an acquaintance, who made

the introduction to Paul Rohan, founder and managing member of Planet Five.

61.    Thereafter, upon information and belief, under the so-called joint venture

agreement, all of the Real Property Interests were transferred to Net Five.  The effect of these

subsequent transfers of the Stillwater Real Property Interests into Net Five was to further transfer

---

[6] In fact, this Court found the Gerova Transaction to be a "fiasco" that "left Stillwater without any assets
whatsoever...."  *In re Stillwater Asset Backed Offshore Fund Ltd.,* 485 B.R. 498, 502 (Bankr. S.D.N.Y. 2013).

the Stillwater Funds' converted assets (including, the Real Property Interests) beyond the reach

of the creditors and investors of Stillwater Funds, whose claims remain unsatisfied.

## 1.    The Operations of Net Five

62.    Thereafter, upon information and belief,  in order to facilitate the further transfer

of the Stillwater Real Property Interests to Net Five (and subsequent transferees), on or about

May 26, 2010, a so-called Operating Agreement of Net Five (the "Operating Agreement") was

entered into by and among the initial members: (i) Gerova, signed by Michaela Hlavsa (ii) Planet

Five Development Group, LLC (the "Planet Five Member") (a new Florida LLC created for the

purpose of entering into the Operating Agreement), signed by Rohan; (iii) Planet Five Gerova,

(another new entity created for the purpose of entering into the Operating Agreement), signed by

Rohan; (iv) Furst REIT Partners, LLC ("Furst"),[7] a Nevada LLC, signed by managing member

Jason Galanis; and (v) Willison.  The Operating Agreement provided for the formation of Net

Five, among other things.  As noted above, Net Five was originally formed as Gerova Real

Estate Group LLC ("GREG"), but the name was changed to "Net Five Holdings, LLC" when the

Operating Agreement was signed.

## 2.    Equity, Membership Interests & Management of Net Five

63.    At the time the Operating Agreement was signed, the documents provided that

Planet Five Gerova held a 39% interest and contributed $3,900 plus the appraised net asset value

of the Planet Five Properties (defined below);[8] Gerova held a 49% interest and contributed

$4,900 plus the appraised net asset value of the Gerova Real Estate Portfolio (defined below)[9];

---

[7]  The Operating Agreement refers to both "Furst REIT, LLC" and "First REIT, LLC". For the purposes of this
complaint, the entity will be referenced as "Furst".

[8]  The net asset value of the Planet Five Properties is not stated in the Operating Agreement.

[9]  The net asset value of the Gerova Real Estate

Willison held a 10% interest and contributed $1,000; and Furst held a 2% interest and contributed $200.  Willison and Furst owned the Class B Interests, but it is unclear which members hold Class A interests.

64.     The Operating Agreement, which appears to have been put together as an afterthought, is riddled with unexplained economic terms and errors.  For example, the Operating Agreement indicates that Planet Five Gerova contributed the Planet Five Properties when the Planet Five Properties were owned by Planet Five, not Planet Five Gerova.  The Operating Agreement also indicates that Furst and Willison are collectively entitled to 12% of the Company, notwithstanding their total capital contributions of $1,200.  Furst's involvement in Net Five is also unexplained, as it did not contribute any real estate assets and was not participating in the management of Net Five.

65.     In addition, the Operating Agreement is not clear as to whether the equity interests received by Planet Five Gerova and Gerova correspond to the actual value of assets contributed.

66.     In terms of control, the Operating Agreement provides for a board of management (the "Management Board") which was to initially consist of five (5) members: (i) Paul Rohan, (ii) Gregory Laubach, and (iii) a third party acceptable to Rohan (possibly Halter given his management and decision making role) or any other three persons designated by the Operating Members.  Operating Agreement, §3.1(b).  The Operating Members are defined as "(a) Paul Rohan, (b) Willison, (c) Gregory Laubach, and (d) other members of the Planet Five Group or Willison Group."  Operating Agreement, p. 13.

---

Portfolio is also not stated in the Operating Agreement.

67.    The Operating Agreement further provides that "Members of the Management

Board shall not receive compensation for their services performed on behalf of [Net Five] or

other benefits they provide to [Net Five].  Members of the Management Board shall be entitled

to reimbursement for reasonable, documented out-of-pocket expenses incurred by them in

connection with attendance at meetings of the Management Board or any committee thereof

conducting the business and affairs of [Net Five]."  Operating Agreement, ¶3.1(k).

68.    However, upon information and belief, notwithstanding the prohibition on

receiving compensation, members of the Management Board, including the Insider Defendants,

were receiving both compensation and expense reimbursement as demonstrated by Net Five's

budget, together with additional funds improperly transferred and/or paid/diverted to the Insider

Defendants as loans, distributions, or other compensation, all of which enriched the Insider

Defendants, while claims of the original creditors and investors of Stillwater Funds went

unsatisfied.

69.    For example, in addition to transferring substantial portions of the equity and cash

values from the Stillwater Assets to insiders of Net Five as discussed below, according to the

proposed budget in 2012 for Net Five upper level management was scheduled to receive almost

$1.7 million, Net Five Management Board member Rohan was budgeted as receiving $30,000

per month ($360,000 per year) and Net Five Management Board member Laubach was receiving

$30,000 per month ($360,000 per year).  Additionally, upon information and belief, both Halter

and Laubach were receiving exorbitant reimbursement of expenses.

70.    Upon information and belief, the Insider Defendants directly, and or indirectly,

controlled and dominated Net Five.

### 3. Transfers to Net Five.

71.    As indicated in the Operating Agreement, Schedule 1, as part of its so-called

capital contribution, Planet Five Gerova allegedly contributed 10 properties (the "Planet Five

Properties") that were purportedly owned by Planet Five.  The values of the Planet Five

Properties are not indicated in the Operating Agreement.[10]

72.    However, upon information and belief, four of the Planet Five Properties were not

owned by Planet Five, despite being listed in the Operating Agreement as Planet Five investment

properties: Palm Ridge, Santa Fe Crossing, Santa Fe Medical, and Sabal Retail.  It is believed

that at the time of the execution of the Operating Agreement, Rohan intentionally omitted the

fact that these properties were not actually owned by Planet Five.

73.    At the same time, Gerova "contributed" over 100 parcels of property as part of its

so-called capital contribution to Net Five.  These properties are traceable to the Real Property

Interests originally transferred from the Stillwater Funds.   The values of the Real Property

Interests are not indicated in the Operating Agreement, but are believed to have been worth tens

of millions of dollars as noted above.[11]  The Real Property Interests, as further described in

Schedule II, Appendix A to the Operating Agreement, consist of the following interests:

---

[10]  The Planet Five Properties, as further described in Exhibit II, Schedule B to the Operating Agreement, consist of
the following interests:

|     |     |
|-----|-----|
| a.  | Sabal Retail, 510 Hwy 466, Lady Lake, Florida |
| b.  | Sabal Storage, 520 Hwy 466, Lady Lake, Florida |
| c.  | Santa Fe Medical, 8564 E. Cr. 466, The Villages, Florida |
| d.  | Santa Fe Crossing, 8600 CR 466, The Villages, Florida |
| e.  | Dana, 11950 CR 101, The Villages, Florida, |
| f.  | Palm Ridge, 11962 CR 101, The Villages, Florida |
| g.  | Lauren, 11974 CR 101, The Villages, Florida |
| h.  | Savannah Oaks, 439 CR 466A, Fruitland Park, Florida ("Savannah Oaks") |
| i.  | Village Parc (Steinmetz), 11725 NE 63rd Drive, The Villages, Florida ("Village Parc") |
| j.  | The Port Authority, 39.98 (acres), Hecksher Drive, Jacksonville, Florida (the "Port Property"). |

[11]  Documents provide a valuation for the Real Property Interests in December 2009 of between approximately $92

a.  41 single family homes in Delaware
b.  55 single family homes in Pennsylvania ("Kesef Pa")
c.  2 single family homes in New Jersey
d.  225 Carowinds Boulevard, Fort Mill, South Carolina (the "Carowinds Property")
e.  Detroit, 54 & 59 Seward Street, Detroit, Michigan
f.  JPS St. Augustine, 335 Washington Avenue, Miami Beach, Florida (the "St. Augustine Property")
g.  15-18  Judge Street, Brooklyn, New York (the "Judge Street Property")
h.  476 Broome Street, 476-478 Broome Street, New York, New York (the "Broome Street Property")
i.  25 Broad Street, LLC, 25 Broad Street, New York, New York (the "Broad Street Property")
j.  1888 Boggy Creek Road, Kissimmee, Florida (the "Boggy Creek Property")
k.  West Palm Beach Trinity, 704 south Dixie Highway, West Palm Beach, Florida ("WBP Trinity")
l.  WPB II—Trinity 1515, 1515 South Flagler Drive, West Palm Beach, Florida  ("WPB 1515")
m.  WPB II-Trinity Quadrille, NE Corner of Quadrille Boulevard & Lakeview Avenue
n.  Kings Hotel, 2416 Atlantic Avenue, Brooklyn, New York ("Kings Hotel Property")
o.  Pittsburgh, 7700 University Boulevard, Pittsburg, Pennsylvania
p.  Wex Water East Lyme, Parcel of land banded by Holmes Road, Grassy Hill Road & Upper Walnut Hill Road, East Lyme/Montville, Connecticut  ("East Lyme Property")
q.  Wex Water Brandermill, 13550 Harbour Pointe Parkway, Chesterfield, Virginia (the "Brandermill Property")
r.  NH Aaron Road, 34 & 49 Aaron Road, Wolfeboro, New Hampshire
s.  Kronos, 2 parcels in Pensacola, Florida, 1 parcel in Winter Haven, Florida, 1 parcel in East Cedar Rapids, Iowa, 1 parcel in Sheffield, Alabama, and 1 parcel in Pittsburgh, Pennsylvania
t.  Palisades, 3 parcels in South Pasadena, California and 1 property in West Hollywood, California
u.  2 parcels in Columbus, Ohio
v.  Favorite, 264 North 11th Street and 265-267 Franklin Avenue, Brooklyn, New York
w.  JPS Dolce Vita, 151 South Ocean Avenue, Singer Island, Florida
x.  JPS Arbors at BC, 1201 West Hillsborough Avenue, Tampa, Florida
y.  Perla 107 E 60, 107 East 6th Street, New York, New York

million and $143 million according to the Houlihan Report.

z.   Perla 132 E 82, 132 East 82nd Street, New York, New York
aa.  Perla 123-11 Rockaway, 123-11 Rockaway Beach Boulevard, Rockaway Park, New York
bb.  Stone Creek, 2707 Stonehenge Drive, Columbus, Ohio
cc.  Calhoun, 1589 Georgia Highway
dd.  Ellijay, 300.11 acres of vacant land on the SE side of Roy Road, Ellijay Georgia
ee.  Top Flight, 6600 ("Parcel 1") and 6616 ("Parcel 2")  Hillandale Drive, Lithonia, Georgia (the "Hillandale Property").

74.    All of the Real Property Interests were loan interests or real estate ownership interests initially owned by the Stillwater Funds that were transferred to Gerova as part of the Gerova Transfer without consideration.

75.    Plaintiff has requested documentation from Net Five detailing the transfer of the Real Property Interests, but Net Five has failed to maintain adequate records regarding the transfers of the Real Property Interests and has even alleged that the records were destroyed, thereby hindering the discovery of further irregularities and fraudulent transfers.

**4.    Lack of Consideration From Net Five and Insolvency.**

76.    Upon information and belief, from the outset of the formation of Net Five in May 2010, Net Five's employees were promised big things from the company by its mastermind, Rohan, and others.  They were told they would all be receiving raises and stock options.  They were also told that the formation of Net Five would give them a platform to quickly "go public" and trade their Net Five stock on a public exchange.  However, upon information and belief, the employees learned quickly that Net Five was unable to pay its vendors, unable to pay its various creditors on the Real Property Interests, unable to pay salaries of certain of its employees and that the company was in fact insolvent.  They watched while the Management Board, including the Insider Defendants, continued to receive funds funneled directly or indirectly to them, and to receive their salaries and full reimbursement for all expenses regardless of whether Net Five's

bills were being paid and regardless of the prohibition on payment of salaries to them contained in the Operating Agreement.

77.    Indeed, upon information and belief, despite the influx of real property worth tens of millions of dollars, including the Real Property Interests, many of which were subsequently sold or used as collateral to obtain new, high-dollar-value loans (as described below), collection companies were routinely calling Net Five employees to request payment and Net Five being served with new complaints became a routine occurrence.

78.    Upon information and belief, rather than paying its creditors with the revenue generated from the sale and/or encumbrance of real property, including the Stillwater Real Property Interests, or the cash and other consideration generated from the sale, leverage or management of the Real Property Interests, the revenue and proceeds were used to enrich Net Five management.  Notwithstanding the company's inability to pay its creditors, Net Five's then-current operating budget provided for almost $1.7 million in compensation to be paid to its upper level management, including the Insider Defendants (exclusive of other amounts transferred to them out of Net Five).

79.    Moreover, from a review of the available information, it is clear that despite Net Five receiving tens of millions of dollars from the transfer and encumbrance of the Real Property Interests, the Stillwater Funds never received any consideration for the transfer of the Real Property Interests from either Gerova or Net Five, with creditors' and investors' claims going unsatisfied.

**D.    The Fraudulent Scheme Leads to Stillwater's Bankruptcy Case**

80.    Given, amongst other things, the lack of transparency and allegations of fraud and insolvency,  Eden Rock Finance Fund, L.P. ("ERFF") and other creditors of the Debtor filed the involuntary Bankruptcy Case against the Debtor, which the Debtor contested but which the

Bankruptcy Court later granted by memorandum order dated January 17, 2013, entering the order of relief.

81.    The filing of the Bankruptcy Case and subsequent investigation by parties within the Bankruptcy Case, ultimately led to the Settlement, described in more detail above.

**E.    Red Flags Indicating that Gerova and Net Five Were Frauds**

82.    The conversion of the Stillwater Assets through transfers made while the Stillwater Funds were insolvent and for no consideration, did not go unreported.  Indeed, beginning in early 2011, numerous news outlets and finance publications began to issue reports regarding the irregular business practices of Gerova and a suspected fraud.

83.    On January 10, 2011, Dalrymple Finance LLC ("Dalrymple") issued a research report on Gerova (the "Dalrymple Report")[12] detailing numerous irregularities in the business practices of Gerova and Stillwater including, among other things, fraud, financial distress, self-dealing and breaches of fiduciary duty.

84.    The Dalrymple Report included numerous allegations which led it to conclude that Gerova was likely fraudulent and the firm's assets, and its shares, worth a fraction of the then current stated value, including:

- Complete lack of financial disclosure.   "[Gerova] has not filed financial statements since becoming public a year ago.  Consequently, there is no publicly available information available to shareholders.  We believe this is intentional."

- Impaired and overvalued assets.  "The acquired assets were likely impaired and overvalued at purchase; quality has eroded in 2010.  In our opinion, critical information on asset quality, performance and a long history of audit problems has been kept from [Gerova] shareholders."

- Undisclosed related-party transactions and affiliations.  "An examination of numerous transactions indicates self-dealing to us.  Moreover, we believe these

---

[12]   *Gerova Financial Group (GFC): An NYSE-listed Shell Game, Company Overview,* January 10, 2011 by Dalrymple Finance LLC.

relationships have been carefully edited from [Gerova] documentation to give the illusion of arms-length transactions."

- Strong ties to the investment underworld. "[Gerova] insiders exhibit strong ties to individuals and entities that have been sanctioned, sued or shut-down by regulators, including Jason Galanis, Matthew Jennings and Westmoore Capital."

- A deeply troubled company. "[Gerova] has many hallmarks of a classic fraud. In our opinion, [Gerova] exhibits: a lack of financial disclosure, insider dealing, and obfuscation of both relationships and transactions. When this information is widely disseminated, we expect the stock to trade at a fraction of the current price."

F.    **Multiple Investor Actions Against Gerova and Stillwater Allege Vast Corruption and Fraud**

85.    Shortly after the Dalrymple Report was issued, creditors and investors of the Stillwater Funds and Gerova filed multiple actions alleging, among other things, fraud, breach of fiduciary duty, breach of contract and violations of federal securities laws in connection with the Gerova Transfer.

86.    On March 8, 2011, creditor ERFF filed a lawsuit in New York Supreme Court against amongst others, Gerova and Stillwater entities alleging fraudulent conveyance, fraud, breach of contract and breach of fiduciary duty, among other things, in connection with the transfer of the Stillwater Assets to Gerova. *Eden Rock Finance Fund, L.P., et al. v. Gerova Financial Group, Ltd., et al.,* Index No. 650613/2011 (the "ERFF Action"). The complaint mentions that Gerova is responsible for managing Net Five and was formerly connected with Westmoore Capital, which was shut down by the SEC in 2010 and was alleged to have operated a ponzi scheme.

87.    On March 22, 2011, a class of similarly situated investors filed a class action suit in the District Court for the Eastern District of New York against Gerova, Stillwater and Net Five entities alleging, among other things, breach of fiduciary duty, fraud, and violations of federal securities laws in connection with the Gerova Transfer. *Goldberg v. Gerova Financial*

*Group, Ltd., et al.,* Case No. 11-cv-1385 (the "<u>Goldberg Action</u>"). The complaint in this action details that Gerova's real estate was transferred to a joint venture with Net Five and explains how the transfer was fraudulent and further explains some of the suspect real estate transfers.

88.     Similarly, on April 21, 2011, a class of similarly situated investors filed a class action suit in the District Court for the Southern District of New York against Gerova, Stillwater and Net 5 entities alleging, among other things, breach of fiduciary duty, unjust enrichment and breach of contract. *Russo v. Gerova Financial Group, Ltd., et al.,* Case No. 11-cv-02737 (the "<u>Russo Action</u>"). This complaint also indicates that Gerova's real estate assets were transferred to Net Five and outlines Net Five's corporate structure including allegations that Gerova and Net Five are related parties.

89.     On May 5, 2011, a group of investors filed a third class action suit in the District Court for the Southern District of New York against Gerova entities alleging, among other things, fraud and violations of the federal securities laws in connection with the Gerova Transfer. *Arar v. Gerova Financial Group, Ltd., et al.,* Case No. 11-cv-03081 (the "<u>Arar Action</u>"). The three class action suits were consolidated before the District Court for the Southern District of New York (the "<u>Class Action Court</u>").

90.     The various complaints alleged, corruption and fraud related, to amongst other things, the diversion of assets from the Stillwater Funds to Gerova pursuant to the  Gerova Transfer including: (i) fraudulent transfer; (ii) failure to perform proper due diligence; (iii) failure to cause the audit/appraisal necessary for certain restricted shares to be registered for the benefit of investors; and (iv) failure to disclose material adverse facts about Gerova's business, operations, and prospects, including but not limited to, misrepresentations and fraud in connection with the transfer of assets acquired in transactions with Stillwater in January 2010.

91.    The complaints also discussed and detailed the Dalrymple Report and the

allegations contained therein, as well as other publications such as *Forbes* and the *Wall Street*

*Journal* which detailed the suspected fraud, amongst other things, by Gerova including,

misleading both existing and prospective investors as to the value of the Stillwater portfolio.

92.    Thereafter, on July 12, 2012, the Class Action Court entered an injunction order

(the "Injunction") stating "Net Five and its subsidiaries (if any) shall not sell, transfer, or pledge

any asset they own or control that is valued at $50,000 or more to any Related Person [defined to

include officers or directors of Net Five or Planet Five or an entity controlled by Net Five or

Planet Five]..." without disclosing certain information to the class action plaintiffs.

93.    On January 5, 2011, *Forbes* published an article entitled "NYSE-Listed Gerova

Financial Has Close Ties to Westmoore Ponzi Scamsters." The article discusses how Gerova

acquired Stillwater's assets, which were valued at $541.25 million. The article states that audits

had not been filed by Gerova and Gerova had not yet released Stillwater's annual reports, and

that Gerova had not issued a financial report since 2009. Because of this, amongst other things,

Gerova had received a notice from the New York Stock Exchange in February, 2010 that it was

at risk of being delisted.

94.    The article also noted Gerova's issues with finding permanent management and

highlighted that a member of Gerova had been known for preparing false financials and had been

barred by the SEC from acting as an officer or director of a public company. The article

characterized Gerova as a "complex fraud" and stated that individuals involved in the $53

million Ponzi scheme with Westmoore Capital were also behind Gerova.

95.    There were subsequent articles, also in *Forbes,* first on January 18, 2011

("Gerova Goes Down Hard") noting Gerova's dramatic drop in share price of 10.9%, and next

on March 1, 2011 ("Gerova Financial RIP (if only)") noting that the NYSE had halted trading on

Gerova's stock, which ceased trading at $5.28, referring to lawsuits pending against Gerova by

its former legal counsel, and noting its failed merger with Seymour Pierce and Ticonderoga

Securities.

96.      The *Wall Street Journal* also published a detailed article on January 28, 2011,

discussing the Dalrymple Report and how it claimed that the Real Property Interests were

overvalued and worth 40% less than what was on Gerova's books. It further discussed Jason

Galanis' trouble with the law, his having been banned by the SEC, and his involvement with

Gerova.[13]

97.      Consequently, the published news reports, the publicly filed lawsuits which

included the Injunction against Net Five, the plummeting in value and delisting of  Gerova's

stock, and/or Net Five's routine use of the Suspicious Paper Trail (defined below) to facilitate the

transfers and encumbrances including name changes and the use of "special vice presidents", as

further discussed below, were all red flags regarding fraudulent conduct in connection with the

transfers at issue (together, the "Red Flags").

**G.      The Fraudulently Transferred Real Estate Interests
         are Sold and Encumbered by Net Five**

98.      Thereafter, under the foregoing backdrop, multiple interests in the converted real

estate assets that made up the Real Property Interests were either (a) transferred by Net Five to

the Purchaser Defendants or (b) encumbered by the Lien Defendants, as further detailed herein.

By way of example only, a summary of select transfers is provided in the below chart (the

"Chart"):

---

[13] *See "Gray Area In Jobs After SEC Ban", January 22, 2011, *Wall Street Journal*.

| Property Address | Purchaser/ Lien Defendant | Basis | Date of Transfer/ Lien | SW Entity | Amount of Transfer/ Encumbrance |
|---|---|---|---|---|---|
| Judge Street | Judge Realty as Purchaser Defendant | -Subsequent Transferee with Notice -Lack of fair value | 4/12/11 | SREP | Transfer Amount: $3.85 million Value: At least $6.1 million |
| St. Augustine | Camden as Purchaser and Lien Defendant | -Subsequent Transferee with Notice -Lack of fair value | 1/13/12 (lien) 6/16/12 (sale) | SABF | Transfer Amount: $721,000 (lien) and just over $400,000 Value: $6.4 million |
| St. Augustine | Paradigm as Lien Defendant | -Subsequent Transferee with Notice -Lack of fair value | 12/20/11 | SABF | Transfer Amount: $2 million |
| Carowinds | Shreeji as Purchaser Defendant | -Subsequent Transferee with Notice -Lack of fair value | 1/11/11 | SABF | Transfer Amount: $1.2 million Value: $3.1 million |
| Boggy Creek | WAMOJ LLC as Purchaser Defendant | -Lack of fair value | 9/29/2010 | SABF | Transfer Amount: $450,000 Value: at least $615,000 |
| Boggy Creek | Saunders as Lien Defendant | -Lack of fair value | 9/30/10 | SABF | Transfer Amount: $300,000 |
| Calhoun—All Parcels | ASGAARD as Lien Defendant | -Subsequent Transferee with Notice | 10/26/12 | SABF | Transfer Amount: $515,464 and $1,546,393 |
| Calhoun- Track 1 | John R. and Yvette Daniels III as Purchaser Defendants | -  Subsequent Transferee with Notice | 12/12/12 | SABF | Transfer Amount: $450,000 |
| Calhoun – Track 2 | Gerova/Net Five as Purchaser Defendant | - Subsequent Transferee with Notice - Lack of fair value | 01/20/10 05/26/10 | SABF | Transfer Amount: $0 Value: Unknown |
| Calhoun- Track 3 | John R. & Yvette Daniels III as Purchaser Defendants | -Subsequent Transferee with Notice | 12/13/12 | SABF | Transfer Amount: $450,000 |
| Calhoun- Track 5 Parcels | Stephen & Vicki McDonald as Purchaser Defendants | -Subsequent Transferee with Notice | 8/10/12 | SABF | Transfer Amount: $138,244 |
| Calhoun- Track 6 | Calhoun Commercial Construction as Purchaser Defendant | -Subsequent Transferee with Notice | 12/27/13 | SABF | Transfer Amount: Unknown Value: $900,000 |

| East Lyme | Duval as Lien Defendant | -Subsequent Transferee with Notice | 10/10 | SABF, SABFII | Transfer Amount: $5 million Value: $4.3 million |
| Kings Hotel | Redrock Kings as Purchaser Defendant | -Subsequent Transferee Notice -Lack of fair value | 08/31/11 | SABF | Transfer Amount: Unknown Value: Unknown |
| Hillandale, Parcels 1 and 2 | FTTD as Purchaser Defendant | -Subsequent Transferee with Notice -Lack of fair value | 5/3/11 | SABF | Transfer Amount: $226,000 Value: At least $4 million |
| Hillandale, Parcels 1 and 2 | EHM as Purchaser Defendant | -Subsequent Transferee with Notice -Lack of fair value | 6/22/11 | SABF | Transfer Amount: Unknown Value: At least $4 million |
| Hillandale, Parcels 1 and 2 | SFN as Purchaser Defendant | -Subsequent Transferee with Notice -Lack of fair value | 4/3/13 | SABF | Transfer Amount: $452,000 Value: At least $4 million |
| 17 of the Kesef Pa properties | Memphis Blues as Purchaser Defendant | -Subsequent Transferee with Notice -Lack of fair value | 2011 | SABII | Transfer Amount: Unknown Value: Between $2.7 and $3.4 million |
| Life Policy | Duval as Lien Defendant | -Subsequent Transferee with Notice | 11/10/10 | SABF | Transfer Amount: Unknown Value: $20 million |
| Real Property Interests | Net Five, Planet Five, Gerova | -Transferee with Notice -Lack of Fair Value | Various | Various | Transfer Amount: Total value unknown Value: $92 to $143 million |

99.    These transfers were effectuated, as discussed below, under questionable circumstances, through changes in the ownership of SPEs holding title, transfer of title, and/or name changes.  In many cases, "ownership title" remained in the name of the Stillwater Funds that originally owned the Real Property Interests, despite the so-called transfers to Gerova and Net Five, until Net Five sought to sell and/or pledge such Real Property Interests.  As a result, even a basic title search should have revealed ownership, notwithstanding the prior transfers, in the names of the Stillwater Funds and/or Gerova.  Further, as described above, third parties were on notice of the multiple Red Flags that suggested fraud and malfeasance with respect to the transfer and/or diversion of the assets at issue.

100.    In this regard, in order to effectuate the various transfers (including the sale and/or

encumbrance of the Real Property Interests at issue), Net Five and Gerova created a paper trail

that raised many questions, utilizing SPEs in many of the other real property transfers.  For

example, this paper trail included:

> •    An amended and restated LP agreement (the "Amended LP Agreement")
> of Stillwater Asset Backed Holdings LP ("SABH") dated January 21, 2010. This
> agreement indicates that ASSAC General Partner, Inc. ("ASSAC") is the general
> partner of SABH with a capital contribution of $1 and a 1% interest percentage.
> Gerova is the limited partner, with a capital contribution of $99 and a 99%
> interest percentage.  The Amended LP Agreement was signed by Gary T. Hirst as
> president of ASSAC and Gerova.
> •    A certificate of amendment (the "Certificate of Amendment") dated April
> 22, 2010 of SABH changing its name from SABH to Gerova Asset Backed
> Holdings LP. ("GABH") This document was signed by Gary Hirst, President of
> ASSAC.
> •    A written consent by Michael A. Hlavasa, President of ASSAC dated
> January 10, 2011 (the "Written Consent"). This Written Consent indicates that
> ASSAC owns the various Real Property Interests and deems it is in its best
> interest to convey the Real Property Interests.  The Written Consent  purports to
> appoint Halter and other Net Five and Gerova management and employees, as
> Special Vice Presidents of ASSAC, to "effectuate and consummate (including,
> but not limited to, executing  and delivering all necessary instruments, documents
> and agreements) . . . " regarding the Real Property Interests.  The Written Consent
> further states that "all actions heretofore taken by the officers, directors, or other
> agents of ASSAC relating to the foregoing matters and resolutions be, and they
> hereby are, approved, adopted, ratified, and confirmed in all respects as if they
> had been done pursuant to specific authority granted to them by the President."
> (the "Suspicious Paper Trail")

101.    With regard to the Lien Defendants, many are sophisticated commercial and/or

hard money lenders as discussed below, with a history of business transactions and ongoing

relationship with Net Five and/or its insiders.  The Lien Defendants approved borrowing by Net

Five, using the converted Real Property Interests as collateral, despite notice of irregularities in

the title and business conduct of Net Five and/or the fraudulent scheme and insolvency itself.

Upon information and belief, Net Five's apparent purpose was to withdraw equity from real

estate through both the sale and refinancing to either prop up other properties that it sought to

leverage with the Stillwater Assets or to withdraw as much money as possible from the properties to pay its managers, including Rohan, in furtherance of Net Five's fraudulent scheme.

102.    In this regard, the Lien Defendants allowed Net Five to borrow against the equity on the various Real Property Interests, sometimes allowing Net Five to use another property as collateral when there was no real equity in that property.  Upon information and belief, without continuing to allow Net Five to withdraw this equity or to use the equity to prop up other properties (mainly those that were contributed from Planet Five), Net Five could not have continued with its fraudulent scheme.

103.    Upon information and belief, in many cases, after engaging in little or no due diligence (or suspect diligence), the Lien Defendants would permit the debt to be refinanced or the property to be encumbered.  Indeed, there were often discrepancies in the title reports or deeds, which were often not in the name of Net Five or a Net Five entity.  At the same time, upon information and belief, Net Five could not obtain financing from traditional banks.

104.    These documents were provided to legal counsel and others to purportedly support Net Five's claim of an ownership interest in the Real Property Interests as part of the sale and/or encumbrance of these properties by Net Five.  For example, as to one of the converted Stillwater Funds' properties which Net Five was looking to pledge, on October 29, 2012, Daniel White, Esq., outside legal counsel, reached out to Rohan and other Net Five employees via email regarding the Calhoun Property and inquired, "Is this property still owned by Stillwater."  Halter responds "yes—I will send you the documents that show I have authority to place it as collateral."  It appears that Net Five was trying to use the Calhoun Property as collateral for another loan.

105.     Additionally, Net Five was asked by its own external legal counsel how it held

title to the WPB 1515 Property, one of the converted properties, as part of another transfer.

According to documents, Net Five explained that it held an ownership interest by virtue of a

transfer of a partnership interest of GREG which held all of the real estate interests transferred

from the Stillwater Funds.

106.     Despite these discrepancies and Red Flags, the Purchaser Defendants and Lien

Defendants still went forward with the sale and/or refinance or the encumbrance on the Real

Property Interests.

107.     Indeed, Net Five could not have continued its scheme but for the continued stream

of funds infused by the Purchaser Defendants and being loaned by the Lien Defendants.

108.     As provided above, upon information and belief, the Purchaser Defendants and

Lien Defendants are sophisticated parties.

109.     Moreover, despite the Suspicious Paper Trail and the Red Flags regarding fraud

and insolvency, Net Five moved forward with the transfer or encumbrance of the Real Property

Interests even though such property remained legally titled to the Stillwater Funds and even on

notice of fraud and insolvency, as further described below. In turn, the third parties disregarded

the clear Red Flags that even a basic search of public records would have revealed when they

moved forward with the acquisition of or pledge of the converted collateral from the Stillwater

Funds, in furtherance of Net Five's fraudulent scheme.

110.     Thereafter, amazingly, in September 2012, in an attempt to further divert the Real

Property Interests, Planet Five attempted to merge with an entity called Liberty International

Holdings, LLC ("Liberty").  Upon information and belief, under the proposed merger, Net Five

would contribute all of the Real Property Interests to Liberty Holdings.  As was its pattern, it was

unclear what consideration or value would be exchanged for the contribution of these assets to Liberty, however, it was clear that the Stillwater Funds were to receive nothing in the transaction.  Upon information and belief, this merger was never completed and Liberty is currently under investigation by federal authorities.

### H.    Summary of Disposition of Select Real Property Interests by Net Five

#### 1.    Judge Street

111.    According to public records, on or about September 14, 2006, 15 Judge Street LLC, a Delaware limited liability company ("Judge Street LLC") was formed.  Judge Street LLC was initially wholly owned by Stillwater Real Estate Partners, L.P. ("SREP").  SREP is one of the Stillwater Funds transferred to Plaintiff through the GSA.

112.    On or about December 22, 2006, Judge Street LLC acquired the Judge Street Property.

113.    Upon information and belief, thereafter, Judge Street LLC took out loans (the "Judge Street Mortgage") on the Judge Street Property totaling $2,300,000.

114.    The Judge Street Property was included in the real estate assets transferred to Gerova through the Gerova Transfer on January 20, 2010, although the deed was not changed.

115.    Upon information and belief, on or about May 18, 2010, after Judge Street LLC had stopped paying on the Judge Street Mortgage, the lender agreed to forbear from a foreclosure on the Judge Street Property until July 31, 2010.

116.    Thereafter, the Judge Street Property was transferred to Net Five pursuant to the Operating Agreement on May 26, 2010, although the deed was not changed.

117.    Upon information and belief, at that time, SREP indicated the value of the Judge Street Property was $6.1 million.

118.    Facing a potential foreclosure for nonpayment on the mortgage, on information and belief, on December 30, 2010, Judge Street LLC and Judge Realty entered into a purchase and sale agreement for the purchase of the Judge Street Property.

119.    Upon information and belief, on December 30, 2010, Paul Rohan of Net Five instructed Toni Kara, a Net Five employee, to execute the Purchase and Sale Agreement on his behalf.  Ms. Kara, unsure what role Net Five had in the transaction,  responded to Mr. Rohan's request by asking "As seller only?" to which Mr. Rohan responded "Yes."

120.    On or about April 12, 2011, Judge Street LLC, whose sole member had been changed to GREG, sold the Judge Street Property for $3,854,600 to Judge Realty, approximately $1 million over the asserted debt.  This assumes the sale price was not itself a sham, which remains an open question given the earlier valuation of $6.1 million as stated above.

121.    The sale of the Judge Street Property to Judge Realty was effectuated on April 12, 2011, under the backdrop of the litany of suspicious conduct and transfer documents, and after, amongst other things, the commencement of the ERFF Action and the Goldberg Action, after publication of the Dalrymple Report, and after publication of numerous articles reporting that Gerova was tied to ponzi scammers, and after detailed claims had been filed  in federal and state courts calling into question the fraudulent transfers by Stillwater and Gerova, the insolvency of such entities, and other improper conduct.  The transfer of the Judge Street Property also took place after Gerova's share value plummeted.

122.    Any sale proceeds paid were paid to Net Five and were not for reasonably equivalent value given the value of the Judge Street Property.  Notwithstanding, the transfer to Judge Realty closed.

123.    Upon information and belief, after Judge Realty's mortgage was satisfied, upon the sale of the Judge Street Property, there would have been surplus sale proceeds.

124.    Neither SREP nor any Stillwater Funds received any of the sale proceeds or any consideration for the transfer of the Judge Street Property to Gerova, then subsequently to Net Five, and then to Judge Realty.

### 2.    St. Augustine Property

125.    Upon information and belief, AUG Funding LLC ("AUG"), a Delaware LLC, was formed in November of 2005 to lend funds to St. Augustine Hotel, LLC ("St. Augustine LLC") for the acquisition and conversion of the St. Augustine Property into luxury condominiums and to acquire the vacant lot located adjacent thereto. AUG was wholly owned by JPS Loan Holdings I, LLC, which was wholly owned by SABF, which is one of the Stillwater Funds transferred to the Plaintiff pursuant to the GSA.

126.    Upon information and belief, in November, 2005, St. Augustine LLC acquired the St. Augustine Property with the funds loaned by AUG, which loan was secured by a mortgage and a security agreement on the St. Augustine Property.

127.    Upon information and belief, ultimately, the St. Augustine Property was not converted and St. Augustine LLC defaulted on its loan to AUG and then filed bankruptcy. AUG obtained title to the St. Augustine Property in May, 2007 pursuant to a bankruptcy §363 sale.

128.    According to documents, on May 7, 2008, AUG executed and delivered a promissory note to Stonegate Bank, which later assigned its interest to EWE Loan No. 4, LLC ("EWE"), in the original principal amount of $2,000,000.

129.    On January 20, 2010, the St. Augustine Property was transferred to Gerova pursuant to the Gerova Transfer without consideration, though neither the deed nor the public records for AUG were altered to reflect the transfer.

130.     On May 26, 2010, the St. Augustine Property was transferred to Net Five pursuant to the Operating Agreement, although the deed was not changed.

131.     Upon information and belief, neither Gerova nor Net Five continued to pay on the EWE note, and EWE initiated a foreclosure proceeding on the St. Augustine Property on October 14, 2010.  On June 10, 2011, the court in the foreclosure proceeding entered a final judgment decreeing that AUG owed EWE $2,375,436.98 and setting a foreclosure sale for July 19, 2011.

132.     On July 18, 2011, AUG filed for bankruptcy relief in an attempt to restructure EWE's note.

133.     Thereafter, upon information and belief, on August 2, 2011, Net Five conducted a limited appraisal determining that the value of the St. Augustine Property was $6.4 million.

134.     On November 24, 2011, the bankruptcy court dismissed AUG's bankruptcy case upon the motion to dismiss filed by EWE.

135.     According to public tax records, before another foreclosure sale could commence on the St. Augustine Property, on December 20, 2011, AUG transferred its interest in the St. Augustine Property to Net Five SB, whose sole managing member is Net Five, for just over $2.3 million (likely just enough to pay off EWE's loan), even though the St. Augustine Property had been recently appraised at the direction of Net Five for $6.4 million.

136.     The special warranty deed evidencing the transfer of the St. Augustine Hotel to Net Five SB was signed by Rachel Lanham as Special Vice President of Gerova—again Net Five utilized a "special vice president" to effectuate the transfer.

137.     Net Five SB subsequently granted two mortgages on the St. Augustine Property. Upon information and belief, the first was granted to Paradigm, a commercial and/or hard money lender on December 20, 2011 to secure a loan of an approximately $2 million.  The second

mortgage was granted to Camden, another commercial lender and/or hard money lender, on

January 13, 2012 to secure a $721,000 loan. Upon information and belief, $700,000 of this loan

was used to fund an escrow (the "Winn Dixie Escrow") required by Jasmine Resources Capital

Group LTD as lender on certain property Net Five was attempting to acquire in Islamorada,

Florida to build a Winn Dixie (the "Winn Dixie Property").  Upon information and belief, the

Escrow was stolen by George Kalivretenos ("Kalivretenos"), an employee of the escrow agent.

Upon information and belief, the FBI has begun an investigation and has seized property of

Kalivretenos, and Net Five has filed a claim with the FBI for payment of the stolen Winn Dixie

Escrow.

138.    To the extent the interest in the St. Augustine Property is avoided, Plaintiff would

be entitled to any distributions received by Net Five from the FBI and any other claim or relief

Net Five is entitled to for the stolen Winn Dixie Escrow.

139.    According to the public records, Net Five SB subsequently sold the St. Augustine

Property to Camden on June 6, 2012. [14]   The purchase price is unclear from records produced,

however, the public records provide that the sale price was just over $400,000.

140.    The liens placed by both Camden and Paradigm and the sale to Camden were

effectuated  under the backdrop of the litany of suspicious conduct and transfer documents, and

after the commencement of the ERFF Action, Goldberg and Russo Actions, after publication of

the Dalrymple Report, publication of numerous articles reporting that Gerova was tied to ponzi

scammers, and after detailed claims had been filed  in federal and state courts calling into

---

[14]  It also appears that another Real Property Interest in Pali House Hotel, located at 8465 Holloway Drive West,
West Hollywood, California (the "Pali House Property") may have served as additional collateral for the new liens
on the St. Augustine Property.  Pali-Funding LLC, owned by JPS Holdings I, LLC, whose sole member was SABF,
held the mezzanine loan on the Pali House Property for $18.3 million, behind a $16 million first lien. It is unclear
what happened to this loan interest once the Pali House interest was transferred to Gerova and then to Net Five.

question the fraudulent transfers by Stillwater and Gerova, the insolvency of such entities, transactions with Net Five, and other improper conduct, and after Gerova's stock was delisted from the New York Stock Exchange.  Notwithstanding, Camden and Paradigm both encumbered the St. Augustine Property and paid the loan proceeds to Net Five, and in the case of Camden, acquired the fee interest in the subject property.

141.    In addition to the foregoing, upon information and belief, Paradigm, as a lender who made multiple loans to Net Five, was familiar with Net Five and on notice of the questionable and irregular conduct and documentation and Net Five's fraudulent scheme.

142.    The transfers and encumbrances to Paradigm and Camden also took place despite use of suspect documents when Net Five acquired the St. Augustine Property by documents signed by representatives of Gerova.  Upon information and belief, the transfer to Camden also took place for less than reasonably equivalent value given the so-called $6.4 million value of the St. Augustine Property.[15] Notwithstanding, the transfer to Camden closed.

143.    Neither SABF nor any Stillwater entity received any of the loan proceeds or any consideration for Camden and Paradigm encumbering the St. Augustine Property or upon the sale of such property.

144.    Neither SABF nor any Stillwater entity received any of the sale proceeds or any consideration for the transfer of this property to Gerova and then subsequently to Net Five.

### 3.    The Carowinds Property

145.    Upon information and belief, on or about January 19, 2007, SABF, through its wholly-owned subsidiary, Carowinds Hotel Owner LLC ("SW Carowinds") loaned $4.1 million

---

[15]  It is unclear if the loans on the St. Augustine Property were cross-collateralized by other Net Five properties.

to Carowinds Metro, LLC ("Carowinds"), using the Carowinds Property[16] as collateral.  SABF is one of the Stillwater Funds transferred to the Plaintiff pursuant to the GSA.

146.    Upon information and belief, as of November, 2008, the value of the Carowinds Property was $3.1 million according to an appraisal.

147.    Upon information and belief, Carowinds defaulted on its loan with SW Carowinds and SW Carowinds foreclosed its loan interests on the Carowinds Property on July 28, 2008, and then became record owner of the Carowinds Property.

148.    On January 20, 2010, the Carowinds Property was transferred to Gerova through the Gerova Transfer.

149.    On May 26, 2010, the Carowinds Property was transferred to Net Five according to the Operating Agreement.

150.    Also, on June 30, 2010, pursuant to a "Special Warranty Deed", SW Carowinds transferred the Carowinds Property to Net Five. The consideration for the transfer is unclear.

151.    On January 11, 2011, Net Five sold the Carowinds Property for $1.2 million to Shreeji Hospitality despite an appraisal value of $3.1 million.

152.    The sale of the Carowinds Property to Shreeji Hospitality took place under the backdrop of the litany of suspicious conduct and transfer documents, and after publication of the Dalrymple Report, publication of numerous articles reporting that Gerova was tied to ponzi scammers and other improper conduct, and after Gerova's stock plummeted.

---

[16]  The Carowinds Property is approximately 3.42 acres or 148,975 square feet, and the total building area is 114,916 square feet.  The hotel has a total of 198 guest rooms, including 62 king rooms, 118 queen rooms, eight double rooms and ten apartment units.  The apartment units include eight one-bedroom king suites, one two-bedroom suite and one queen studio unit.

153.    In addition, upon information and belief, any sale proceeds paid were paid to Net

Five and were not for reasonably equivalent value given the value of the Carowinds Property.

Notwithstanding, the transfer to Shreeji Hospitality closed.

154.    Upon information and belief, upon the sale of the Carowinds Property, there

would have been surplus sale proceeds.

155.    Neither SABF nor any Stillwater entity received any of the sale proceeds or any

consideration for the transfer of the Carowinds Property to Gerova, then subsequently to Net

Five, and then to Shreeji Hospitality.

### 4.    The Calhoun Property

156.    Upon information and belief, on December 22, 2006, SABF made a loan of

$4,750,000 to Cohutta Water, Inc., a company owned by Steve Carroll.  The $4,750,000 loan

was personally guaranteed by Steve Carroll and secured by a first mortgage on 6 separate parcels

of real estate. This mortgage security included the following 6 parcels in Gilmer County GA,

which were the location of Cohutta's bottling facility and spring: Tract 1 (171.01 acres), Tract 2

(1.11 acres), Tract 3 parcel 1 (7 acres), Tract 3 parcel 2 (18.12 acres), and Tract 5 (54.67 acres).

Tract 6 in Gordon County, Georgia (the "Gordon Parcel") was an office/warehouse facility

(together, the "Calhoun Property").[17]

157.    According to the Stillwater Funds documents, the combined value of the six

Gilmer County Georgia parcels was $4,696,740 and the Gordon Parcel was appraised at

$900,000 in March, 2009.   The actual value remains an open question.

---

[17]  SABF is the second lienholder on Tract 4; however, SABF believed that it was the first lienholder when it
acquired its interest. This issue is currently being litigated in the Superior Court of Fulton County, Georgia, Civil
Action No. 2010-cv-184502.

158.    On April 7, 2009 SABF foreclosed on the Calhoun Property, after Cohutta Water, Inc. defaulted on the $4,750,000 loan.

159.    In January 2010, the Calhoun Property was transferred to Gerova pursuant to the Gerova Transfer, although the title on the deed was not changed.

160.    In May, 2010, the Calhoun Property was transferred to Net Five pursuant to the Operating Agreement, though, in many of the cases, the public records did not evidence a change in ownership.

161.    After the Calhoun Property was transferred to Net Five, Net Five began encumbering and transferring the parcels.

162.    Upon information and belief, on October 26, 2012, Halter of Net Five Holdings, on behalf of GABH, as successor to SABF, granted a mortgage on the entire Calhoun Property to ASGAARD, a commercial and/or hard money lender and security for loan notes in the amount of (a) $515,464, and (b) $1,546,393. Both notes were signed by Halter as special vice president for GABH.

163.    On December 12, 2012, Net Five sold Tract 1 to the Daniels for $450,000. Public records indicate that SABF made this transfer, but the property had purportedly been transferred to Net Five at the time it was sold as noted above.

164.    SABF is still the record owner of Tract 2, and, to the extent Tract 2 was transferred to Gerova and subsequently to Net Five, SABF seeks avoidance of this transfer.

165.    On December 13, 2012, Net Five sold Tract 3 to the Daniels for $450,000, despite, upon information and belief, Tracts 1 and 3 purportedly having been sold at a tax sale on November 6, 2012 to UMP LLC and Apple Valley Investments, LLC. [18]   Thereafter, the Daniels

---

[18]  Upon information and belief, Tract 1 and Tract 3 were sold at a tax sale to U.M.P., LLC and Apple Valley Investments, LLC on November 6, 2012.  John R. and Yvette Daniel III have filed a declaratory relief action against

conveyed Parcel 3 to such that only John Daniel was titled as owner on April 18, 2013. The

assessor's land value is listed in public records as $125,931.  According to the settlement

statement, Net Five received $301,779.83. Public records indicate that SABF made this transfer,

but the property had purportedly been transferred to Net Five at the time it was sold as noted

above.[19]

166.    On August 10, 2012, Net Five sold Tract 5 for $138,244 to the McDonalds, who

are the current owners. Public records indicate that SABF made this transfer, but the property

purportedly had been transferred to Net Five at the time it was sold as noted above.

167.    On December 27, 2013, Tract 6 was transferred from SABF's name into the name

of Net Five, which then transferred Tract 6 to Calhoun Commercial. It is unclear what, if any,

consideration was received for this transfer, but discovery revealed that Tract 6 was appraised for

$900,000 in 2009.

168.    The encumbrance of the Calhoun Property by ASGAARD took place under the

backdrop of the litany of suspicious conduct and transfer documents, and after the ERFF Action,

the Goldberg Class Actions, and Russo Class Actions, after publication of the Dalrymple Report,

after publication of numerous articles reporting that Gerova was tied to ponzi scammers which

detailed the claims on file in federal and state courts calling into question the fraudulent transfers

by Stillwater and Gerova, insolvency of such entities, and other improper conduct, and after

---

SABH, as successor to SABF, alleging that they had no notice of the  tax sale and were told by the tax commissioner
that there were no past due taxes on Tract 1 and 3 when they purchased Tract 3  They allege that the tax deeds were
not recorded until after they purchased Tracts 1 and 3.  They further assert that they have tried to tender the past due
taxes to U.M.P., LLC and Apple Valley Investments, LLC who have refused to accept them in exchange for the
property. The complaint further alleges that the [ASGAARD] mortgages taken out by Net Five (as described above)
were not recorded until several months after the Daniels' purchased Tract 1 and Tract 3, so they are a cloud on the
title that should be removed. This lawsuit is still pending.

[19] SABF was the second lienholder on Tract 4, which was foreclosed by the first lienholder in April 2008.

Gerova's stock was delisted from the New York Stock Exchange. Notwithstanding, the lien by

ASGAARD closed.

169.    The sale of Tracks 1 and 3 to the Daniels and the subsequent transfer of Track 3

to John Daniel individually, took place under the backdrop of the litany of suspicious conduct

and transfer documents, and after the commencement of the ERFF Action, the Goldberg Action,

and Russo Action, after publication of the Dalrymple Report, after publication of numerous

articles reporting that Gerova was tied to ponzi scammers which detailed the claims on file in

federal and state courts calling into question the fraudulent transfers by Stillwater and Gerova,

insolvency of such entities, and other improper conduct, and after Gerova's stock was delisted

from the New York Stock Exchange.    These transfers were also made after the Injunction

against Net Five was entered in the class action.  Notwithstanding, the transfer to John R. and

Yvette Daniel III and the subsequent transfer to John Daniel closed.

170.    Additionally, the sale of Track 5 to the  McDonalds took place after under the

backdrop of the litany of suspicious conduct and transfer documents, and after the

commencement of the ERFF Action, the Goldberg Action, and Russo Action, after publication of

the Dalrymple Report, publication of numerous articles reporting that Gerova was tied to ponzi

scammers which detailed the claims on file in federal and state courts calling into question the

fraudulent transfers by Stillwater and Gerova, insolvency of such entities, and other improper

conduct, and after Gerova's stock was delisted from the New York Stock Exchange.   This

transfer was also made after the Injunction against Net Five was entered in the class actions.

Notwithstanding, the transfer to Stephen J. and Vicki McDonald closed.

171.    Finally, the sale of Track 6 to Calhoun Commercial took place under the backdrop

of the litany of suspicious conduct and transfer documents, and after the commencement of the

ERFF Action, the Goldberg Action, and Russo Action, after publication of the Dalrymple

Report, publication of numerous articles reporting that Gerova was tied to ponzi scammers which

detailed the claims on file in federal and state courts calling into question the fraudulent transfers

by Stillwater and Gerova, insolvency of such entities, and other improper conduct, and after

Gerova's stock was delisted from the New York Stock Exchange.  This transfer was also made

after the Injunction against Net Five was entered in the class actions.   Notwithstanding, the

transfer to Calhoun Commercial Construction closed.

172.    Neither SABF nor any Stillwater entity received any consideration for the transfer

of Track 1, Track 3, Track 5, and Track 6 first to Gerova, then to Net Five and then to the parties

as discussed above.  Upon information and belief, Track 2 is still titled to SABF, but under the

control of Net Five.

### 5.    Kings Hotel

173.    On March 22, 2006, SABF made a secured real estate loan in the amount of

$3,500,000 to Kings Hotel, Inc. ("Kings Hotel")  The property securing the loan was a former

factory in the process of being rehabilitated and converted into a 119-room hotel in Brooklyn,

New York (the "Kings Hotel Property").

174.    In 2009, SABF commenced a foreclosure action in Supreme Court, Kings County,

entitled *The Stillwater Asset Backed Fund, LP v. Kings Hotel, Inc., et al. (Index No. 17220/09)* to

foreclose the lien on the Kings Hotel Property.[20]

175.    On January 20, 2010, the mortgage interest in the Kings Hotel Property (the

"Kings Hotel Mortgage") was transferred to Gerova pursuant to the Gerova Transfer.

---

[20]  Redrock Kings (defined subsequently) was substituted as plaintiff in this action and lost its motion for summary judgment but won on appeal.  It appears that Redrock Kings was able to resolve the action with Kings Hotel, as further described below.

176.    On May 26, 2010, the Kings Hotel Mortgage was transferred to Net Five pursuant to the Operating Agreement. There was also no publically filed assignment but instead, Net Five used the so-called certificate of merger and certificate of name change to effectuate the transfer. At this time, upon information and belief, Net Five began transferring the mortgage back and forth among third parties in furtherance of its scheme to shield assets from the reach of creditors. Specifically, according to real property records and other documents:

- The Kings Hotel Mortgage was encumbered by Sawtooth Capital, LLC ("Sawtooth") on June 29, 2010 for $500,000;

- The Kings Hotel Mortgage was assigned to Sawtooth on July 28, 2010;

- The Kings Hotel Mortgage was assigned back to Net Five by Sawtooth just one day later on July 29, 2010;

- The Kings Hotel Mortgage was assigned by Net Five to Net Five Holdings at Kings Hotel LLC ("Net Five Kings") on August 4, 2010.  Net Five is the sole managing member of Net Five Kings;

- The Kings Hotel Mortgage was encumbered by Paradigm on August 5, 2010 for $3,300,000.  Upon information and belief, $507,333.41 of which was used to pay Sawtooth, the balance of the funds went to Net Five;

- The Kings Hotel Mortgage was assigned to Paradigm by Net Five Kings on August 5, 2010;

- The Kings Hotel Mortgage rents were assigned by Gerova to Net Five Kings on August 5, 2010, with Michael Grant as vice president of ASSAC signing. Contemporaneously, the rents were assigned by Net Five Kings to Paradigm on August 5, 2010;

- The Kings Hotel Mortgage was assigned from Paradigm to Net Five Kings on August 31, 2011;

- The Kings Hotel Mortgage was assigned from Net Five Kings to Redrock Kings on August 31, 2011;

- The Kings Hotel Mortgage assignment of  leases from Net Five Kings to Redrock Kings on August 31, 2011;

- The Kings Hotel Mortgage assignment of leases from Kings Hotel Mortgage to Alma Bank on February 18, 2014.

- Satisfaction of Kings Hotel Mortgage between Kings Hotel and Redrock Kings on February 19, 2014.

177.    Upon information and belief, the transfers back-and-forth between entities was effectuated by Net Five in an attempt to cleanse title and/or shield Net Five and its co-conspirators from claims by creditors relating to the converted property transferred from the Stillwater Funds.  In addition, the assignment of the Kings Hotel Mortgage took place under the backdrop of the litany of suspicious conduct and transfer documents and/or after the ERFF Action, the Goldberg Action, the Arar Action, and the Russo Action, after publication of the Dalrymple Report, and after publication of numerous articles reporting that Gerova was tied to Ponzi scammers which detailed the claims on file in federal and state courts calling into question the fraudulent transfers by Stillwater and Gerova, insolvency of such entities, and other improper conduct. The assignment of the Kings Hotel Mortgage also took place after Gerova's shared fell precipitously and after their stock was delisted.  The assignment of the Kings Hotel Mortgage also took place after the Injunction was in place.  Finally, the assignment took place even though Net Five utilized suspect documents to demonstrate its ownership interest in the Kings Hotel Mortgage.

178.    Upon information and belief, the assignment of the Kings Hotel Mortgage was also not for fair value.

179.    SABF, nor any Stillwater entity received any of the lien proceeds or any consideration for the assignment and pledge of the Kings Hotel Mortgage.

**6.    Memphis Blues**

180.    Memphis Blues was formed on March 11, 2011 by members Rohan, Halter (acting through an LLC), and Laubach (acting through an LLC), as well as Steve Rich, Stan Joseph, and Marc Gerber (acting through MAG Future Fund, LLC), each of whom was, upon

information and belief, a former investor in Net Five and/or Planet Five.  Upon information and

belief, Mr. Rich was the manager of Memphis Blues.

181.    Each member other than Stan Joseph allegedly invested $100,000 to Memphis

Blues - Mr. Joseph invested $200,000 - for a total of $700,000.  However, upon information and

belief, the Insider Defendants did not invest or contribute any funds to Memphis Blues, and, in

fact, were assigned shares with value based on past due compensation owed to them from Net

Five and/or Planet Five.

182.    Upon information and belief, Memphis Blues was formed to (i) to raise capital to

pay for Gerova's officers and directors policy and (ii) to pay past due compensation to the

Insider Defendants, although they were not entitled to compensation under the Operating

Agreement.

183.    Stillwater Kesef, LLC ("SW Kesef"), wholly owned by SWAB II, another of the

Stillwater Funds transferred to the Plaintiff pursuant to the GSA, owned loan interests secured by

the Kesef Pa property("Kesef Pa Properties"), which, upon information and belief, the SW

General Partner valued at between $2.7 and $3.4 million as of December 2010.  As of December

2010, SW Kesef was owed approximately $3 million on its loan interest in the Kesef Pa

Properties.

184.    Upon information and belief, between 2009 and the end of 2010, SW Kesef

acquired the deeds to the Kesef Pa Properties and thus held a real property interest in same.

185.    On January 20, 2010, the interests in Kesef Pa were transferred to Gerova,

although the deed was not changed.

186.    On May 26, 2010, the interest in Kesef Pa  were transferred to Net Five pursuant

to the Operating Agreement, although the deed was not changed.

187.    Upon information and belief, while the Kesef Pa Properties remained legally titled to SW Kesef, in March or April of 2011, seventeen (17) of the Kesef Pa Properties were sold in bulk to Memphis Blues (the "Memphis Blues Properties") for approximately $600,000, despite a substantially higher listed property valuation according to Stillwater documents.[21]  Further, upon information and belief, a portion of that amount was a "credit" for the back-pay owed by Net Five and/or Planet Five to the Insider Defendants.

188.    Likely in contemplation of the Memphis Blues transaction, on April 11, 2011, Net Five amended its Operating Agreement (the "Amended Operating Agreement") removing the conflicts provision which read "each member (i) covenants and agrees to notify the Management Board and the other Members of any business opportunity available to such Member that could reasonably be expected to be in competition with the Business of the Company and (ii) grants a right of first refusal to [Net Five] with respect to such opportunity. . . ." Operating Agreement, 3.4(c)  The signors of the Amended Operating Agreement, not surprisingly, were Rohan and Gerova, among others, who stood to gain from the Memphis Blues transaction, but only if the non-compete provision in the Operating Agreement was stricken.

189.    Subsequently, upon information and belief, Memphis Blues, through SW Kesef, sold off the Memphis Blues Properties between 2011 and 2012 to third parties and distributed the proceeds to Memphis Blues' members, and with respect to the Insider Defendants, such distributions were made to purportedly satisfy past due compensation owed to them from Net Five and/or Planet Five. In addition, upon information and belief, Memphis Blues had returned to each member $73,500 of each $100,000 invested.  At that time, eight (8) out of the seventeen (17) Memphis Blues Properties had been sold, with nine (9) remaining to be sold.

---

[21]  Based on the deposition testimony of Greg Laubach, Memphis Blues paid approximately $600,000 to Net Five for the Memphis Blues Properties.

190.    Documents relating to the above sales of the Memphis Blues Properties were often executed by Halter on behalf of SW Kesef as "special vice president" of SW Kesef.

191.    The members of Memphis Blues were insiders of and investors in Net Five so they were aware of the fraudulent conduct and transfers from Gerova to Net Five and were aware that the value of the Memphis Blues Properties far exceeded any consideration paid for the sale of same to Memphis Blues.

192.    Additionally, the transfer of the Memphis Blues Properties took place under the backdrop of the litany of suspicious conduct and transfer documents, and was effectuated after the commencement of the ERFF Action, after the Goldberg Action, after the Arar Action, and after the Russo Action, after publication of the Dalrymple Report, and after publication of numerous articles reporting that Gerova was tied to ponzi scammers and detailing the claims on file in federal and state courts calling into question the fraudulent transfers by Stillwater and Gerova, insolvency of such entities, and other improper conduct.  The sale of the Memphis Blues Properties also took place after Gerova's share value plummeted.  Notwithstanding the afore-mentioned facts, the transfer of the Memphis Blues Properties to Memphis Blues was effectuated.

193.    Neither SABF II nor any Stillwater entity received any of the sale proceeds or any consideration for the transfer of the Kesef Pa Properties (or loan interest secured by same) to Gerova, then subsequently to Net Five, and then the Memphis Blues Properties to Memphis Blues.

### 7.    The Hillandale Property

194.    Upon information and belief, on April 9, 2007, Top Flight Investment LLC ("Top Flight") purchased the Hillandale Property for $12.6 million.

195.    Upon information and belief, SABF, as lender, one of the Stillwater Funds transferred to Plaintiff pursuant to the GSA, lent $18 million on April 9, 2007 to Top Flight, which was secured by the Hillandale Property. The loan on the Hillandale Property was guaranteed by Matthew White and Jamal Lewis.

196.    According to a broker's price opinion, the Hillandale Property was worth $39,706,587; however, the Hillandale Property was valued at between $8.3 and $13.3 million as of April 28, 2008 according to an appraisal of the property. A subsequent appraisal competed by Net Five indicated that the value of the Hillandale Property was $9,160,000 as of January 19, 2010.

197.    Top Flight defaulted on the loan and SABF obtained a money judgment against Top Flight, Jamal Lewis, and Matthew White for $26 million on December 11, 2008. [22]

198.    On June 11, 2009, Stillwater began foreclosure proceedings, and the Hillandale Property was to be auctioned on July 7, 2009; however, upon information and belief, Top Flight requested forbearance for a period of time.

199.    SABF's loan interest in the Hillandale Property was transferred to Gerova in January 2010, pursuant to the Gerova Transfer.

200.    SABF's loan interest in the Hillandale Property was then transferred to Net Five in May, 2010 pursuant to the Operating Agreement and pursuant to an assignment of mortgage that purports to transfer the notes and loan documents evidencing the indebtedness on the Hillandale Property, from GABH (which, upon information and belief, was owned directly or indirectly by Gerova) to Net Five at Hallandale (sic), LLC (which, upon information and belief, was owned directly or indirectly by Net Five), which inexplicably was signed on March 1, 2010,

---

[22] Jamal Lewis subsequently filed Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the Northern District of Georgia, case number 12-58938.

before the interest in the Hillandale Property was even transferred to Net Five pursuant to the Operating Agreement.

201.    Upon information and  belief, thereafter, Net Five was trying to restructure the debt with Top Flight and entered into a so-called joint venture agreement to develop the property.

202.    On May 3, 2011, it appears from public records that a tax deed was issued from Top Flight to FTTD for $26,000 on Parcel 1 and $200,000 for Parcel 2, the amount of the unpaid taxes on the Hillandale Property.

203.    Upon information and belief, thereafter, on June 22, 2011, the Hillandale Property was then transferred via a Quit Claim Deed  from FTTD3 to EHM.  No purchase price is listed on the deed.

204.    Upon information and belief, on November 8, 2011 EHM transferred the Hillandale Property back to Top Flight for $31,200 (Parcel 1) and $240,000 (Parcel 2) via quit claim deed pursuant to Top Flight's right of redemption.

205.    Then, on April 3, 2013, in a multiple parcel sale, Top Flight transferred the Hillandale Property to SFN for $226,300 (Parcel 1) and $226,300 (Parcel 2).

206.    On August 22, 2013, SFN took out a $500,000 loan on the Hillandale Property from AQC LLC as the lender.

207.    Upon information and belief, SFN is presently marketing the Hillandale Property for $4 million.

208.    Upon information and belief, the value paid by FTTD,  EHM, and SFN was below the $8.3 and $13.3 appraisal value for the Hillandale Property.

209.    The sale of the Hillandale Property to FTTD, EHM, and/or SFN took place under

the backdrop of the litany of suspicious conduct and transfer documents, and was effectuated

after the commencement of the ERFF Action, the Goldberg Action, the Arar Action, and the

Russo Action, after publication of the Dalrymple Report, after publication of numerous articles

reporting that Gerova was tied to Ponzi scammers and detailing the claims on file in federal and

state courts calling into question the fraudulent transfers by Stillwater and Gerova, insolvency of

such entities, and other improper conduct. The sale of the Hillandale Property also occurred after

Gerova's shares fell precipitously. Notwithstanding, the sales closed.

210.    Neither SABF nor any Stillwater entity received any consideration for the transfer

of the Hillandale Property to Gerova and then subsequently to Net Five.

211.    Neither SABF nor any Stillwater entity received any consideration for the sale of

the Hillandale Property to either FTTD, EHM, or SFN.

### 8.    The Boggy Creek Property

212.    On January 13, 2009, Richard Rudy signed formation documents for 1888 Boggy

Creek Road LLC ("BC Road"), a Florida LLC with SABF as its sole member.  SABF is one of

the Stillwater Funds transferred to the Plaintiff pursuant to the GSA.

213.    Upon information and belief, the only known asset of BC Road was the Boggy

Creek Property, which was owned by BC Road.  Further, the Boggy Creek Property is comprised

of 11 multi-family units with 3-5 bedrooms each.  Upon information and belief, as of August 1,

2009, it was appraised at $615,000.

214.    On January 20, 2010, the Boggy Creek Property was transferred to Gerova

through the Gerova Transfer, though the deed was not changed to reflect this transfer.

215.    The interest in the Boggy Creek Property was then transferred from Gerova to Net Five in May, 2010 according to the Net Five Operating Agreement, although the deed was not changed.

216.    Upon information and belief, on June 24, 2010, BC Road, whose new managing member was changed to Gerova Asset Backed Holdings LP,  transferred the Boggy Creek Property to Boggy Creek Villas, LLC ("BC Villas") for $500,000, although it is unclear what, if any, consideration was actually received for this transfer, and the SABF never received any consideration.

217.    The deed was signed by Gary Hirst as the president of ASSAC, which was the general partner of GABH, on behalf of BC Road.

218.    Purchaser BC Villas was a Florida LLC formed 3 days before the sale of the Boggy Creek Property to it.  According to documents, the managing member of BC Villas was WLMG Holdings Inc., which is a DE corporation formed in 2007 and its authorized representative is Greg Laubach, an officer of Net Five.

219.    Although a Gerova entity, BC Road, was named as the owner of the Boggy Creek Property on the June 2010 deed, Florida corporate records do not show an ownership change from  Stillwater to Gerova ownership. Rather, on April 26, 2011, after the sale of the Boggy Creek Property, BC Road filed a reinstatement with the Florida Secretary of State, changing the company address from 41 Madison Ave, New York, New York (Stillwater's address) to 4540 Southside Blvd, Suite 603, Jacksonville Florida 32216.  Also, the Registered Agent was changed to Eric Halter (Net Five COO), and the CEO was changed from Richard Rudy to Gregory L. Laubach (Net Five CEO).[23]

---

[23]  Upon information and belief, at the same time BC Road transferred the Boggy Creek Property to BC Villas, Net Five planned to use the Boggy Creek Property as collateral for a $4.3 million loan it intended to take out with Duval

220.    On September 29, 2010, BC Villas and WAMOJ signed a sales contract, providing that WAMOJ agreed to purchase the Boggy Creek Property for $450,000 - - despite, upon information and belief, the book value being evidenced at $713,511 and an appraisal value of $615,000. The closing statement shows that the total adjusted purchase price was only $375,000.

221.    At the same time, BC Villas took out a $300,000 mortgage on the BC Property in favor of Saunders, which was recorded on September 30, 2010, 1 day after the sales contract was signed as described below.

222.    Upon information and belief, the financing by Saunders was made under the backdrop of the litany of suspicious conduct and transfer documents.  Notwithstanding, upon information and belief, Saunders paid the $300,000 loan proceeds to Net Five.

223.    Additionally, upon information and belief, the sale to WAMOJ was for less than reasonably equivalent value given the appraisal value of $615,000 and was made under the backdrop of the litany of suspicious conduct and transfer documents. Notwithstanding, the sale to WAMOJ closed.

224.    Upon information and belief, after Saunders' mortgage was satisfied, upon the sale of the Boggy Creek Property, there may have been surplus sale proceeds.

225.    Neither SABF nor any Stillwater entity received any of the loan proceeds or any consideration for the Boggy Creek Property.

---

Partners, LLC, as borrower, to restructure existing debt held by Palm Pointe LLC, whose sole member is Net Five. Net Five, however, appears to have decided at the last minute not to use the Boggy Creek Property as collateral; Net Five closed the loan in April, 2011, using the Wexwater Property as collateral instead, as further discussed below.

226.    Neither SABF nor any Stillwater entity received any of the sale proceeds or any consideration for the transfer of this property to Gerova, and then subsequently to Net Five, and then subsequently to WAMOJ.

### 9.    East Lyme Property

227.    Upon information and belief, in February 2005, Wextrust Capital, LLC ("Wextrust")[24] formed a joint venture with SABF and SABF II, entities owned by Stillwater Funds,  called Wexwater, LLC ("Wexwater"), under which SABF and SABF II, L.P. held a majority membership interest.  The SW General Partner was the sole manager of Wexwater.

228.    Upon information and belief, in 2005, Wexwater loaned to Walnut Hill Properties, LLC ("Walnut Hill") $1.8 million, using the East Lyme Property as collateral.  The East Lyme Property consisted of five contiguous tax parcels; three in the Town of East Lyme and two in the Town of Montville, containing a total land area of 332.98 acres.[25]

229.    Ultimately, Walnut Hill defaulted on the loan and Wexwater initiated a foreclosure action on May 20, 2008.  A judgment for foreclosure was entered on December 21, 2009.  A certificate of foreclosure was entered on August 18, 2010 making Wexwater the owner of the East Lyme Property.

230.    On January 20, 2010, SABF and SABF II's interest in Wexwater was transferred to Gerova pursuant to the Gerova Transfer.

---

[24] On August 11, 2008, the Securities and Exchange Commission ("SEC") initiated an action against the principals of Wextrust, as well as Wextrust and its affiliates in SEC v. Byers, 08-cv-7104 in the United States District Court for the Southern District of New York, alleging that the individual defendants participated in securities fraud.  That same day, a receiver was appointed, and Wextrust was accordingly placed into receivership.

[25] Upon information and belief, the property received all needed approvals for an 18 hole golf course with a clubhouse, 70 units of active adult community housing (restricted to residents aged 55 and older), and 40 units of duplex and triplex style residential accessory use golf course housing.

231.    On May 26, 2010, SABF and SABF II's interest in Wexwater was transferred to Net Five pursuant to the Operating Agreement.

232.    In October, 2010, Net Five formed Net Five East Lyme, LLC (whose sole member was Net Five Holdings).

233.    Thereafter, according to documents, on November 2, 2010, Wexwater, as grantor, deeded the East Lyme Property via warranty deed to Net Five Palm, as grantee, for $2 million—which was evidenced by a promissory note from Net Five Palm.

234.    The Member's and Manager's Certificate in connection with the deal indicates that the Members of Wexwater at the time of the transaction were GABH (successor by merger to SABF) and WexTrust Capital, LLC.  It is therefore unclear what role, if any, Net Five East Lyme, LLC played in this transaction.

235.    Upon information and belief, using the interest in the East Lyme Property as collateral, in October 2010, Net Five Palm borrowed $5 million from Duval, a commercial and/or hard money lender, which was also cross collateralized on the Port Property (defined below) and Life Policy (defined below).   In this regard, at that time, according to an appraisal, the East Lyme Property was valued at roughly $4.3 million.  Irrespective, the appraisals is more than double, the $2 million purchase price by Palm Pointe.  This valuation was used to support an ALTA Loan Policy of $4.3 million relating to the insurance.

236.    The transfer of the East Lyme Property to Net Five Palm was for less than reasonable equivalent value.  Similarly, Net Five Palm further leveraged the East Lyme Property, through the loans from Duval, with actual intent to hinder, delay, and defraud creditors of the Stillwater Funds, by pulling out any and all value from the property for the benefit of Net Five and its insiders.

237.    On May 10, 2012, the Duval loan matured and Net Five Palm defaulted by failing to pay the full amount of the loan.  On July 26, 2012, Duval filed a foreclosure action in the Circuit Court of the 4th Judicial Circuit in and for Duval County, Florida, *Duval Partners, LLC v. Net Five at Palm Pointe, LLC.*  The East Lyme Property was ultimately foreclosed upon and Duval took title to the property on September 16, 2013.

238.    Duval made multiple loans to Net Five including the loan on the interest in the East Lyme Property.

239.    Neither SABF and SABF II  nor any Stillwater entity received any consideration for the  transfer and encumbrance of the interest in the East Lyme Property to Gerova and then subsequently to Net Five.

240.    Neither SABF and SABF II nor any Stillwater entity received any of the lien proceeds or any consideration for the liens placed on the East Lyme Property by Duval.

### 10.    The Life Policy

241.    On June 15, 2005, SABF and E-Vestments, LLC ("E-Vestments") entered into a Line of Credit and Security Agreement (the "Line"), pursuant to which SABF, one of the Stillwater Funds owned by the Plaintiff,  made advances to E-Vestments for the purpose of enabling E-Vestments to finance the Life Assets.   E-Vestments granted SABF a security interest in all of its assets, including the loans to be made by E-Vestments and the Life Policies financed thereby.

242.    In September 2005, E-Vestments entered into a premium finance agreement with The Morris Schnitzer Irrevocable Insurance Trust (the "Schnitzer Trust") pursuant to which E-vestment loaned funds to finance the first two years' premiums for the Life Policy.  SABF advanced funds under the line to E-Vestments to enable E-Vestments to make the loan.  The loan was secured by the Life Policy, which included death benefits totaling $15,000,000.

243.    The Schnitzer Trust defaulted, and the Schnitzer Trust elected to satisfy amounts owing thereunder by conveying the Life Policy to E-Vestments.  E-Vestments formed Eternity Trust I to obtain ownership of the Life Policy, and the Schnitzer Trust transferred the Life Policy to Eternity Trust I. The ownership of Eternity Trust I was then transferred to SABF.

244.    On January 20, 2010, the interest in the Life Policy was transferred to Gerova as part of the Gerova Transfer.

245.    The interest in the Life Policy was not transferred to Net Five by Gerova.

246.    However, on November 10, 2010, Gerova directed that the trustee of Eternity Trust I assign the interest in the Life Policy to Duval as additional collateral for a $5 million loan on 39.98 acres on the property located in Jacksonville, Florida (the "Port Property"), initially owed by Planet Five and contributed to Net Five as part of the joint venture with Gerova.[26]

247.    Duval, as a sophisticated lender, who made multiple loans to Net Five, was familiar with Net Five and on notice or should have been on notice of the questionable and irregular conduct and documentation and Net Five's fraudulent scheme.  Indeed, the lien placed by Duval against collateral that was not owned by Net Five, as purported borrower, was made under the backdrop of the litany of suspicious conduct and transfer documents.  The transactions also followed Net Five's apparent scheme to pull out all equity from the Stillwater Assets for personal gain.

248.    Neither SABF nor any Stillwater entity received any of the lien proceeds or consideration for the encumbrance of the Life Policy after the transfer to Gerova and the encumbering of the Life Policy by Net Five.

---

[26] Net Five also used the East Lyme Property as collateral for this $5 million loan. As of August 15, 2011, the loan to Duval on the Port Property was in default. Upon information and belief, on June 26, 2013, Duval obtained a foreclosure judgment on the Port Property.  Thereafter, on August 8, 2013, there was a foreclosure sale on the Port Property.  Upon information and belief, the Port Property was foreclosed.

### 11.    Additional Escrow Account

249.    Upon information and belief, the Brandermill Property was a property owned by Wexwater, which, as described previously, is a joint venture partner between Wextrust and SABF and SABF II, two of the Stillwater Funds transferred to the Plaintiff pursuant to the GSA.

250.    As noted above, a Receiver was appointed over Wextrust.  Upon information and belief, the Receiver subsequently sold the Brandermill Property, for $1.45 million.

251.    In support of the sale proceedings, Rohan falsely submitted an affidavit alleging that Net Five was now the member in Wexwater rather than SABF and SABF II, because this interest had been transferred to Gerova and then subsequently to Net Five. In fact, in the Memorandum of Law in Support of Motion to Confirm the Sale, the Receiver states "The remaining funds will be distributed between the receivership estate and Net Five." Receivership DN ,960,  p. 16, filed December 16, 2013.

252.    Upon information and belief, after the sale of the Brandermill Property by the Receiver, there were net proceeds of the sale that are being held by the Receiver (the "Brandermill Escrow").  These proceeds should be distributed to SABF and SABF II as the members of the Wexwater joint venture.

### I.    The Hard Money Lenders' Actions Furthered Net Five's Scheme

253.    Upon information and belief, the Hard Money Lenders lent to Net Five when traditional banks and lenders were unwilling to lend on the Real Property Interests.  Upon information and belief, the Hard Money Lenders also performed little due diligence in connection with the loans at issue.

254.    The Hard Money Lenders lent using multiple parcels as collateral and, in some cases, also provided multiple loans to Net Five.  These loans were then used to pay off other loans and expenses, including, for the personal benefit of the Insider Defendants.  Moreover, as

discussed above, if not for these loans by the Hard Money Lenders, Net Five and its insiders, including the Insider Defendants, could not have continued its scheme and fraudulent conduct.

255.    For example, Saunders provided a loan to Net Five on or about June 11, 2010 totaling $501,000 ("Saunders Loan One") and a loan on September 17, 2010 totaling $300,000 ("Saunders Loan Two"). Upon information and belief, the net proceeds of these loans were used as follows: (a) $180,960 of Saunders Loan One and $46,180 of Saunders Loan Two for Net Five operating expenses (likely used in large part to pay the salaries and or distributions of the Insider Defendants); (b) $78,500 of Saunders Loan One was transferred to Gerova; (c) $100,000 of Saunders Loan One was invested in the Savannah Oaks Property, (d) $80,000 of Saunders Loan One was invested in the Port Property, which owned the Port Property, (e) $20,320 of Saunders Loan Two for legal and other property costs, (f) $35,000 in Saunders Loan Two for an investment in Net Five at Palm Pointe, and (g)$150,000 of Saunders Loan Two for an investment in WPB Trinity.

256.    In addition, Paradigm provided a loan on or about August 5, 2010 totaling $3,300,000 (the "Paradigm Loan"). Upon information and belief, the net proceeds of this loan were used as follows: (a) $459,552.04 for Net Five operating expenses (likely used in large part to pay the salaries of the Insider Defendants); (b) $625,000 was transferred to Gerova, (c) $100,000 was used for an investment in Net Five Palm which owned the Port Property, (d) $633,550.73 was used for an investment in the Savannah Oaks Property, (e) $100,000 was used as an investment in the Village Parc Property, (f) $513,316.25 for repayment of the loan to Sawtooth on the Kings Hotel Property, and (g) $507,333.41 for repayment of the Sawtooth loan on the Kings Hotel Property.

257.    Duval provided a loan on or about October, 2010 totaling $5 million

collateralized by the Port Property, the Life Policy, and the East Lyme Property.  Upon

information and belief, these funds were also funneled through Net Five for the benefit of Net

Five and its insiders, including the Insider Defendants.  At no time did the Stillwater Funds

receive any value or consideration from the foregoing transfers.

## V.    CAUSES OF ACTION

### COUNT I

**FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 544(B) AND NEW YORK DEBTOR &
CREDITOR LAW §§ 273, 278 AND/OR 279**

**(AGAINST GEROVA AS NOMINAL DEFENDANT AND NET FIVE)**

258.    Plaintiff repeats and incorporates by reference each and every allegation

contained in the foregoing Paragraphs as though fully set forth herein.

259.    Upon information and belief, prior to the Petition Date, the Stillwater Funds made

the Gerova Transfer to Gerova who shortly thereafter transferred the Real Property Interests to

Net Five, thereby transferring all of the Stillwater Assets to or for the benefit of Gerova and Net

Five.  Upon information and belief, the Gerova Transfer and the subsequent transfer of the Real

Property Interests to Net Five (together, the "Fraudulent Transfers") individually and collectively

constitute a fraudulent transfer designed to defraud the creditors of the Stillwater Funds.

260.    At all times relevant to the Fraudulent Transfers, there have been and are one or

more creditors who have held and still hold matured or unmatured unsecured claims against the

Stillwater Funds that were and are allowable under section 502 of the Bankruptcy Code or that

were and are not allowable only under section 502(e) of the Bankruptcy Code.

261.    Each of the Fraudulent Transfers constituted a conveyance by the Stillwater

Funds as defined under section 270 of the New York Debtor & Creditor Law (the "DCL").

262.    The Stillwater Funds did not receive fair consideration for any of the Fraudulent Transfers.

263.    The Stillwater Funds were insolvent, or rendered insolvent, as a result of the Fraudulent Transfers.

264.    The Fraudulent Transfers were fraudulent as to creditors and investors of the Stillwater Funds without regard to the actual intent of the Stillwater Funds.

265.    By reason of the foregoing, the Plaintiff is entitled to judgment pursuant to section 544(b) of the Bankruptcy Code and, on behalf of the Stillwater Funds and their creditors and investors, pursuant to sections 273, 278 and/or 279 of the DCL: (a) avoiding the Fraudulent Transfers and preserving the Stillwater Assets; (b) directing that the Fraudulent Transfers be set aside and (c) recovering the Fraudulent Transfers, including the Calhoun Property Track 2 believed to be held by Net Five, or the value thereof, in the amount of no less than $50 million, or as determined by the Court, plus interest at the judgment amount and attorneys' fees, from Net Five only.

## COUNT II

### FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 544(B) AND NEW YORK DEBTOR & CREDITOR LAW §§ 274, 278 AND/OR 279

### (AGAINST GEROVA AS NOMINAL DEFENDANT AND NET FIVE)

266.    Plaintiff repeats and incorporates by reference each and every allegation contained in the foregoing Paragraphs as though fully set forth herein.

267.    Upon information and belief, prior to the Petition Date, the Stillwater Funds made the Gerova Transfer to Gerova who shortly thereafter transferred the Real Property Interests to Net Five, thereby transferring all of the Stillwater Assets to or for the benefit of Gerova and Net

Five. Upon information and belief, the Fraudulent Transfers were individually and collectively a fraudulent transfer designed to defraud the creditors of the Stillwater Funds.

268.    At all times relevant to the Fraudulent Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against the Stillwater Funds that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

269.    Each of the Fraudulent Transfers constituted a conveyance by the Stillwater Funds as defined under section 270 of the DCL.

270.    The Stillwater Funds did not receive fair consideration for any of the Fraudulent Transfers.

271.    At the time the Fraudulent Transfers were made, the Stillwater Funds were engaged or about to engage in a business or transaction for which the property remaining in its hands after each of the Fraudulent Transfers was an unreasonably small capital.

272.    The Fraudulent Transfers were fraudulent as to present and future creditors and investors of the Stillwater Funds without regard to the actual intent of the Stillwater Funds.

273.    By reason of the foregoing, the Plaintiff is entitled to judgment pursuant to section 544(b) of the Bankruptcy Code and, on behalf of the Stillwater Funds and their creditors and investors, pursuant to sections 274, 278 and/or 279 of the DCL: (a) avoiding the Fraudulent Transfers and preserving the Stillwater Assets; (b) directing that the Fraudulent Transfers be set aside and (c) recovering the Fraudulent Transfers, including the Calhoun Property Track 2 believed to be held by Net Five, or the value thereof, in the amount of no less than $50 million, or as determined by the Court, plus interest at the judgment amount and attorneys' fees, from Net Five only.

## COUNT III

### FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 544(B) AND NEW YORK DEBTOR & CREDITOR LAW §§ 275, 278 AND/OR 279

### (AGAINST NOMINAL DEFENDANT GEROVA AND NET FIVE)

274.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

275.    Upon information and belief, prior to the Petition Date, the Stillwater Funds made the Gerova Transfer to Gerova who shortly thereafter transferred the Real Property Interests to Net Five, thereby transferring all of the Stillwater Assets to or for the benefit of Gerova and Net Five.  Upon information and belief, the Fraudulent Transfers individually and collectively were a fraudulent transfer designed to defraud the creditors of the Stillwater Funds.

276.    At all times relevant to the Fraudulent Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against the Stillwater Funds that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

277.    Each of the Fraudulent Transfers constituted a conveyance by the Stillwater Funds as defined under section 270 of the DCL.

278.    The Stillwater Funds did not receive fair consideration for any of the Fraudulent Transfers.

279.    At the time the Fraudulent Transfers were made, the Stillwater Funds had incurred, were intending to incur, or believed that they would incur debts beyond their ability to pay as the debts matured.

280.    The Fraudulent Transfers were fraudulent as to present and future creditors and investors of the Stillwater Funds.

281.     By reason of the foregoing, the Plaintiff is entitled to judgment pursuant to section 544(b) of the Bankruptcy Code and, on behalf of the Stillwater Funds and their creditors and investors, pursuant to sections 275, 278 and/or 279 of the DCL: (a) avoiding the Fraudulent Transfers and preserving the Stillwater Assets; (b) directing that the Fraudulent Transfers be set aside and (c) recovering the Fraudulent Transfers, including the Calhoun Property Track 2 believed to be held by Net Five, or the value thereof, in the amount of no less than $50 million, or as determined by the Court, plus interest at the judgment amount and attorneys' fees, from Net Five only.

## COUNT IV

### FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 544(B) AND NEW YORK DEBTOR & CREDITOR LAW §§ 276, 278 AND/OR 279

### (AGAINST GEROVA AS NOMINAL DEFENDANT AND NET FIVE)

282.     Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

283.     Upon information and belief, prior to the Petition Date, the Stillwater Funds made the Gerova Transfer to Gerova who shortly thereafter transferred the Real Property Interests to Net Five, thereby transferring all of the Stillwater Assets to or for the benefit of Gerova and Net Five.  Upon information and belief, the Fraudulent Transfers individually and collectively were fraudulent transfers designed to defraud the creditors of the Stillwater Funds.

284.     At all times relevant to the Fraudulent Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against the Stillwater Funds that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

285.    Each of the Fraudulent Transfers constituted a conveyance by the Stillwater Funds as defined under section 270 of the DCL.

286.    Upon information and belief, the Stillwater Funds and Gerova made the Fraudulent Transfers with actual intent to hinder, delay and/or defraud present or future creditors.

287.    The Fraudulent Transfers were fraudulent as to present and future creditors and investors of the Stillwater Funds.

288.    By reason of the foregoing, the Plaintiff is entitled to judgment pursuant to section 544(b) of the Bankruptcy Code, and on behalf of the Stillwater Funds and their creditors and investors, pursuant to sections 276, 278 and/or 279 of the DCL: (a) avoiding the Fraudulent Transfers and preserving the Stillwater Assets; (b) directing that the Fraudulent Transfers be set aside and (c) recovering the Fraudulent Transfers, including the Calhoun Property Track 2 believed to be held by Net Five, or the value thereof, in the amount of no less than $50 million, or as determined by the Court, plus interest at the judgment amount and attorneys' fees, from Net Five only.

### COUNT V

**RECOVERY OF SUBSEQUENT TRANSFERS UNDER 11 U.S.C. §544(B) AND NEW YORK DEBTOR & CREDITOR LAW §§ 278 AND/OR 279**

**(AGAINST NET FIVE, THE PURCHASER DEFENDANTS, AND HARD MONEY LENDERS)**

289.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

290.    The Fraudulent Transfers are avoidable under section 544 of the Bankruptcy Code and sections 273, 274, 275, and/or 276 as detailed above and generally herein.

291.    Upon information and belief, following the Fraudulent Transfers, the Real Property Interests were transferred or encumbered as collateral to secure certain loans (the "Subsequent Transfers") by Net Five to the Purchaser Defendants and the Lien Defendants  (the "Subsequent Transferees") with knowledge of the Red Flags, the Suspicious Paper Trail, fraud and insolvency, as detailed above and summarized in the Chart.

292.    The Subsequent Transferees are the immediate or mediate transferees of the Subsequent Transfers from Net Five as follows:

- Judge Realty, a Purchaser Defendant, purchased the Judge Street Property.

- Camden, a Purchaser and Lien Defendant, purchased and placed a lien on the St. Augustine Property.

- Paradigm, a Lien Defendant, placed a lien on the St. Augustine Property.

- Shreeji Hospitality, a Purchaser Defendant, purchased the Carowinds Property.

- WAMOJ, a Purchaser Defendant, purchased the Boggy Creek Property.

- Saunders, a Lien Defendant, placed a lien on the Boggy Creek Property.

- ASGAARD, a Lien Defendant, placed a lien on the Calhoun Property.

- The Daniels, Purchaser Defendants, purchased the Calhoun Track 1 Property and Calhoun Track 3 Property.

- The McDonalds, Purchaser Defendants, purchased the Calhoun Track 5 Property.

- Calhoun Commercial, a Purchaser Defendant, purchased the Calhoun Track 6 Property.

- Duval, a Lien Defendant, placed liens on the East Lyme Property and the Life Policy.

- Memphis Blues, a Purchaser Defendant, purchased the Memphis Blues Properties.

- Redrock Kings, a Lien Defendant, placed liens on the Kings Hotel Property.

- SFN, a Purchaser Defendant, purchased the Hillandale Property.

293.    By reason of the foregoing, the Plaintiff is entitled to judgment pursuant to section 544(b) of the Bankruptcy Code, and on behalf of the Stillwater Funds and their creditors and investors, pursuant to sections 278 and/or 279 of the DCL: (a) avoiding the Subsequent Transfers and preserving the Stillwater Assets; (b) directing that the Subsequent Transfers be set aside and (c) awarding the Plaintiff the value of property transferred in the amount as may be determined at trial, plus interest at the judgment rate and attorneys' fees.

## COUNT VI

## CONVERSION

## (AGAINST NET FIVE, PLANET FIVE, AND THE INSIDER DEFENDANTS)

294.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

295.    As detailed herein, the Stillwater Assets were fraudulently transferred from the Stillwater Funds to Gerova and Net Five without fair consideration.

296.    Despite their knowledge of the Stillwater Funds' rights and interests in the fraudulently transferred Stillwater Assets, Net Five and Planet Five, through their principals, the Insider Defendants, improperly took possession of and interfered with the Real Property Interests in derogation of the rights and interests of the Stillwater Funds.

297.    Specifically, Net Five and Planet Five, through their principals, the Insider Defendants, exercised complete dominion and control over the Real Property Interests, converting the Real Property Interests for their own personal gain as part of a fraudulent scheme intended to ensure that such Interests remained out of reach of the Stillwater Funds and their creditors and investors.

298.    As a result, the Stillwater Funds and their creditors and investors have been damaged as they were improperly divested of the Real Property Interests.

299.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and their creditors and investors, is entitled to judgment against Net Five, Planet Five and the Insider Defendants in an amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT VII

### CONSPIRACY TO DEFRAUD

### (AGAINST GEROVA AS NOMINAL DEFENDANT, NET FIVE, PLANET FIVE AND THE INSIDER DEFENDANTS)

300.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

301.    As described herein, Gerova along with Net Five and Planet Five, through their principals, the Insider Defendants, conspired to ensure that the Stillwater Assets remained out of reach of the Stillwater Funds and their creditors and investors by, among other things, establishing Net Five as a new entity for the purpose of transferring the Real Property Interests to Net Five following the Gerova Transfer and then converting those assets all to the detriment of the Stillwater Funds and their creditors and investors.

302.    Through the Gerova Transfer, Gerova represented to the Stillwater Funds that it would provide consideration to the Stillwater Funds for the transfer of the Stillwater Assets.

303.    Notwithstanding its promise to pay for the Stillwater Assets, upon information and belief, Gerova never intended to, nor did it, provide reasonably equivalent value or any consideration to the Stillwater Funds.  Indeed, shortly after the Gerova Transfer, Gerova transferred the Real Property Interests to Net Five without providing any consideration to the

Stillwater Funds and thereby, further diverting the Stillwater Assets away from the Stillwater Funds and their creditors and investors.

304.    Upon information and belief, Gerova falsely promised to provide consideration to the Stillwater Funds in order to deceive the Stillwater Funds and to induce the Stillwater Funds to rely on such promise in order to transfer the Stillwater Assets to Gerova and then Net Five.

305.    The Stillwater Funds justifiably relied on Gerova's false promises in transferring the Stillwater Assets and were damaged as they were divested of all of the Stillwater Assets without fair consideration.

306.    Net Five, Planet Five and the Insider Defendants conspired with Gerova to perpetuate this fraudulent scheme.  The parties' agreement to defraud the Stillwater Funds was memorialized through the Operating Agreement of Net Five entered into by Gerova and certain Planet Five/Gerova-related entities controlled by the Insider Defendants.  The Management Board for Net Five included Rohan and Laubach.

307.    Upon information and belief, upon formation of Net Five and consistent with its purpose, the Real Property Interests were transferred from Gerova to Net Five without providing any consideration to the Stillwater Funds whose claims remained unsatisfied while its assets were moved further out of reach.

308.    Gerova, Planet Five, Net Five and the Insider Defendants acted with the intentional and common purpose of further diverting the Real Property Interests from the Stillwater Funds and stripping the Real Property Interests of equity and value to enrich Net Five, Planet Five and the Insider Defendants, thereby damaging the Stillwater Funds and their creditors and investors.

309.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and

their creditors and investors, is entitled to judgment against Gerova as a nominal defendant, Net

Five, Planet Five and the Insider Defendants in an amount in excess of $50 million, or as

determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT VIII

### CONSPIRACY TO DEFRAUD AND CONVERT PROPERTY

### (AGAINST NET FIVE, PLANET FIVE, THE INSIDER DEFENDANTS AND THE HARD MONEY LENDERS)

310.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth

herein.

311.    Net Five and Planet Five, through their principals, the Insider Defendants, along

with the Hard Money Lenders, conspired, through a series of deceptive and layered transactions,

to strip the Real Property Interests of any value for their own personal gain and to perpetuate the

fraudulent scheme of diverting such Real Property Interests from the Stillwater Funds and their

creditors and investors.

312.    As detailed above, Net Five and Planet Five, through their principals, the Insider

Defendants, participated in the fraudulent transfer of the Real Property Interests and improperly

converted the Real Property Interests for their own personal gain and conspired with Gerova to

fraudulently transfer and hide the Real Property Interests from the Stillwater Funds.

313.    The agreement among the parties to defraud the Stillwater Funds and convert the

Real Property Interests was memorialized through various loan documents through which the

Hard Money Lenders, among other things, provided funding that they knew or should have

known would be used to further Net Five's scheme to defraud and strip the Real Property

Interests of all equity and value, remove such Real Property Interests from the reach of creditors

and investors of the Stillwater Funds, and enrich the Insider Defendants, as detailed more fully above.

314.   The parties acted with the intentional and common purpose of enabling and perpetuating the fraudulent scheme to convert the Real Property Interests, stripping such assets of all value and equity, and further diverting those Interests from the Stillwater Funds, thereby damaging the Stillwater Funds and their creditors and investors.

315.   By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and their creditors and investors, is entitled to judgment against Net Five, Planet Five, the Insider Defendants and the Hard Money Lenders in an amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

**COUNT IX**

**AIDING AND ABETTING CONVERSION**

**(AGAINST THE HARD MONEY LENDERS)**

316.   Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

317.   As described above, Net Five, Planet Five and the Insider Defendants are each liable for conversion of the Real Property Interests.

318.   The Hard Money Lenders knowingly and substantially assisted in the conversion by, among other things, providing funding that they knew or should have known would be used to further Net Five's scheme to defraud and strip the Real Property Interests of all equity and value, remove such Real Property Interests from the reach of creditors and investors of the Stillwater Funds, and enrich the Insider Defendants, as detailed more fully above.

319.   The Stillwater Funds and their creditors suffered damages as a result of the Hard Money Lenders' substantial assistance and concerted action in conjunction with Net Five, Planet

Five and the Insider Defendants that further diverted the Real Property Interests out of the reach

of the Stillwater Funds and their creditors and investors.

320.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and

their creditors and investors, is entitled to judgment against the Hard Money Lenders in an

amount in excess of $50 million, or as determined by the Court, plus interest at the judgment

rate, and attorneys' fees.

## COUNT X

### BREACH OF FIDUCIARY DUTIES

### (AGAINST NET FIVE, PLANET FIVE, AND THE INSIDER DEFENDANTS)

321.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth

herein.

322.    Through the GSA, the Plaintiff owns all causes of action of Gerova, which would

include this breach of fiduciary duty claim, or, in the alternative, Gerova's membership interest

in Net Five should be held in a constructive trust for the benefit of Plaintiff.

323.    At all relevant times, Rohan was the founder, CEO and decision-maker in control

of Net Five and Planet Five.

324.    At all relevant times, Halter was a member and an insider of Net Five.

325.    At all relevant times, Laubach was a member and an insider of Net Five.

326.    Gerova and Planet Five are members of Net Five.  Plaintiff owns all claims

relating to Net Five and Planet Five pursuant to the Settlement and GSA.

327.    As a consequence, Net Five, Planet Five and the Insider Defendants owed

Gerova, as a member of Net Five, fiduciary duties composed of the duty of care, loyalty, and

candor and to act in good faith.

328.    Net Five, Planet Five and the Insider Defendants also owed creditors of Gerova, including the Stillwater Funds, fiduciary duties after Gerova became insolvent on or before May 26, 2010, the date the Real Property Interests were transferred to Net Five.

329.    Rohan breached his fiduciary duties to Gerova and its creditors by, among other things, willfully and/or recklessly causing Net Five to fraudulently transfer the Real Property Interests to each of the Subsequent Transferees as alleged above herein.

330.    By authorizing, encouraging, and/or ratifying such transfers, Net Five, Planet Five, and the Insider Defendants did not: (a) discharge their duties in good faith; (b) exercise the duty of care an ordinarily prudent person in a like position would exercise under similar circumstances; and/or (c) act in a manner they reasonably believed to be in the best interests of Gerova.

331.    Net Five, Planet Five, and the Insider Defendants further breached their fiduciary duties by allowing the transfers to occur despite the fact that they were either: (a) aware that the transfers were made to one or more of the Defendants, including the Subsequent Transferees, as alleged, for less than reasonably equivalent value and with actual fraudulent intent; or (b) reckless in permitting such transfers to occur.

332.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and their creditors and investors, is entitled to judgment against Net Five, Planet Five and the Insider Defendants in an amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT XI

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (AGAINST THE HARD MONEY LENDERS)

333.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

334.    As described above, Net Five owed fiduciary duties to Gerova which was a member of Net Five, and breached its duties by, among other things, authorizing certain fraudulent transfers of the Real Property Interests, converting the Real Property Assets in derogation of the Stillwater Funds' rights and interests and conspiring to defraud.

335.    The Lien Defendants knowingly and substantially assisted Net Five in breaching its fiduciary duties by providing funding, through mortgages and loans granted to Net Five, that they knew or should have known would be used to further Net Five's scheme to defraud and strip the Real Property Interests of all equity and value, remove such Real Property Interests from the reach of creditors and investors of the Stillwater Funds, and enrich the Insider Defendants, as detailed more fully above.

336.    Accordingly, the Hard Money Lenders aided and abetted breaches of fiduciary duty by Net Five.

337.    The Stillwater Funds and its creditors suffered damages as a result of the Hard Money Lenders' substantial assistance and concerted action in conjunction with Net Five that further diverted and encumbered the Real Property Interests stripping all equity and value and transferring the Real Property Interests out of the reach of the Stillwater Funds and their creditors and investors.

338.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and their creditors and investors, is entitled to judgment against the Hard Money Lenders in an

amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT XII

### FRAUDULENT MISREPRESENTATION

### (AGAINST ROHAN, PLANET FIVE AND NET FIVE)

339.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

340.    Net Five and Planet Five, through Rohan, misrepresented the value of their assets to Gerova including stating that certain parcels were owned by Planet Five when they were not in order to defraud Gerova by inducing Gerova to transfer the Real Property Interests to Net Five for no consideration.

341.    Gerova reasonably relied on this misrepresentation when it agreed to transfer the Real Property Interests to Net Five.  Gerova assigned all of its claims relating to Net Five and Planet Five to Plaintiff pursuant to the Settlement and GSA.

342.    The Stillwater Funds and Gerova suffered damages as a result the misrepresentations and subsequent transfer of the Real Property Interests as the Stillwater Funds, who were creditors of Gerova, were divested of the Real Property Interests without consideration.

343.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and their creditors and investors, is entitled to judgment against Rohan, Net Five and Planet Five in an amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT XIII

### BREACH OF CONTRACT

### (AGAINST NET FIVE, PLANET FIVE, ROHAN AND LAUBACH)

344.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

345.    Through the GSA, the Plaintiff owns all causes of action of Gerova, which would include this breach of contract claim, or, in the alternative, Gerova's membership interest in Net Five should be held in a constructive trust for the benefit of Plaintiff.

346.    As a member of Net Five, Gerova is a party to the Operating Agreement along with Planet Five and related entities.

347.    Rohan and Laubach were members of the Net Five Management Board as indicated in the Operating Agreement and, therefore, subject to the terms of the Operating Agreement.  In addition, Rohan directly or indirectly controlled the Planet Five-related entities serving as members.

348.    The Net Five Operating Agreement contains a provision that prohibits members of the Management Board from receiving a salary from Net Five.  (Operating Agreement, ¶ 3.1(k)).

349.    Gerova performed all of its obligations under the Net Five Operating Agreement.

350.    Net Five, through Rohan and Net Five-related entities including Planet Five, breached the Operating Agreement by authorizing the payment of salaries to members of the Management Board, including Rohan and Laubach, despite the prohibition in the Operating Agreement and the fact that Net Five was insolvent and unable to pay its creditors.

351.    Rohan and Laubach breached the Operating Agreement by accepting a salary in contravention thereof.

352.     Gerova, and its creditors, including the Stillwater Funds, as a member of Net Five and a party to the Operating Agreement, was harmed by the breach of the Operating Agreement by Net Five, Rohan and Laubach which improperly divested Gerova of assets that may have otherwise been available to Gerova and its creditors.

353.     By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and their creditors and investors, is entitled to judgment against Net Five, Rohan and Laubach in an amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT XIV

## UNJUST ENRICHMENT

## (AGAINST GEROVA AS A NOMINAL DEFENDANT AND ALL OTHER DEFENDANTS)

354.     Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

355.     Gerova received all of the Stillwater Assets from the Stillwater Funds without providing fair consideration or any monetary consideration, stock (as promised), or any other form of consideration.

356.     Net Five received the Real Property Interests from Gerova without fair consideration or providing any consideration to Gerova or the Stillwater Funds.

357.     The Subsequent Transferees received the Real Property Interests without providing fair consideration and without providing any consideration to the Stillwater Funds.

358.     The Insider Defendants received so-called salaries, cash, and other distributions and otherwise received the fruits of the converted Real Property Interests while creditor and investor claims remained unsatisfied.

359.     Accordingly, all of the Defendants received valuable assets including the Stillwater Assets, the Real Property Interests and the proceeds thereof, that were stolen and converted from the Stillwater Funds, without providing any compensation to the Stillwater Funds.

360.     It would be highly inequitable and unjust for the Defendants to retain the Stillwater Assets and the fruits of such assets received from the Stillwater Funds, or at the expense of the Stillwater Funds, in particular given the notice of the Suspicious Paper Trail, Red Flags, fraud and insolvency, as described above.

361.     By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and its creditors and investors, is entitled to judgment against the Defendants, excluding nominal defendant Gerova, in an amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT XV

## CONSTRUCTIVE TRUST

## (AGAINST ALL DEFENDANTS)

362.     Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

363.     As described above, Gerova and Net Five had duties to the Stillwater Funds.

364.     Through the Gerova Transfer, Gerova promised the Stillwater Funds that they would receive shares in Gerova as consideration for transferring the Stillwater Assets to Gerova.

365.     In reliance on this promise by Gerova, the Stillwater Funds transferred the Stillwater Assets, including the Real Property Interests, to Gerova.  The Stillwater Funds received nothing from Gerova for the transfer of the Stillwater Assets.

366.    The Real Property Interests were assets of the Stillwater Funds that were wrongfully stolen and converted by Gerova and subsequently, Net Five, without paying reasonably equivalent value or any consideration to the Stillwater Funds.

367.    Gerova transferred the Real Property Interests to Net Five, and neither Net Five nor Gerova provided any consideration to the Stillwater Funds in exchange for such transfer.

368.    Net Five then further transferred and/or encumbered the Real Property Interests to the Subsequent Transferees and neither Gerova, Net Five nor the Subsequent Transferees provided any consideration to Stillwater in exchange for such transfers.

369.    Accordingly, Gerova, Net Five and the Subsequent Transferees were unjustly enriched as they received the Stillwater Assets without providing fair consideration to the Stillwater Funds.

370.    In addition, the funds held in the Brandermill Escrow and the Winn Dixie Escrow were assets or proceeds of assets from the Stillwater Assets, and, consequently, any amount of such funds belonging to Net Five should be held in constructive trust and paid to Plaintiff.

371.    Under these circumstances, a constructive trust is required because equity and good conscience require that the Stillwater Assets be held in trust for the benefit of the Stillwater Funds in order to prevent the unjust enrichment of the Defendants.

372.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and its creditors and investors, is entitled to judgment against the Defendants requiring that all of the Stillwater Assets received by Defendants be placed in a constructive trust for the benefit of the Stillwater Funds and their creditors in an amount in excess of $50 million, or as determined by the Court, plus interest at the judgment rate, and attorneys' fees.

## COUNT XVI

### ACCOUNTING

### (AGAINST ALL DEFENDANTS)

373.    Plaintiff incorporates the aforementioned paragraphs as though fully set forth herein.

374.    Absent an accounting from all Defendants that have received or encumbered the Real Property Interests, the Plaintiff is unable to fully identify the proceeds that were received from either the sale of, or liens on, the Real Property Interests.

375.    The Defendants have the best access to information concerning the transfer of the Real Property Interests as they were the parties to these transfers.

376.    Despite requesting information from Net Five, Net Five has refused or has been unable to provide it.

377.    Because the Plaintiff has no adequate remedy at law without an itemization of the sale and/or lien proceeds resulting from the sale or encumbrance of the Real Property Interests, Plaintiff is entitled to an accounting.

378.    By reason of the foregoing, the Plaintiff, on behalf of the Stillwater Funds and its creditors and investors, is entitled to an accounting from Defendants.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

A.    Award Plaintiff all relief to which it is entitled pursuant to law and equity, including but not limited to an order setting aside the Fraudulent Transfers, and/or for judgment

in an amount of not less than $50 million as detailed above, and or interest from the date of the

initial Gerova Transfer at the judgment rate;

      B.     Award Plaintiff compensatory and punitive damages in an amount to be

determined at trial;

      C.     Impose a constructive trust in favor of Plaintiff;

      D.     Award the costs of this action to Plaintiff, including reasonable attorneys' fees;

and

      E.     Order such other and further relief as the Court deems just and proper.


Dated: New York, New York
October 2, 2014

                        */s/ Douglas E Spelfogel*_____

                        Douglas E. Spelfogel

                        Richard J. Bernard

                        Mark Wolfson[27]

                        Katherine R. Catanese

                        **FOLEY & LARDNER LLP**

                        90 Park Avenue

                        New York, NY 10016-1314

                        Telephone: 212-682-7474

                        Facsimile: 212-687-2329

                        *Attorneys for Stillwater Liquidation LLC*

---

[27] Admitted in Florida