UNITED STATES BANKRUPTCY COURT                    FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                              :
                                                    :        Chapter 11
STILLWATER ASSET BACKED OFFSHORE  :
FUND LTD.,                                           :        Case No. 12-14140 (MEW)
                                                    :
                Debtor.                             :
-----------------------------------------------------------------x
STILLWATER LIQUIDATING LLC,                         :
                                                    :
                Plaintiff,                          :
                                                    :
        v.                                          :        Adv. Pro. No. 14-02245 (MEW)
                                                    :
NET FIVE AT PALM POINTE, LLC, *et al.,*             :
                                                    :
                Defendants.                         :
                                                    :
GEROVA FINANCIAL GROUP LTD.,                        :
                                                    :
                Nominal Defendant.                  :
-----------------------------------------------------------------x

## <u>OPINION ON MOTIONS TO DISMISS</u>

A P P E A R A N C E S :

FOLEY & LARDNER LLP
New York, New York
*Counsel to Stillwater Liquidating LLC*
  By:  Douglas Spelfogel, Esq.
        Richard J. Bernard, Esq.
        David B. Goroff, Esq.
        Katherine R. Catenese, Esq.

MARC STUART GOLDBERG, LLC.
Scarsdale, New York
*Counsel to Paul Rohan, Gregory Laubach, Eric Halter, Net Five at
Palm Pointe, LLC, Net Five Holdings LLC, Planet Five Development
Group LLC, Net Five South Beach LLC, Net Five at Kings Hotel LLC
and Planet Five at Gerova, LLC*
  By:  Marc Stuart Goldberg, Esq.

BERLANDI NUSSBAUM & REITZAS LLP
New York, New York
*Counsel to Paradigm Credit Corporation*
  By:  Joshua T. Reitzas, Esq.
       Jay Nussbaum, Esq.

DORF & NELSON LLP
Rye, New York
*Counsel to Calhoun Commercial Construction LLC*
  By:  Jonathan B. Nelson, Esq.
       Laura-Michelle Horgan, Esq.

BUTLER, FITZGERALD, FIVESON & McCARTHY
New York, New York
*Counsel to SFN DeKalb Holdings, LLC*
  By:  David K. Fiveson, Esq.

ACKERMAN, LEVINE, CULLEN, BRICKMAN
    & LIMMER, LLP
Great Neck, New York
*Counsel to John R. Daniel, Yvette Daniel, Stephen J. McDonald and Vicki McDonald*
  By:  Brian J. Grieco, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

        Stillwater Liquidating LLC claims that the "Stillwater Funds" were defrauded in 2010

when their assets were transferred to the Gerova group of companies and then, a few months

later, to the Net Five group of companies.  Stillwater Liquidating seeks to recover the properties

or their values.  Some defendants are persons and entities who allegedly committed the fraud.

Other defendants are buyers of real property, or secured lenders, who are sued as "subsequent

transferees" of properties that the Stillwater Funds once owned.  *See* 11 U.S.C. § 550.  The

secured lenders (but not the buyers) also are accused of aiding and abetting the alleged fraud and

joining in a conspiracy to commit it.

        These claims sound straightforward, but they are not.  The original Complaint was

eighty-one pages long.  The Court directed that clarifying amendments be made, which led to the

filing of a thirty-four page Supplement with 949 pages of exhibits.  An Amended Complaint

made further changes and is 124 pages long, with 112 pages of its own exhibits.  The hope was

that the amendments would provide clarity, particularly as to the alleged fraudulent transfers.

Instead, Stillwater Liquidating has stubbornly mischaracterized transactions, conflated parties

and events, and tried to gloss over important details about the assets that were transferred and the

nature of the Stillwater Funds' property interests.  As a result the lengthy pleadings are packed

with plain errors, contradictions and poorly conceived claims.

Many of the defendants filed motions to dismiss.  Some of the moving defendants have

since settled the claims and have been dismissed from the case.  This Opinion addresses the

remaining motions.  The Court holds:

> (1)    All claims asserted against Paradigm Credit Corporation ("**Paradigm**"),
> Calhoun Commercial Construction LLC ("**Calhoun**"), SFN Dekalb Holdings LLC
> ("**SFN**"), John R. Daniel and Yvette Daniel (the "**Daniels**"), and Stephen J. McDonald
> and Vicki McDonald (the "**McDonalds**") should be dismissed; and

> (2)    To the extent the Amended Complaint asserts fraudulent transfer claims
> against the Net Five Defendants (defined below) based on transfers of assets that never
> belonged to a debtor in a bankruptcy case, those claims also should be dismissed.
> However, the Net Five Defendants' joinder in motions to dismiss filed by other parties is
> not, by itself, sufficient to warrant a dismissal of the other claims against them.

The Court will hold a conference on September 27, 2016 at 11:00 a.m. to discuss further

proceedings, including whether all or some of the dismissals should be with prejudice.

## I.    Background

Although there are many Stillwater Funds, there are only two funds that owned assets

that are relevant to the pending motions to dismiss.  One is a Delaware limited partnership

named Stillwater Asset Backed Fund, L.P.; the parties have referred to this entity as the
"Onshore Fund," but in order to distinguish it more easily from other funds the Court will refer
to it as the "**Delaware Fund**."  Prior to 2010 the Delaware Fund and its subsidiaries made real
estate loans and other types of loans.  The other relevant fund is a Cayman Islands entity named
Stillwater Asset Backed Offshore Fund Ltd. (the "**Offshore Fund**"), which was the debtor in the
bankruptcy case in which this adversary proceeding has been filed .  The Offshore Fund bought
"participation interests" that related to loans made by the Delaware Fund and by other entities.

In January 2010 the Stillwater Funds entered into a number of agreements with the
Gerova companies.  Stillwater Liquidating alleges that through these agreements the assets of the
Delaware Fund and the Offshore Fund were transferred to the Gerova companies.  Those assets
allegedly included mortgage loans, real properties and participation interests in the same.

In May 2010, the Gerova companies agreed with an entity named Planet Five
Development Group LLC ("**Planet Five**"), and with two individuals who were associated with
Planet Five, to form a joint venture.  The joint venture company was a Florida limited liability
company named Net Five Holdings LLC ("**Net Five Holdings**").  Stillwater Liquidating alleges
that the Gerova companies transferred the assets formerly owned by the Delaware Fund and the
Offshore Fund to Net Five Holdings and its subsidiaries.

At various times after May 2010 the lender and buyer defendants either bought properties
that had once been owned by the Stillwater Funds and their subsidiaries, or made loans that were
secured by such properties.

Investors in the Stillwater Funds were unhappy with the 2010 transactions, and at least
three separate class actions were filed in the United States District Court for the Southern District
of New York in 2011, alleging violations of federal securities laws and breaches of fiduciary

4

duty by Gerova, various individuals and the managers of the Stillwater Funds.  *See In re Stillwater Capital Partners Inc. Litigation*, Case No. 11-CV-2737; *Goldberg, et al. v. Gerova Financial Group, Ltd., et al.*, Case No. 11-CV-07107; *Arar, et al. v. Gerova Financial Group, Ltd., et al.*, Case No. 11-CV-3081.  In 2012, a number of investors also commenced an involuntary bankruptcy case in this Court against the Offshore Fund; that case later was converted to a voluntary chapter 11 case (Case No. 12-14140).

Stillwater Liquidating was formed as part of a settlement agreement in 2014 that resolved the three class actions listed above and other disputes.  The settlement was "memorialized" in four documents: a Global Settlement Agreement, a so-called "Stillwater Agreement," the limited liability agreement through which Stillwater Liquidating was formed, and the confirmed plan of reorganization in the Offshore Fund's chapter 11 case, which was confirmed by Judge Gropper on August 13, 2014.  Amended Complaint ¶ 1 n.4, ECF No. 297.  The Amended Complaint alleges that through these agreements Stillwater Liquidating is now the owner of "all of the claims owned by Gerova relating to the assets at issue hereunder and formerly owned by the Stillwater Funds," as well as "all of the claims owned by the Stillwater Funds."  *Id.* ¶¶ 21, 22, 65.

## II.    The Claims

The Amended Complaint asserts 16 claims.  Some are statutory claims, and others are common law claims.  All of the claims are asserted by Stillwater Liquidating as the alleged assignee of other entities.

The primary claims are fraudulent transfer claims asserted by Stillwater Liquidating as alleged assignee of the Stillwater Funds.  Counts I through IV name "Gerova" and "Net Five" as defendants (more on those defined terms below).  These four claims allege that the transfers of the Stillwater Funds' assets to Gerova, and Gerova's later transfers of those assets to Net Five, "individually and collectively" were fraudulent transfers that were designed to defraud the

5

creditors of the Stillwater Funds.  Amended Complaint ¶¶ 389, 397, 405, 413.  Stillwater

Liquidating contends that the Stillwater Funds may challenge those fraudulent transfers pursuant

to section 544 of the Bankruptcy Code and New York state law.[1]  Gerova has previously settled

all claims against it and is named as a "nominal" defendant "for the purposes of avoiding the

transfers and pursuing" later transferees.  *Id.* ¶ 24.  Net Five is named as a defendant "to the

extent that the transfers to Gerova and then Net Five are collapsed."  *Id.* ¶ 15(a).

Count V alleges that the buyer and lender defendants are "subsequent transferees" from

whom Stillwater Liquidating may recover the fraudulently transferred assets or their values.

Paragraph 15(b) of the Amended Complaint, and the title of Count V, state that "Net Five" is a

defendant in Count V.  Curiously, however, the supporting allegations merely allege that "Net

Five" made transfers to other persons, and the transfers to Net Five are not included among the

"Subsequent Transfers" that are challenged in the Amended Complaint.  *Id.* ¶¶ 15(b), 421-36.

Counts VI through IX are common law claims that are also asserted by Stillwater

Liquidating as the alleged assignee of the Stillwater Funds.[2]  More particularly:

- Count VI alleges that the Gerova transfers constituted a "conversion" of property for

  which Gerova, Net Five and Messrs. Rohan and Halter are liable.

- Count VII focuses on the transfers to Net Five and actions subsequently taken by Net

  Five.  It alleges that Gerova, Net Five and Messrs. Rohan and Halter conspired

---

[1]    The New York Debtor and Creditor law uses the term "fraudulent conveyance" rather than "fraudulent transfer," but for ease of reference the Court will use the terms interchangeably.

[2]    The "Insider Defendants" are listed as parties to Counts VI, VII, VIII and X.  "Insider Defendants" is not a defined term in the Amended Complaint, but in context it is clear that the term is a carryover from prior pleadings and that it refers to Messrs. Rohan and Halter, who have been re-defined in the Amended Complaint as the "Net Five Insiders."  *Id.*  ¶ 8.

through these actions "to ensure that the Stillwater Assets remained out of reach of the Stillwater Funds" and thereby conspired to defraud the Stillwater Funds.

- Count VIII accuses the lender defendants, Net Five and Messrs. Rohan and Halter of a "conspiracy to defraud and convert property" based on actions taken by Net Five "to strip the Real Property Interests of any value for their own personal gain and to perpetrate the fraudulent scheme of diverting such Real Property Interests from the Stillwater Funds and their creditors and investors." *Id.* ¶ 461. The lenders allegedly "greased" the Net Five scheme by providing funding that they "knew or should have known" would be used to accomplish the wrongful aims of the scheme. *Id.* ¶ 463.

- Count IX accuses the lenders of aiding and abetting a conversion of property by Net Five, Planet Five and Messrs. Rohan and Halter, which allegedly damaged the Stillwater Funds by "helping to further divert" assets and putting them "out of the reach" of the Stillwater Funds and their creditors and investors. *Id*. ¶ 469.

Counts X through XIII assert common law claims as an alleged assignee of Gerova. Stillwater Liquidating alleges that Net Five, Planet Five, Rohan and Halter breached fiduciary duties that they owed to Gerova (Count X) and that the lenders aided and abetted those breaches of fiduciary duty (Count XI). Stillwater Liquidating also asserts claims of fraudulent misrepresentation and breach of contract on behalf of Gerova and against Rohan, Planet Five and Net Five (Counts XII and XIII).

Finally, the Amended Complaint contends that all defendants (including the buyers and lenders) were unjustly enriched (Count XIV) and hold properties in constructive trust (Count XV), and that all defendants should be compelled to provide an accounting (Count XVI).

### III.    Jurisdiction

This Court has jurisdiction over civil proceedings that arise "under" the Bankruptcy Code

or that "arise in" or are "related to" cases under the Bankruptcy Code.  *See* 28 U.S.C. §§ 157,

1334; Amended Standing Order of Reference from the United States District Court for the

Southern District of New York, dated as of January 31, 2012.

### A.    "Arising Under" Jurisdiction

The Bankruptcy Code gives a trustee the right to assert claims that a creditor could have

asserted under state law with respect to fraudulent transfers of a debtor's property, plus a right to

seek recovery from subsequent transferees of such property.  *See* 11 U.S.C. §§ 544, 550.  A

chapter 11 debtor may assert the same fraudulent transfer claims that a trustee could assert.  11

U.S.C. § 1107(a).  The Offshore Fund was a debtor in a chapter 11 case.  Any claims that the

Offshore Fund may assert under sections 544 and 550 arise "under" the Bankruptcy Code.

However, the Offshore Fund's other claims are based on non-bankruptcy law.

The other Stillwater Funds did not file U.S. bankruptcy cases.  Stillwater Liquidating

argues that the other funds' fraudulent transfer claims still may be asserted under sections 544

and 550.  If that contention were correct, then their fraudulent transfer claims would arise

"under" the Bankruptcy Code.  *But see* Part IX, below.  The other claims asserted on behalf of

the non-debtor funds are common law claims that do not "arise under" the Bankruptcy Code.

The two entities defined as "Gerova" are the subject of chapter 15 cases in this Court, but

chapter 15 debtors are not entitled to pursue claims under sections 544 and 550 of the

Bankruptcy Code.  *See* 11 U.S.C. § 1521(a)(7).  The Amended Complaint only asserts common

law claims as an assignee of Gerova, and those claims do not "arise under" the Bankruptcy Code.

### B.    "Arising In" Jurisdiction

Stillwater Liquidating argues that any claims that did not "arise under" the Bankruptcy

Code nevertheless "arose in" the Offshore Fund's chapter 11 case.  That argument is plainly

wrong.  Matters "arise in" a bankruptcy case if they "are not based on any right expressly created

by title 11, but nevertheless, would have no existence outside of the bankruptcy."  *Elliott v. GM*

*LLC (In re Motors Liquidation Co.)*, Nos. 15-2844-bk(L), 15-2847-bk(XAP), 15-284-bk(XAP),

2016 WL 3766237, at *10 (2d Cir. July 13, 2016) (citing *Baker v. Simpson*, 613 F.3d 346, 351

(2d Cir. 2010)).  Here, the asserted claims (except for claims under section 544) would have

existed outside of the Offshore Fund's chapter 11 case.  The claims arise under non-bankruptcy

law and are based on property transfers and other events that were independent of the chapter 11

case and that mostly pre-dated the chapter 11 case.

Stillwater Liquidating argues that the confirmation order approved the assignment of the

Offshore Fund's claims to Stillwater Liquidating, but that does not mean that the assigned claims

"arose" in the Offshore Fund's bankruptcy case.  The Offshore Fund's non-bankruptcy claims

could and would have arisen, and the same assignments of claims could have occurred, if the

bankruptcy case had never existed.  A debtor must obtain court approval of an assignment of

claims (just as debtors must obtain court approval of asset dispositions generally), but that court

approval does not change the character of the claims being assigned or the extent of the Court's

jurisdiction over them.  And it certainly does not mean that claims owned and allegedly assigned

to Stillwater Liquidating by other Stillwater Funds, or by Gerova, somehow "arose in" the

Offshore Fund's chapter 11 case.

Stillwater Liquidating also argues that the confirmation order in the Offshore Fund's case

included a broad reservation of jurisdiction, but an order that retains jurisdiction may not grant

jurisdiction that does not otherwise exist.  Neither the Global Settlement Agreement, nor the

confirmed plan, nor the confirmation order, turned the Stillwater Funds' non-bankruptcy

litigation claims into matters that "arose in" in the Offshore Fund's case.

### C.    "Related To" Jurisdiction

Generally, before a plan is confirmed, "a civil proceeding is related to a title 11 case if

the action's outcome might have any conceivable effect on the bankrupt estate." *Residential*

*Funding Co., LLC v. UBS Real Estate Secs. (In re Residential Capital, LLC)*, 515 B.R. 52, 63

n.12 (Bankr. S.D.N.Y. 2014) (citing *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d

572, 579 (2d Cir. 2011)).  Section 1334 of title 28 does not distinguish between a court's pre-

confirmation and post-confirmation jurisdiction.  However, if a lawsuit is filed after a business

has reorganized and emerged from bankruptcy the "conceivable effect" test often gives way to a

more limited "close nexus" test.  *ACE Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings*

*Corp.)*, 448 Fed. Appx. 134, 137 (2d Cir. 2011) (summary order).  Under the "close nexus" test,

"related to" jurisdiction does not exist unless (a) a dispute has a close nexus to the bankruptcy

case (as when a matter requires interpretation or administration of the confirmed plan), and (b)

the plan retains jurisdiction over the dispute.  *Savoy Senior Hous. Corp. v. TRBC Ministries,*

*LLC*, 401 B.R. 589, 597 (S.D.N.Y. 2009).

Courts have applied the more limited "close nexus" test after a reorganized debtor has

emerged from bankruptcy because the purpose of plan confirmation is to free the reorganized

business from court supervision.  *See In re Park Ave. Radiologists, P.C.*, 450 B.R. 461, 468

(Bankr. S.D.N.Y. 2011); *see also Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991)

(noting that after confirmation a reorganized company "is without the protection of the

bankruptcy court" and "may not come running to the bankruptcy judge every time something

unpleasant happens"). Courts have expressed concern that the continued application of the

"conceivable effect" test could result in an unwarranted exercise of jurisdiction over the post-

confirmation business of a reorganized debtor:

> . . . [A]pplying the general ["conceivable effect"] rule without
> qualification after the confirmation of a reorganization plan easily
> could result in the bankruptcy court retaining jurisdiction of all
> cases affecting the reorganized debtor for many years
> thereafter. This prospect not only would work an unwarranted
> expansion of federal court jurisdiction but also would unfairly
> advantage reorganized debtors by allowing such firms to funnel
> virtually all litigation affecting them into a single federal forum.

*In re Boston Reg' l Med. Ctr., Inc.*, 410 F.3d 100, 106 (1st Cir. 2005). The First Circuit Court of

Appeals has held, however, that the "conceivable effect" test ought to remain in place where a

debtor is liquidated rather than reorganized. The First Circuit explained the difference as

follows:

> Typically, a reorganized debtor is attempting to make a go of its
> business. Thus, its actions (including any involvement in
> litigation) redound primarily to that end and only affect the
> underlying bankruptcy proceeding in a tangential or derivative
> way. . . By contrast, a liquidating debtor exists for the singular
> purpose of executing an order of the bankruptcy court. Any
> litigation involving such a debtor thus relates much more directly
> to a proceeding under title 11.

*Id.* at 107 (citations omitted).

The Second Circuit Court of Appeals has not ruled on this issue, but at least one decision

in this district has cited the First Circuit ruling with approval. *See Cross Media Mktg. Corp. v.

CAB Mktg., Inc. (In re Cross Media Mktg. Corp.)*, 367 B.R. 435, 444 (Bankr. S.D.N.Y. 2007).

Other decisions in this district have approved the First Circuit reasoning, though they have not

found it necessary to rule on the point. *See Kirschner v. Grant Thornton LLP (In re Refco, Inc

Sec. Lit.)*, 628 F. Supp. 2d 432, 442 (S.D.N.Y. 2008) (finding the First Circuit reasoning

"persuasive" but concluding that jurisdiction existed no matter which test applied); *Ames Dep't*

11

*Stores, Inc. v. Lumbermens Mut. Cas. Co. (In re Ames Dep't Stores, Inc.)*, 542 B.R. 121, 137

n.52 (Bankr. S.D.N.Y. 2015) (approving the First Circuit view but finding it unnecessary to rule

because "related to" jurisdiction existed no matter which test applied); *Residential Funding Co.,*

*LLC v. UBS Real Estate Secs. (In re Residential Capital, LLC)*, 515 B.R. 52, 63 n.12 (Bankr.

S.D.N.Y. 2014) (noting the issue but declining to rule on the point because the court had core

jurisdiction over the matter).

   In this case, the confirmed plan was a liquidating plan.  Stillwater Liquidating alleges that

the Offshore Fund's "bankruptcy estate" will receive forty percent of any net recoveries that

Stillwater Liquidating obtains, including any recoveries on claims asserted by Stillwater

Liquidating as assignee of other Stillwater Funds and as assignee of Gerova.  Amended

Complaint ¶ 23.  The Court believes that under these circumstances the "conceivable effect" test

is proper and that the allegations of the Amended Complaint support the exercise of "related to"

jurisdiction.

   **D.  Supplemental Jurisdiction**

   Stillwater Liquidating argues that the Court also has "supplemental jurisdiction" over the

non-bankruptcy claims.  28 U.S.C. § 1367.  There is a split of authority as to whether section

1367 applies to bankruptcy courts.  *Compare, e.g.*, *Walker v. Cadle Co. (In re Walker)*, 51 F.3d

562, 572–73 (5th Cir. 1995) (concluding that bankruptcy courts are not authorized to exercise

supplemental jurisdiction) *with Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189,

1195 (9th Cir. 2005) (concluding that bankruptcy courts may properly exercise supplemental

jurisdiction).  Prior decisions in this Circuit have noted the conflict, though generally they have

upheld a bankruptcy court's exercise of supplemental jurisdiction.  *See, e.g.*, *Cavalry Const., Inc.*

*v. WDF, Inc. (In re Cavalry Constr., Inc.)*, 496 BR. 106, 113-15 (S.D.N.Y. 2013) (discussing the

case law and concluding that bankruptcy courts may exercise supplemental jurisdiction); *In re Dreier LLP*, No. 10-5456, 2012 WL 4867376 at *4 (Bankr. S.D.N.Y. Oct. 12, 2012) (noting that there is "serious question whether the supplemental jurisdiction statute is applicable to the jurisdiction exercised by bankruptcy judges" but recognizing that prior decisions in this Circuit have authorized bankruptcy courts to exercise such jurisdiction).  It is not necessary to weigh in on this dispute since it is evident that the Court has "related to" jurisdiction.

## IV.    Power to Issue Final Decisions

Section 157 of title 28 provides that this Court may issue final decisions in "core" matters, including those that "arise under" the Bankruptcy Code.  Matters that are "related to" a debtor's case are non-core matters, as to which a bankruptcy court may issue final decisions with the parties' consent.  28 U.S.C. § 157(c)(2).  The United States Constitution imposes limits on this Court's powers that are independent of the limits in section 157(c)(2).  *See Stern v. Marshall*, 564 U.S. 462 (2011).  However, the Supreme Court has confirmed that the parties' knowing and voluntary consent is sufficient to let a bankruptcy judge make final determinations of matters that otherwise would require a final decision by an Article III court.  *See Wellness International Network, Ltd., et al. v. Sharif*, 575 U.S. __ (2015).

Stillwater Liquidating, all of the buyer and lender defendants whose motions to dismiss are addressed by this Opinion, and all but one of the Net Five defendants have consented to the issuance of a final decision by this Court.  That consent satisfies the requirements of the Constitution and of section 157(c)(2).  One Net Five defendant, Paul Rohan, has not provided such consent.  No claims have been asserted against Mr. Rohan under section 544 of the Bankruptcy Code.  As to the claims that have been made against Mr. Rohan, as to which the Court only has "related to" jurisdiction, this Opinion shall constitute the Court's report and recommendations pursuant to 28 U.S.C. § 157(c)(1).

13

## V.    Pleading Standards

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal Rule of Civil Procedure 12(b)(6), permits a bankruptcy court to dismiss an adversary proceeding if a complaint fails to state a claim upon which relief may be granted.  In reviewing a motion to dismiss the court accepts the factual allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  However, the factual allegations in a complaint must be supported by more than mere conclusory statements.  *Twombly*, 550 U.S. at 555.  The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action."  *Id*. (citations omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678 (citing *Twombly*, 550 U.S. at 556).  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief."  *Id*. at 679; *see also id*. at 682 (allegations in a complaint are rejected where there is an "obvious alternative explanation" for the conduct alleged that is more "likely") (internal quotation marks and citation omitted).

14

Rule 7009 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 9(b) of the Federal Rules of Civil Procedure, imposes the additional requirement that allegations of fraud must be stated "with particularity." "[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). While "the fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted); *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Nevertheless, a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

Where (as here) the pleadings refer to agreements and other documents, it is proper for the Court to consider the documents as part of the Complaint in ruling on motions to dismiss. *Grant v. County of Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013) ("In its review [of a Rule 12(b)(6) motion to dismiss], the court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d. Cir. 2000) (noting that it is proper to consider documents that are quoted in or attached to the complaint or incorporated in it by reference, or that plaintiffs either possessed or knew about and upon which they relied in bringing suit); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d

15

759, 762 (2d Cir. 1991) (noting that it is proper to consider a document upon which allegations are based, whether or not it is attached to the complaint).  If an allegation is belied by the terms of the documents, the documents are controlling.  *Id.; see also Alexander v. Board of Education of City of New York*, No. 15-1959, 2016 WL 2610009 (2d Cir. May 6, 2016) (summary order) (dismissing complaint where documents contradicted allegations).

## VI.    The Alleged Assignments of Claims to Stillwater Liquidating

Stillwater Liquidating claims that it is the owner of "all of the claims owned by Gerova relating to the assets at issue hereunder and formerly owned by the Stillwater Funds," as well as "all of the claims owned by the Stillwater Funds."  Amended Complaint ¶¶ 21, 22, 65.  The assignments of claims allegedly were accomplished pursuant to four documents: the Global Settlement Agreement, the "Stillwater Agreement," the limited liability agreement through which Stillwater Liquidating was formed, and the confirmed plan of reorganization in the Offshore Fund's chapter 11 case.  *Id.* ¶ 1 n.4.  Copies of these documents were submitted as Exhibits 5, 6, 7 and 18 to a Court-ordered Supplement to the original Complaint.  Supplement to Complaint, ECF No. 131.

The Global Settlement Agreement is Exhibit 5 to the Supplement.  The only Stillwater Fund that was a party to the agreement was the Offshore Fund.  Supplement to Complaint, Ex. 5, at 2, ECF No. 131-5.  The investment manager of the Stillwater Funds was a party, but it was a defendant in the underlying class actions that were being settled, and it did not purport to execute the agreement on behalf of anyone else.  Two Gerova companies were parties: Gerova Financial Group, Ltd. and Gerova Holdings, Ltd.  *Id.* at 1.  No other Gerova entity was a named party.

The Global Settlement Agreement stated that the two named Gerova parties "and Gerova's subsidiaries and the former directors and officers thereof" would be "deemed" to have "automatically" transferred their ownership interests in the assets formerly belonging to the

16

Stillwater Funds to a new entity that would pursue claims against third parties.  It similarly stated that each of the Stillwater Funds "shall be deemed to have automatically transferred their ownership interest in the Assets, including all of the assets of the Stillwater Funds, and any rights attendant thereto" to the same entity.  *Id.* ¶ 12.  It is unclear how the parties to the Settlement Agreement could "deem" other persons and entities (who were not parties to the agreement) to have assigned their properties and claims, and how this could have been sufficient to accomplish an actual assignment of claims to an entity that did not yet exist.  None of the named parties purported to sign the agreement on behalf of any other entity, or represented that it had authority (or intended) to do so.  *Id.* at 26-34.

The so-called "Stillwater Agreement" was submitted as Exhibit 6 to the Supplement.  It, too, states that the various Stillwater Funds shall be "deemed" to have "automatically" transferred their assets to a new entity.  Supplement to Complaint, Ex. 6, ¶ 3(b), ECF No. 131-6.  Again, however, the only Stillwater Fund that is identified as a party to the agreement, or on whose behalf anyone purported to execute the agreement, is the Offshore Fund.  The manager and general partner of the Stillwater Funds (Stillwater Capital Partners, Inc. and Stillwater Capital Partners LLC) were parties, but each of those entities signed the agreement only on its own behalf.

Stillwater Liquidating was formed under a Limited Liability Company Agreement dated as of July 10, 2014.  *See* Supplement to Complaint, Ex. 7, ECF No. 131-7.  The recitals state that Stillwater Liquidating was formed to serve as the entity to which various assets and claims would be assigned under the Global Settlement Agreement and the Stillwater Agreement.  The agreement refers to assets being assigned pursuant to the Global Settlement Agreement and the Stillwater Agreement and states that those assets would be deemed to be the capital contributions

by the Members.  *Id.* § 5.1(a).  However, none of the Stillwater Funds were named as parties to the Limited Liability Company Agreement, and the agreement does not itself provide for an assignment of claims.

The fourth document cited by Stillwater Liquidating is the plan of reorganization that was confirmed in the Offshore Fund's case.  *See* Supplement to Complaint, Ex. 18, ECF No. 131-18. The plan referred to the terms of the Global Settlement Agreement and the Stillwater Agreement and to transfers of claims that were to occur pursuant to those agreements.  *Id.* at 13-15. However, this Court had jurisdiction only over the assets and claims of the Offshore Fund.  The plan may have referred to the Global Settlement Agreement and the Stillwater Agreement, but this Court had no power to direct the transfers of assets by non-debtors.

The cited documents therefore raise serious questions as to whether Stillwater Liquidating even has the right to assert many of the claims that it seeks to pursue.  The moving defendants, however, did not seek dismissal on this ground, and so Stillwater Liquidating offered no further explanations of its allegations or of the manner in which the assignments allegedly occurred.  Accordingly, the Court will presume for purposes of the pending motions that the alleged assignments actually occurred.

## VII.    The Fraudulent Transfer Allegations

The primary claims in the Amended Complaint are that the Stillwater Funds owned properties that were fraudulently transferred to "Gerova" and then to "Net Five," and that the lender and buyer defendants are subsequent transferees of those properties.  A brief description of how Stillwater Liquidating's arguments have developed through the amended pleadings and the arguments of the motions to dismiss is necessary as background to the Court's rulings.

18

### A.    The Original Complaint

Despite its length, the original Complaint was far from specific in describing the sequences of property transfers that it sought to undo, and how those transfers were subject to claims under sections 544 and 550 of the Bankruptcy Code.

First, the Complaint was not clear in identifying the "initial transfers" that allegedly were fraudulent.  It alleged that all of the transfers to Gerova, and all of the transfers by Gerova to Net Five, "individually and collectively" were "Fraudulent Transfers."  Complaint ¶¶ 259, 267, 275, 283.  However, it also alleged that the "Fraudulent Transfers" were transfers made by "the Stillwater Funds," suggesting that it was the Stillwater Funds' transfers to "Gerova," rather than Gerova's alleged transfers to "Net Five," that were the initial transfers.  *Id.* ¶¶ 261, 269, 277, 285.  A subsequent transferee has no liability unless an initial transfer was fraudulent, *see* 11 U.S.C. § 550, but here it was difficult to discern which transfer was the "initial" transfer that was being challenged.

Second, the Complaint did not identify the transferors of each property.  The Complaint vaguely defined the "Stillwater Funds" as including eleven named investment funds "together with any other funds controlled by any or a combination of these entities."  *See* Complaint ¶ 10 n.1.  It further defined "Stillwater Assets" as "any and all of the assets held by the Stillwater Funds," *id.* ¶ 43, and then generally alleged that various properties were among the "Stillwater Assets" that were fraudulently transferred.  The lumping of parties and assets was a problem in tracing the transfers that occurred and identifying the laws that should govern the asserted fraudulent transfer claims.  The lumping also made it impossible to evaluate Stillwater Liquidating's alleged right to assert claims under sections 544 and 550 of the Bankruptcy Code.

Third, the Complaint was not precise in identifying the properties that the Stillwater Funds transferred. For example, the Complaint alleged that all but a few of the transfers described in the Complaint were transfers of real property owned by the Stillwater Funds themselves. However, other allegations in the Complaint made clear that many properties were owned by limited liability companies that one or more of the Stillwater Funds owned. *See, e.g.*, *id.* ¶¶ 111-20 (alleging that the "Judge Street Property" was transferred to Gerova but also alleging that the property was owned by "15 Judge Street LLC" both before and after the Gerova transactions); *id.* ¶¶ 125-31 (alleging that the "St. Augustine Property" was transferred to Gerova but also alleging that the property was owned by "AUG Funding, LLC" both before and after the Gerova transactions). It was apparent that in many instances the "property" that the Stillwater Funds owned, and that allegedly was transferred to Gerova, was their ownership interests in other companies. Yet the Complaint ignored the other companies and treated all transfers of property by those limited liability companies as though they involved transfers of real property belonging to the Stillwater Funds themselves. Fraudulent transfer claims require careful identification of the parties to the transfers, but here a host of separate Stillwater entities and subsidiaries were just lumped together as though it made no difference.

Fourth, the Complaint alleged that the Stillwater Assets were transferred to "Gerova" and then to "Net Five," without identifying the Gerova and Net Five entities that were involved in each alleged transfer or how the transfers allegedly occurred. *Id.* ¶¶ 1, 10, 13, 48-49, 58-61, 73. The defined term "Gerova" included two companies (Gerova Financial Group, Ltd. and Gerova Holdings, Ltd.), while "Net Five" was defined to include Net Five Holdings LLC and a host of other "single purpose" entities, only some of which were even named. *Id.* ¶¶ 1, 13.

After discussing these issues at a scheduling conference the Court issued an Order dated

April 21, 2015 that directed Stillwater Liquidating to file a supplement to clarify its claims, and

ordered that the supplement would be deemed to have been incorporated into the Complaint:

> Several defendants have raised the issue of whether the Plaintiff
> has the right to assert certain of the fraudulent transfer claims
> alleged pursuant to section 544 of the Bankruptcy Code. The
> current pleadings do not provide clarity in that regard. Therefore,
> plaintiff is directed to provide a statement (the "Statement"), on or
> before May 12, 2015, that specifies separately, for each defendant,
> the precise chain of transfer of the property or properties that the
> Plaintiff contends support its fraudulent transfer claim against that
> particular defendant. The allegations in the Statement will be
> deemed to have been incorporated in the Complaint. To the extent
> known by the Plaintiff, the details provided concerning each
> transfer should be as specific as possible, including (i) the identity
> of each transferor and transferee, and (ii) the precise property that
> was transferred. In instances in which LLCs or other entities were
> transferors or transferees, or in which ownership interests in LLCs
> or other entities were transferred, the Statement should provide the
> name of the LLC or other entity, its place of organization and its
> principal place of business at the time of the relevant transfer(s).

Supplemental Scheduling Order ¶ 2, ECF No. 113.

## B.    The Supplement

Stillwater Liquidating filed the required Supplement together with 949 pages of exhibits.

*See* ECF Nos. 130 and 131. The Supplement described Gerova's alleged transfers to Net Five as

"subsequent" transfers of assets that had been fraudulently transferred. Supplement to

Complaint 8. The Supplement asserted for the first time that the Offshore Fund owned

"participation interests" in loans or properties that are relevant to some (but not all) of the claims

asserted in the Complaint. *See id*. at 2-3. It also asserted various theories as to why all of the

Stillwater Funds – and not just the Offshore Fund – should be entitled to assert claims under

sections 544 through 550 of the Bankruptcy Code. *Id.* at 3-9.

The Supplement clarified some matters, but it continued to lump parties and transactions together and to make loose characterizations of what happened instead of providing careful descriptions of parties and events.  For example, the Supplement named the limited liability companies that held title to some properties, but it continued to allege that transfers of the ownership of those companies, and transfers of property made by those companies, all were transfers of real property owned by the Stillwater Funds themselves.  *See, e.g.*, Supplement to Complaint 13 (making clear that the St. Augustine Property was owned by AUG Funding LLC, but continuing to allege that the "St. Augustine Property" was a Stillwater Asset that was transferred to "Gerova"); *id.* at 15-16 (identifying Carowinds Hotel Owner LLC as the entity that owned the Carowinds Property, but continuing to allege that the "Carowinds Property" itself was a Stillwater Asset that was transferred to Gerova).

The Supplement also continued to allege transfers to "Gerova" and to "Net Five" without identifying the exact entities that were involved.  In some ways the Supplement made the details about those transfers even murkier.  The original Complaint alleged that assets were transferred to "Gerova," which was defined as Gerova Financial Group, Ltd. and Gerova Holdings, Ltd. Complaint ¶¶ 1, 49.  The Supplement alleged instead that all assets were transferred to "Gerova AB Holdings Ltd."  Supplement to Complaint 7-8.

Other agreements (identified in the Supplement but not attached to it) introduced a new wrinkle by making clear that some of the Gerova transactions did not involve asset sales at all, but instead involved mergers.  The details of the transactions make a big difference.  The Complaint alleged that each of the Stillwater Funds sold assets to Gerova and never received the promised compensation from Gerova.  If (instead) a Stillwater Fund merged with a Gerova entity, and if the investors of that Stillwater Fund (not the fund itself) were entitled to receive

22

stock from a Gerova entity in exchange for their stock in the former Stillwater Fund, then the whole character of the alleged fraudulent transfer claim would be different.  *See* Part X(B), below.

### C.    Other Theories Argued in Opposition to Motions to Dismiss

The fraudulent transfer claims set forth in the Complaint (and the Supplement) were asserted by Stillwater Liquidating as the alleged assignee of the Stillwater Funds.  Many defendants renewed or filed motions to dismiss after the filing of the Supplement.  During briefing and argument on the motions to dismiss, Stillwater Liquidating invoked a number of alternative theories of fraudulent transfer liability.  It made each of the following contentions:

- That creditors of the Stillwater Funds had allegedly assigned their own fraudulent transfer claims to Stillwater Liquidating (a contention made during oral argument that was retracted almost immediately).  *See* Hearing Tr. 93:24-94:21, 104:9-14, June 23, 2015, ECF No. 171.

- That the Offshore Fund's participation interests made it a creditor of other Stillwater Funds and that the Offshore Fund had the right, as a creditor, to challenge fraudulent transfers made by the other Stillwater Funds.  *See* Plaintiff's Supplemental Brief in Opposition to Motions to Dismiss 18, ECF No. 188.

- That the Stillwater Funds were creditors of Gerova and, in that capacity, had the right to challenge fraudulent transfers that Gerova allegedly made.  *Id.* at 30-31 (contending that the Onshore Fund could assert such claims); *see also* Plaintiff's Opposition to SFN's Motion to Dismiss 39-40, ECF No. 196; Hearing Tr. 14:23-15:1, 105:2-6, June 23, 2015, ECF No. 171.

- That Stillwater Liquidating was the assignee of Gerova's alleged rights, under
  Bermuda law, to assert fraudulent transfer claims on Gerova's own behalf. *See*
  Plaintiff's Supplemental Brief in Opposition to SFN's Motion to Dismiss 22-23, ECF
  No. 204.

- That Stillwater Liquidating was the assignee of Gerova's rights, as a creditor of Net
  Five, to challenge fraudulent transfers allegedly made by Net Five.  Hearing Tr.
  17:24-18:2, June 23, 2015, ECF No. 171.

The ever-multiplying permutations of Stillwater Liquidating's claims were striking.

Every challenge to a fraudulent transfer claim seemed to generate new descriptions of the claims,

including contentions that contradicted statements that Stillwater Liquidating had made at other

times. *See, e.g.*, Hearing Tr. 28:15-29:1, April 8, 2015, ECF No. 100. (stating, in response to a

question from the Court, that Stillwater Liquidating was not attempting to assert fraudulent

transfer claims that Gerova could have asserted).  In many ways the briefs and arguments in

connection with the motions to dismiss were more about claims that could have been asserted,

rather than about claims that had been asserted.

### D.      The Amended Complaint

Some motions to dismiss were filed later than others, and a long series of motions, briefs,

voluminous exhibit packages and oral arguments continued into the latter part of 2015.  In early

2016, while many of the motions were under submission, Stillwater Liquidating asked for leave

to file an amended complaint that would gather all of its evolving allegations into one place.

Many defendants objected, but the Court authorized the filing, on the condition (to which all

parties consented) that the pending motions to dismiss would be deemed applicable to the new

Amended Complaint, and on the condition that newly-added defendants would not need to

respond to the Amended Complaint until after the Court had ruled on the already-pending

motions to dismiss.  The Court also gave the defendants the right to supplement their prior

submissions if they felt it necessary to do so.  The Amended Complaint was filed on April 22,

2016; the supplemental submissions that it fostered have continued through August 2016.

The only fraudulent transfer claims that are asserted in the Amended Complaint are

claims that the assets of the Stillwater Funds were fraudulently transferred to Gerova and then to

Net Five, and that the Stillwater Funds (and Stillwater Liquidating as their assignee) allegedly

have the right to challenge these transfers under section 544 of the Bankruptcy Code.  *See*

Amended Complaint ¶ 15(a) and Counts I-V.  The "Fraudulent Transfers" allegedly include

Gerova's transfers to Net Five, but only to the extent that the Gerova transactions and the Net

Five transactions are "collapsed."  *Id.*  ¶¶ 15(a), 389, 397, 405, 413.  The many alternative

fraudulent transfer theories that had been raised during the briefing and argument of the motions

to dismiss do not appear in the Amended Complaint.  Thus, there is no separate claim or

allegation that the Stillwater Funds, as creditors of Gerova, have the right to challenge fraudulent

transfers that might have been made by Gerova.  Similarly, there is no separate claim or

allegation that Gerova was a creditor of Net Five and that Stillwater Liquidating, as assignee of

Gerova, has the right to challenge fraudulent transfers made by Net Five.  There is no claim or

allegation that Gerova has rights under Bermuda law to challenge fraudulent transfers that

Gerova itself might have made.  Nor is there any separate claim or allegation that the Offshore

Fund is a creditor of any other Stillwater Fund and that the Offshore Fund, as a creditor, has the

right to challenge transfers made by other Stillwater Funds.  Those many alternative theories and

claims – which the prior briefs and arguments had invoked – apparently were cast aside.

25

As to the claims that have been asserted: the Amended Complaint provides some greater information, but in many ways the Amended Complaint still is intent on obfuscating, rather than clarifying, the transfers that occurred and the entities that were involved.  The Amended Complaint acknowledges that the alleged "Gerova Transfers" were accomplished through a series of mergers as well as asset sales.  *Id.*  ¶¶ 4, 91, 97.  However, the Amended Complaint attempts to brush all of that aside by defining the mergers and asset sales collectively as the "Asset Purchase Agreement" and by identifying all of the relevant Stillwater and Gerova entities as parties to that conflated agreement.  *Id*. ¶ 91.  The Amended Complaint also cites to the terms of one particular asset purchase agreement and treats those terms as though they govern all of the different transactions that occurred among all of the relevant Gerova and Stillwater entities.  *Id.* ¶¶ 91 n.29, 94.  However, the cited agreement was attached to the Supplement, and it is plain that it does not govern the mergers that occurred.  *See* Supplement to Complaint, Ex. 131-15.

Like the Complaint and the Supplement, the Amended Complaint also continues to allege that transfers of the ownership of limited liability companies, or transfers of property by those LLCs, were transfers of real property owned by the Stillwater Funds themselves.  *See, e.g.,* Amended Complaint ¶¶ 163, 166, 167, 169 (making clear that the Judge Street Property was owned by a limited liability company named 15 Judge Street LLC and was later sold by that company, but continuing to allege that the "Judge Street Property" itself was an asset of the Stillwater Funds that was transferred to Gerova and that may now be recovered from the buyer); *id*. ¶¶ 176, 178, 182, 183, 188 (making clear that the St. Augustine Property was owned by a limited liability company named AUG Funding LLC and was later sold by that company, but continuing to allege that the St. Augustine Property itself was an asset of the Stillwater Funds that may be recovered from subsequent buyers and lenders).

VIII.  **Governing Law as to the Fraudulent Transfer Claims**

Section 544 (to the extent applicable) permits a trustee or a debtor-in-possession to assert state law fraudulent claims that otherwise would be available to a creditor.  *See Lippe v. Bairnco Corp.*, 225 B.R. 846, 851 (S.D.N.Y. 1998).  The first question one would expect a plaintiff to address, then, is the state law by which a fraudulent transfer claim is governed.  Stillwater Liquidating has alleged that its fraudulent transfer claims are governed by New York law. Amended Complaint ¶¶ 15(a), 391, 395, 399, 403, 407, 411, 415, 418, 437.  However, it is not at all clear why New York law should be applicable to these claims.

When the Court first raised this question during a hearing in April 2015, Stillwater Liquidating's counsel responded that New York law should apply because the "ultimate property at issue was Stillwater's, which was a New York entity initially."  *See* Hearing Tr. 42:11-14, April 21, 2015, ECF No. 124.  However, the Delaware Fund was organized under the laws of Delaware.  It merged with a new partnership that Gerova had formed and that also was organized under Delaware law.  *See* Part X(B), below.  There is no allegation in the Amended Complaint that either of those entities had a presence in New York.  The real properties that allegedly were owned by the Delaware Fund or by its subsidiaries, or that were the subject of secured loans made by those companies, were located in many different states.  Amended Complaint ¶ 113. There is no allegation in the Amended Complaint that explains why the merger of two Delaware entities should be governed by New York law, or why the alleged transfers of properties located in many states should be governed by New York law.

The Offshore Fund – the entity that was a debtor in this case – is a Cayman Islands company.  It sold its assets to another Cayman Islands company named Gerova AB Holdings, Ltd.  *See* Part X(A), below.  There is no allegation in the Amended Complaint that the Offshore Fund or the buyer had a presence in New York.  As explained in Part XII below, the Offshore

Fund owned participation interests in loans made by others, and the Amended Complaint seeks

to treat those participation interests as though they were direct ownership interests in the real

properties that secured the loans.  However, regardless of whether the participation interests are

viewed as separate intangible contractual property rights, or as interests in a trust for which the

Delaware Fund was trustee, or as direct interests in loans, or as direct interests in real property,

there is no allegation in the Amended Complaint that would support Stillwater Liquidating's

suggestion that the transfers of all of the participation interests should be treated as having been

subject to the provisions of New York's Debtor and Creditor Law.

       This is just one of the many frustrating instances in which Stillwater Liquidating has

simply stopped short in thinking through its claims and the allegations needed to support them.

Some of the defendants argued that if the fraudulent transfer claims relate to real property then

the underlying claims should be governed by the laws of the state in which the real property is

located.  *See* SFN's Motion to Dismiss 7, ECF No. 136.  There is substantial support for that

proposition.  *See James v. Powell*, 225 N.E.2d 741, 745 (N.Y. 1967); *Istim, Inc. v. Chemical

Bank*, 581 N.E.2d 1042, 1044 (N.Y. 1991).  Here, some of the assets that allegedly were

transferred were loans and participation interests and therefore might be regarded as intangible

rights rather than real property, but the premise of the Amended Complaint is that the secured

loans and participation interests should be treated just as though they represented ownership

interests in the real properties that served as collateral for the loans.  *See* Part XII, below.  If that

were true, then the many claims asserted by Stillwater Liquidating would potentially be subject

to different state laws, depending on the states in which properties were located.

       Perhaps what Stillwater Liquidating means to argue is that if a large group of assets is

transferred in a single transaction the transfers that are the subject of that transaction should be

governed by the same law, and not by multiple states' laws.  However, no argument has been

made to that effect and no decisions have been cited to that effect.  Stillwater Liquidating also

asserted, in a footnote to one of its many briefs, that "the initial fraudulent transfers was *[sic]* of

property subject to New York law" and that New York law therefore should apply.  *See*

Plaintiff's Opposition to SFN's Motion to Dismiss 39 n.17, ECF No. 196.  A generous reading of

this cryptic footnote could interpret it as a reference to the fact that the transfer agreements were

governed by New York law.  However, fraudulent transfer claims are statutory claims, not

contract claims; they belong to creditors, not to the parties to the transfer.  No citations were

offered in support of the proposition that the parties to a fraudulent transfer may dictate, by their

contract, the laws that govern a defrauded creditor's rights.

In any event, Stillwater Liquidating's fraudulent transfer claims against the buyer and

lender defendants, and most of its fraudulent transfer claims against the Net Five Defendants, fail

on other grounds that are set forth in Parts IX through XIV and Part XVII, below, regardless of

what law governs.  It is therefore not necessary to resolve the potentially difficult choice of law

issues in this Opinion.

## IX.    Stillwater Liquidating's Alleged Rights to Assert Claims Under Section 544

The Offshore Fund (and Stillwater Liquidating as its alleged assignee) have standing

under section 544 of the Bankruptcy Code to challenge fraudulent transfers of the Offshore

Fund's assets that occurred before the filing of the Offshore Fund's bankruptcy case.  Stillwater

Liquidating argues that it also is entitled, under section 544, to assert fraudulent transfer claims

relating to transfers made by other Stillwater Funds.  Its contentions are without merit.

### A.    Stillwater Liquidating's Status as Assignee or Alleged Successor

The Offshore Fund is the only Stillwater Fund that was a debtor in a US bankruptcy case.

Stillwater Liquidating contends that it is the successor to the Offshore Fund and therefore that all

of the claims it now asserts – including the claims that allegedly were assigned to it by other

Stillwater and Gerova entities – should be treated as claims that are subject to section 544. *See*,

*e.g.*, Amended Complaint ¶¶ 175, 265, 293, 385.  That argument is a non-sequitur.

Stillwater Liquidating is an assignee of certain defined claims, not a corporate

"successor" to the Offshore Fund.  Even if it were such a "successor" to the Offshore Fund, it is

plain that Stillwater Liquidating did not acquire other funds' claims from the Offshore Fund.

The other Stillwater Funds allegedly assigned their claims directly to Stillwater Liquidating.

Those claims never passed through the Offshore Fund and never were owned by the Offshore

Fund.  If Stillwater Liquidating owns those claims it owns them as a direct assignee of the other

Stillwater Funds, not as a successor to (or assignee of) the Offshore Fund.

Furthermore, even if the other Stillwater Funds had assigned their claims to the Offshore

Fund, and even if the Offshore Fund had then transferred them to Stillwater Liquidating, section

544 still would not apply.  Section 544 only applies to actions based on pre-bankruptcy transfers

of a debtor's own property.  *See* 11 U.S.C. § 544 (permitting a trustee to assert claims relating to

pre-bankruptcy transfers of "property of" the debtor).  Section 544 does not apply just because a

debtor has acquired a claim from someone else, and it does not apply to claims that are based on

transfers of property that were made by non-debtor entities.

### B.    Substantive Consolidation

Stillwater Liquidating contends that the confirmed plan of reorganization in the Offshore

Fund's case amounted to a substantive consolidation of the Offshore Fund with all of the other

Stillwater Funds, such that all of the Stillwater Funds should be treated as a single entity that has

the rights of a "debtor" under the Bankruptcy Code.  *See, e.g.*, Amended Complaint ¶¶ 264, 292,

308, 344, 359, 396.

30

Courts have long recognized that bankruptcy courts have general equitable power under section 105(a) of the Bankruptcy Code to order substantive consolidation. *See Fed. Deposit Ins. Corp. v. Colonial Realty Co*., 966 F.2d 57, 59 (2d Cir. 1992); *In re Stone & Webster, Inc.*, 286 B.R. 532, 540–41 (Bankr. D. Del. 2002) ("[T]he Bankruptcy Code [in section 1123(a)(5)] recognizes that, in appropriate circumstances, consolidation of one debtor with one or more debtors is authorized"). Ordinarily, the consequence of substantive consolidation is that the assets and liabilities of the consolidated entities are pooled, with the resulting consolidated assets being used to satisfy the consolidated liabilities of all of the debtors. *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988). In such a case intercompany claims are eliminated and guarantees from co-debtors are disregarded, and the creditors of all of the consolidated companies are combined for purposes of voting on a plan of reorganization. *Id*.; *see also In re Leslie Fay Cos.*, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997) (noting that multiple claims are eliminated).

None of these things happened in the Offshore Fund's chapter 11 case. The words "substantive consolidation" do not appear in the plan or in the confirmation order. Only the creditors of the Offshore Fund were asked to vote on the proposed plan. No notices were sent to other entities, or to their creditors, advising them that a substantive consolidation might occur. There was no consolidation of liabilities. The creditors of the other Stillwater Funds retained their separate claims against those separate Funds.

In fact, the separation of the creditor constituencies is reflected even in the Operating Agreement by which Stillwater Liquidating was formed. *See* Supplement to Complaint, Ex. 7, ECF No. 131-7. The creditors of the Stillwater Funds are not part of a single class who have equal and *pro rata* access to all of the assets of all of the Stillwater Funds. Instead, the operating

31

agreement established different "Series" of membership interests, and each series corresponds to

a separate Stillwater Fund. *Id.* § 3.2. Each Series of members is entitled to a fixed and

predetermined percentage of Stillwater Liquidating's overall recoveries that apparently was

based on the relative asset values of the funds. The recovery that a creditor of the Delaware

Fund may receive (as a percentage of that creditor's claim against the Delaware Fund) may be

completely different from the percentage recovery that a creditor of the Offshore Fund may

receive. The limited pooling of claims is an arrangement to which the Members agreed, rather

than a court-ordered consolidation of entities.

There is nothing about the proceedings in front of Judge Gropper that support the

contention that a "substantive consolidation" occurred. Substantive consolidation raises the

potential for unfair treatment by "forcing creditors of one debtor to share on a parity with

creditors of a less solvent debtor," and therefore can only be applied "sparingly" and when

specific findings are made that support such a result. *Augie/Restivo*, 860 F.2d at 518 (citations

omitted). In *Augie/Restivo*, the Second Circuit indicated that all of the factors considered could

be consolidated into two critical factors:

> (i)    whether creditors dealt with the entities as a single economic unit
> and did not rely on their separate identity in extending credit, and

> (ii)   whether the affairs of the debtors are so entangled that
> consolidation will benefit all creditors.

*Id*. (citations omitted). Judge Gropper was not asked to make any such findings when the

Offshore Fund sought confirmation of its plan of reorganization, and he did not make any such

findings.

Courts also are split on the issues of whether bankruptcy courts have authority to

substantively consolidate a debtor and non-debtor entities. *See, e.g.*, *In re S & G Financial

Services of South Florida, Inc.*, 451 B.R. 573, 579-82 (Bankr. S.D. Fla. 2011) (concluding that a

32

debtor and non-debtor may be substantively consolidated and citing cases on both sides of the

issue); *In re Pearlman*, 462 B.R. 849, 854 (Bankr. M.D. Fla. 2012) (concluding that they may

not be substantively consolidated and also citing cases on both sides of the issue).  The notion

that Judge Gropper ordered a silent "substantive consolidation" of all of the Stillwater Funds –

without addressing the unusual character of the requested relief, without making any of the

factual findings that such unusual relief would require, without soliciting votes by the affected

creditors of the Funds, without consolidating the creditor pools, and without even discussing the

relevant legal standards and questions – is preposterous.

### C.    Alleged Alter Ego Liability

Stillwater Liquidating also argues that the separate corporate forms of the funds should

be disregarded, and that they all should be treated as one entity for purposes of the claims

asserted in this case.

The purpose of disregarding the corporate form is to hold one who has engaged in

inequitable conduct responsible for its actions.  *Off. Comm. of Unsecured Creditors v. Morgan

Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) (citations

omitted).  If corporate formalities have been disregarded such that a corporation's owners have

treated the corporation's assets as though they belong directly to the owners and it would be

unfair or unjust to allow the owners to rely on the limited liability that the corporate form

otherwise would allow, then the corporate form should be disregarded.  *Id.*

In this case, however, the proposed alter ego theory is not being offered for the purpose

of piercing the shield between a corporation and its owners, or of holding owners liable for a

corporation's debts, or even of making sister companies liable for each other's debts.  There are

no allegations, for example, that one Stillwater Fund should have liability for the obligations of

another Stillwater Fund.

33

Instead, Stillwater Liquidating wants to use "alter ego" theories solely to expand the litigation claims that it may assert.  Stillwater Liquidating wants each of the Stillwater Funds to have the right to assert claims under section 544, but without pooling other assets or liabilities of the Funds and without combining creditor groups.  The Court knows of no support for the idea that alter ego theories can be used in this selective and self-serving way.  *Cf. Commissioner of Internal Revenue v. Schaefer*, 240 F.2d 381, 383 (2d Cir. 1957) (noting that one who seeks the benefits of the corporate form of ownership may not ignore the presence or existence of the corporation, in order to avoid the disadvantages (internal quotation marks and citations omitted)); *Harris v. Stony Clove Lake Acres Inc*., 608 N.Y.S.2d 584, 586 (App. Div. 1994) (denying shareholder's effort to apply alter ego status to gain advantage of asserting defenses belonging to corporation, noting that even when a corporation is wholly owned by a single individual, it has a separate existence and "courts are loathe to disregard the corporate form for the benefit of those who have chosen that form to conduct business"); *Jenkins v. Moyse*, 172 N.E. 521, 522 (N.Y. 1930) (denying shareholder's effort to apply alter ego to gain benefit of avoiding interest rate that would be usurious if applied to an individual but not to a corporation).

In addition, the allegations of the Amended Complaint are not sufficient to support an alter ego finding.  The principles for disregarding the corporate form applicable to corporations are generally applicable if a limited liability company is involved.  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).  The law consulted is that of the state of incorporation or formation of the entity whose corporate form is sought to be disregarded. *Fletcher v. Atex, Inc*., 68 F.3d 1451, 1456 (2d Cir. 1995); *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (holding that because the purpose of the law is to provide protection from liability, the state under whose laws the entity was incorporated or formed has

34

the paramount interest in the shedding of that protection); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F.Supp.2d 392, 401 (S.D.N.Y. 2013).  Here, the laws to be applied would include Delaware law (for the Delaware Fund) and Cayman Islands law (for the Offshore Fund).

Alter ego liability under Delaware law requires an allegation of facts sufficient to show (1) that a parent and subsidiary operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present.  *Fletcher*, 68 F.3d at 1457 (internal quotation marks and citations omitted).  The factors to be considered include:

- whether the company to be disregarded was adequately capitalized;

- whether the company to be disregarded was solvent;

- whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed;

- whether the dominant shareholder siphoned corporate funds; and

- whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Id*. at 1458 (*citing Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV.A. 1331, 1989 WL 110537, at *4 (Del Ch. Sept. 19, 1989)).  In the context of an LLC, however, there is "less emphasis placed on whether the LLC observed internal formalities because fewer such formalities are legally required."  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008) (citing relevant Delaware Limited Liability Company Act provisions).

Generally, the question of the degree of domination is a factual issue.  *See Fletcher*, 68 F.3d at 1458; *see also Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1145 (S.D.N.Y. 1996).  However, there have been instances where "courts have granted motions to dismiss as well as motions for summary judgment in favor of defendant parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute."  *See Fletcher*, 68 F.3d

35

at 1458 (citing cases).  Moreover, merely showing that the parent dominated and controlled the

subsidiary is not sufficient to establish alter ego liability or that the subsidiary was just a facade

for the dominating entity.  *Outokumpu Eng'g. Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685

A.2d 724, 729 (Del. Super. Ct. 1996).  Instead, there must be an allegation of facts that would

show that the controlled entity was left without legal or independent significance of its own.

*Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (internal quotation marks and citations

omitted).

Disregarding corporate entities is permitted under Cayman Islands law, but only in

"exceptional cases" where "special circumstances" show that the corporate form was a mere

façade concealing the true facts.  *Beach v. Citigroup Alternative Invs. LLC*, No. 12 Civ.

7717(PKC), 2014 WL 904650, at *10 (S.D.N.Y. Mar. 7, 2014) (citing *Walker Int'l Holdings Ltd.

v. Olearius Ltd.*, [2003] CILR 457 (Grand Ct.) [47172]).  "Traditionally, exceptional

circumstances have been found when a company (1) engages in conduct that is illegal, or *ultra

vires* the company, (2) perpetrates a fraud against the minority shareholders and the wrongdoers

are themselves in control of the company, or (3) passes a resolution which requires a qualified

majority by a simple majority."  *Id.* (citing *Gee v. Attridge*, [1986–87] CILR 343 (Grand Ct.)

[347]).

The allegations of the Amended Complaint are not sufficient, under these standards, to

support the contention that the separate existence of the Delaware Fund and the Offshore Fund

should be ignored and that they should be treated as "alter egos" of each other.  The Amended

Complaint does contain a conclusory allegation that the Funds generally commingled assets and

their products, offspring, and rents in ways that make it impossible to untangle them.  Amended

Complaint ¶¶ 59, 62.  However, mere conclusory allegations of this kind are entitled to no

36

weight.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Papasan v. Allain*, 478 U.S. 265, 286

(1986).  An alter ego claim requires an allegation of facts, not conclusions.  Here, the only facts

alleged in support of the alter ego claim are the following:

- That the Stillwater Funds had a common manager, Amended Complaint ¶ 58, an

  alleged fact that itself establishes nothing;

- That in 2009 cash flows from some producing assets were used to pay fees and to

  support underperforming assets, *id.* ¶ 60, without alleging what those cash flows or

  assets were, how significant they were, to whom they belonged, the manner in which

  such cash flows allegedly were transferred among the companies, or how (or

  whether) such transfers were documented and approved;

- That in 2009 some cash flowed through three common accounts "apparently without

  separate accounting," *id.* ¶ 60, without explanation as to what cash was involved, how

  much was involved, or which Stillwater Funds were affected; and

- That in 2009 the investment manager allegedly used a portfolio of law firm loans to

  borrow up to $30 million and did not account for the use of such loan proceeds, *id.* ¶

  61 – an allegation that is made without identifying the Stillwater Funds that were

  affected.

These allegations are not sufficient to show that the separate existence of the Stillwater

Funds was a complete fiction.  The Amended Complaint merely identifies instances of allegedly

inadequate record-keeping or of misuse of funds by the manager.  Those allegations might

support a claim of negligence or misappropriation of funds, but even if proved they would fall

woefully short of supporting the contention that the separate Stillwater Funds should be

disregarded and should be collapsed into a single entity.  The Amended Complaint itself

documents the careful recognition of corporate formalities and corporate separateness in the executions of participation agreements and in the formation of separate companies to hold particular loans or properties.  In fact, as noted above the separate status of the creditors of the various Stillwater Funds has been preserved even in the Operating Agreement through which Stillwater Liquidating was formed.

Stillwater Liquidating also argues that certain assets *formerly* owned by the Stillwater Funds were commingled, by Gerova, *after* the assets were transferred to Gerova.  Amended Complaint ¶¶ 91, 101.  The allegations are merely conclusory.  They also are irrelevant.  The fraudulent transfer claims that Stillwater Liquidating wishes to assert arise out of the alleged transfers to Gerova.  They may not be asserted under section 544 unless they are claims that are based on transfers of a debtor's assets.  If Stillwater Liquidating wishes to argue (based on alter ego theories) that transfers of assets by other funds should be treated as though they were transfers of assets by the Offshore Fund itself, then the time at which that contention should be evaluated is the time when the transfers allegedly occurred.  Gerova's actions, after Gerova allegedly acquired assets, have no possible bearing on the issue of whether the Stillwater Funds were separate entities at the time the challenged transfers to Gerova occurred.

Only the Offshore Fund had the right, under section 544, to assert fraudulent transfer claims with respect to transfers of its assets.  The other entities had no such rights, and Stillwater Liquidating (as their alleged assignee) has no such rights.  There are also many other defects in the claims that Stillwater Liquidating purports to assert on behalf of those entities (and on behalf of the Offshore Fund as well), as explained more fully below.

X.    **The Alleged Transfers to Gerova**

The Complaint, the Supplement and the Amended Complaint refer to a number of agreements and transfer documents regarding the Gerova transactions and thereby incorporate

38

those documents by reference.  Unfortunately, the cited documents reveal a host of plain errors and a disturbing lack of candor in Stillwater Liquidating's allegations about the transactions.

### A.    The Sale of Assets by the Offshore Fund

The Offshore Fund and two other Stillwater Funds sold their assets under an Asset Purchase Agreement dated as of December 31, 2009.  *See* Amended Complaint ¶ 91.  A copy of the Asset Purchase Agreement was submitted as an exhibit to the Supplement.  *See* Supplement to Complaint, Ex. 15, at 1-34, ECF No. 131-15 ("**Offshore APA**").  The buyer was a Cayman Islands company named Gerova AB Holdings, Ltd.  The buyer's parent company, Asia Special Situation Acquisition Corp. ("**ASSAC**"), was also a party to the agreement.  ASSAC later became Gerova Financial Group Ltd., one of the two entities that are defined as "Gerova" in the Complaint.  *See* Amended Complaint ¶ 79.  The buyer (Gerova AB Holdings, Ltd.) is not included in the definition of "Gerova" and is not a named defendant.  However, no moving defendant has alleged that Gerova AB Holdings Ltd. is a necessary party or has sought dismissal on that ground.

As part of the Asset Purchase Agreement the three selling funds estimated their total net asset values to be $385 million.  The sellers were to receive 385,000 shares of ASSAC preferred stock.  The preferred shares were to be held by the sellers' investment manager for later allocation among the three selling funds.  Offshore APA § 2.8.  The preferred stock was to be convertible into common shares of ASSAC.  The Offshore Fund was valued at $102 million and was to be issued 102,000 preferred shares under the agreement.

The agreement makes clear that the Offshore Fund sold its assets.  The Amended Complaint alleges that the sale turned the Offshore Fund into a hollow shell and that creditors only had access to that hollow shell to obtain payment of their claims.  Amended Complaint ¶¶

78, 97, 113, 106, 389-90, 397-98, 405-06, 451.  However, the Asset Purchase Agreement plainly

says otherwise.  As part of the transaction the buyer agreed to assume all of the liabilities of the

Offshore Fund, including liabilities owed with respect to "Redemption Claims" by investors in

the Offshore Fund.  Offshore APA § 2.3(a).  Creditors of the Offshore Fund, including those

investors who had attempted to redeem shares, therefore continued to have claims against the

Gerova company that bought the assets.

It is difficult from these facts to understand just how the asset sale allegedly defrauded

the Offshore Fund's creditors.  There is no allegation in the Amended Complaint that the buyer

had any liabilities that the Offshore Fund did not have, or that the transfer to the new entity

limited the assets available to pay creditors' claims.  There are allegations that the Offshore Fund

itself could not pay claims, but that is only part of the story.  The buyer's assumption of

liabilities is an item of value to the Offshore Fund and its creditors.  *See*, *e.g.*, *Columbia Realty*

*Venture v. D.C.*, 433 A.2d 1075, 1077 (D.C. 1981) ("It has long been recognized that the

assumption of the debts of another will constitute consideration").  Here, there is no allegation in

the Amended Complaint that would support the contention that the transfer of assets and

liabilities (taken as a whole) reduced the ability of the Offshore Fund's creditors to obtain

payment of their claims, or that the transaction put any assets out of their reach.  It appears from

the Amended Complaint that creditors had claims against the same assets both before and after

the asset sale; only the ownership of the assets changed.

The Offshore Fund may not have received the consideration it expected in exchange for

the asset transfer, but unless creditors were affected, that is just a contract claim, not a fraudulent

transfer claim.  *See Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) ("courts construing

section 276 have continued to allow only creditors to set aside fraudulent transactions");

40

*Silverman v. Sound Around, Inc. (In re Allou Distribs.)*, 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008)

(explaining that "in order to establish standing under section 544(b) to avoid a fraudulent

transfer, a trustee must" identify a "triggering creditor" who could himself have avoided the

transfer under state law and who, as of the petition date, holds an allowed unsecured claim

against the estate). The equity owners of the Offshore Fund might have been unhappy with the

result, but fraudulent transfer claims protect creditors, not equity owners. *See Eberhard*, 530

F.3d at 131.

### B.    The Delaware Fund's Merger with a Gerova Partnership

The Delaware Fund did not sell its assets to a Gerova entity. Instead, the Delaware Fund

and one other Stillwater Fund merged with a Gerova partnership. *See* Amended Complaint ¶ 97.

For some reason the Amended Complaint alleges that the merger occurred *after* the "Gerova

Transfer," *id.*, as though some other transfer occurred before the merger took place. However,

no other agreement or document has been identified or alleged pursuant to which any separate

transfer of the Delaware Fund's assets occurred.

The merger agreement was not filed with this Court, but it is referred to in the Amended

Complaint and a copy can be found among documents filed with the Securities and Exchange

Commission.[3] The Delaware Fund agreed to merge with another Stillwater Fund (also organized

under the laws of Delaware) and with a Delaware partnership named Gerova AB Fund Mergerco

LP, with the Delaware Fund as the surviving entity. Delaware Fund Merger Agreement § 2.1.

The Delaware Fund later filed a certificate of amendment to change its name to Gerova Asset

---

[3]    Asia Special Situation Acquisition Corp., Report of Foreign Private Issuer (Form 6-K) (Jan.
7, 2010), Ex. 10-3 (the "**Delaware Fund Merger Agreement**").

Backed Holdings LP.[4]  All limited partnership interests in the Delaware Fund ceased to exist following the merger and were converted into the right to receive the "Merger Consideration." The portion of the Merger Consideration payable to the limited partners of the Delaware Fund was 17,000 shares of ASSAC preferred stock, but that allocation was subject to adjustment based on a post-closing determination of the relative net asset values of the two Stillwater Funds that participated in the merger.  Delaware Fund Merger Agreement §§ 2.6(d), 2.7(a)(i), 2.8.

The Amended Complaint treats the Delaware Fund's merger as though it were an asset sale under which the Delaware Fund sold its assets in exchange for the right to receive preferred stock and, later, "tradable shares" of Gerova stock.  Amended Complaint ¶ 98.  These allegations are plainly wrong.  The Delaware Fund did not sell its assets and was not entitled to receive preferred or other stock of ASSAC.  Instead, the equity investors in the Delaware Fund were to receive preferred stock in exchange for the equity interests that they formerly held in the Delaware Fund.

The Amended Complaint also alleges that the transaction stripped the Delaware Fund of its assets and left the Delaware Fund's creditors with no effective way to obtain payment.  *Id.*  ¶¶ 78, 95, 106, 389, 390, 397, 398, 405, 406, 451.  Those allegations also are plainly wrong.  The Delaware Fund was the surviving entity after the merger.  It was not stripped of assets, and it did not transfer assets.  The Delaware Fund acquired the assets and liabilities of the other merger parties, but the Delaware Fund still owned all of the assets that it had owned before the merger.

Furthermore, under Delaware law all creditors of the Delaware Fund continued to be creditors of the Delaware Fund after the merger.  8 Del. C. § 259.  In theory a merger could have

---

[4]    Certified Amendment to the Certificate of Limited Partnership of Stillwater Asset Backed Holdings LP (Apr. 22, 2010), Plaintiff's Sur-reply in Further Support of Opposition to SFN's Motion to Dismiss, Ex. 1, ECF No. 199-1.

injured creditors of the Delaware Fund if the merger had added other debts and thereby impaired

the Delaware Fund's financial condition, but the Amended Complaint alleges no such thing. It

does not allege that the company with which the Delaware Fund merged was anything other than

a merger vehicle, or that the Delaware Fund took on liabilities that it did not previously have.

The premise of the fraudulent transfer claims is that the Delaware Fund transferred its own assets

to Gerova and that the Delaware Fund's creditors were left stranded, but neither of those things

happened.

The reason for the persistent mischaracterizations in the Amended Complaint is that

Stillwater Liquidating's fraudulent transfer claims (and its alleged standing to sue) depend on

Stillwater Liquidating's characterization of all of the underlying transactions as asset sales that

defrauded the Stillwater Funds and left them unable to pay their creditors. It is clear from the

terms of the merger agreement that these are false characterizations of what happened in the case

of the Delaware Fund. What ASSAC acquired as a result of the merger was the equity

ownership of the Delaware Fund, not its assets. The transfer (if one occurred) was the exchange

of the investors' ownership interests in the Delaware Fund for the promised shares of ASSAC

preferred stock. Any claims arising from those transfers would belong to the investors, not to the

Delaware Fund. Furthermore, the "properties" that were transferred by the investors were their

limited partnership interests in the Delaware Fund. A claim to recover that property, or its value,

would not support efforts to recover different properties (the loans and real estate owned by the

Delaware Fund or by subsidiaries of the Delaware Fund) from subsequent buyers and lenders,

and therefore would not support the fraudulent transfer claims that have been asserted against the

buyer and lender defendants.

C.    **Properties Owned by LLCs**

Many of the properties that were allegedly transferred by the Delaware Fund were not

owned by the Delaware Fund, but instead were owned by limited liability companies that were

direct or indirect subsidiaries of the Delaware Fund. *See, e.g.,* Amended Complaint ¶¶ 164, 169

(Judge Street Property); *id.* ¶¶ 178, 185, 188 (St. Augustine Property); *id.* ¶¶ 346, 351 (Boggy

Creek Property). Stillwater Liquidating nevertheless insists that the Delaware Fund transferred

the properties owned by the LLCs directly to Gerova. Stillwater Liquidating bases this

contention entirely on the definition of "Acquired Assets" that appears in the Asset Purchase

Agreement to which the Offshore Fund (not the Delaware Fund) was a party. That agreement

defined "Acquired Assets" as:

> . . . (i) the securities and other investments, (ii) any and all participating
> interests in such securities or investments, and (iii) any and all other assets
> and properties, real and personal, both tangible and intangible, of every kind
> and description, that is owned, leased, or otherwise used by the applicable
> Fund as the same shall exist as at the Closing Date . . .

*See* Supplement to Complaint, Ex. 15, at 2, ECF No. 131-15; Amended Complaint ¶ 91 n.29.

Stillwater Liquidating believes that this language required that all of the real properties owned by

subsidiaries of the Delaware Fund be re-recorded in the names of Gerova entities in January

2010, though the Amended Complaint acknowledges that this did not happen. Amended

Complaint ¶¶ 94, 149.

There are two insurmountable problems with Stillwater Liquidating's allegations about

properties owned by LLCs.

First, all of the LLCs relevant to the pending motions were owned directly or indirectly

by the Delaware Fund. The contractual language upon which Stillwater Liquidating relies

appears in the asset purchase agreement to which the Offshore Fund was a party. The Delaware

Fund was not a party to that agreement. As described above, the Delaware Fund did not sell its

assets; it merged with a Gerova entity, with the Delaware Fund as the surviving party.  The

Delaware Fund's assets (whatever they were) automatically were property of the surviving

entity.  No deed transfers or other transfer documents were needed, because the merger did not

effect any transfer of the Delaware Fund's assets.  No provision of the merger agreement

required any subsidiary of the Delaware Fund to transfer its assets to anyone else.

Second, if the Delaware Fund owned a limited liability company, the two entities were

legally distinct from each other (at least in the absence of some legal reason to ignore the

corporate distinctions).  As the Supreme Court held in *Dole Food Co. v. Patrickson*:

> A basic tenet of American corporate law is that the corporation and its
> shareholders are distinct entities. . . . An individual shareholder, by virtue of
> his ownership of shares, does not own the corporation's assets and, as a result,
> does not own subsidiary corporations in which the corporation holds an
> interest. . . . A corporate parent which owns the shares of a subsidiary does
> not, for that reason alone, own or have legal title to the assets of the
> subsidiary; and, it follows with even greater force, the parent does not own or
> have legal title to the subsidiaries of the subsidiary.

538 U.S. 468, 474-75 (2003) (citations omitted); *see also New Colonial Ice Co. v. Helvering*, 292

U.S. 435 (1934) ("As a general rule a corporation and its stockholders are deemed separate

entities.").  The same principles apply to limited liability companies.  A membership interest in a

limited liability company is property (just as a share of stock is property), but the owner of the

membership interest has no ownership right in the property that is owned by the limited liability

company.  *See, e.g.,* 6 Del. C. § 18-701 ("A limited liability company interest is personal

property.  A member has no interest in specific limited liability company property."); NY

Limited Liability Company Law § 601 (McKinney) ("A membership interest in the limited

liability company is personal property.  A member has no interest in specific property of the

limited liability company.").

45

Here, the Delaware Fund owned membership interest(s) in the LLCs. The quoted language from the Asset Purchase Agreement – even if it had been relevant – would just have required the transfer of the ownership of the limited liability companies, because that was the property that the Delaware Fund owned. More importantly, transfers of those membership interests would not give the Delaware Fund, or Stillwater Liquidating, any right to challenge later transfers of properties that the limited liability companies owned. *See Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) ("The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's."); *see also Miller v. Barenberg (In re Bernard Techs., Inc.)*, 398 B.R. 526, 529 (Bankr. D. Del. 2008) (holding that a trustee could not avoid transfers made by a "separate and distinct" non-debtor subsidiary because "the transferred assets were not property of the [d]ebtor"); *In re Agriprocessors, Inc.*, 490 B.R. 374, 388-89 (Bankr. N.D. Iowa 2013) (holding that trustee could not avoid transfers made by a separate entity); *Ries v. Firstar Bank Milwaukee (In re Spring Grove Livestock Exch.)*, 205 B.R. 149, 156 (D. Minn. 1997) (holding that a trustee for a debtor lacked standing to pursue preference claims based on transfers of assets by another company).

Stillwater Liquidating argued in response to the motions to dismiss that the existence of wholly-owned limited liability companies should automatically be ignored and that their properties should always be deemed to be properties belonging to their parent entities. *See* Plaintiff's Opposition to Camden's Motion to Dismiss 26, ECF No. 150. Not surprisingly, there is no support for this absurdly broad proposition, which would run counter to the whole purpose for which limited liability companies exist. The authorities that were initially cited merely stand for the proposition that a parent's membership interest in an LLC is "property" of the parent –

46

not that the LLC's own property somehow belongs to the parent directly. *Garcia v. Garcia (In re Garcia)*, 494 B.R. 799 (E.D.N.Y. 2013) (holding that an owner's membership interest in an LLC is an asset in the member's own bankruptcy case); *U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*, No. 18357/10, 2011 WL 293716 (N.Y. Sup. Ct. Jan. 31, 2011) (holding that membership interests in LLCs are items of property and can be transferred); *Duncan v. Dixie Mgmt. & Inv., Ltd. Partners (In re Dixie Mgmt. & Inv., Ltd. Partners)*, 474 B.R. 698, 700 (Bankr. W.D. Ark. 2011) (holding that membership interest became property of the bankruptcy estate notwithstanding termination clause triggered by bankruptcy filing).

Stillwater Liquidating also cited *Sigmon v. Goldman Sachs Mortg. Co.*, 539 B.R. 221 (S.D.N.Y. 2015) for the proposition that "recent authority from this District confirms that an ownership interest in an entity which, in turn, owns property, is sufficient interest in the property" for purposes of avoidance actions. Plaintiff's Opposition to Camden's Motion to Dismiss 27-28, ECF No. 150. The court in *Sigmon*, however, initially held that such an interest was a "sufficient property interest *under Utah law*." *Sigmon*, 539 B.R. at 227 (emphasis added). Moreover, upon a motion for reconsideration the court directed the trustee to respond to the defendants' argument that the decision was erroneous because under Utah law the members of an LLC have no interest in the property owned by the LLC. *See Sigmon v. Goldman Sachs Mortg. Co.*, No. 1:12-cv-3367 (ALC), 2015 WL 5724736 (S.D.N.Y. Sept. 29, 2015). Thereafter, the trustee abandoned that line of argument altogether and instead alleged that the debtor's interest in the LLC (and not the property owned by the LLC) was in fact the property fraudulently transferred. *See id.* and *Sigmon v. Goldman Sachs Mortg. Co.*, No. 1:12-cv-3367 (ALC), 2016 WL 3982509 (S.D.N.Y. July 22, 2016). *Sigmon* therefore is not valid authority for the proposition that Stillwater Liquidating has advanced.

47

In later papers, Stillwater Liquidating cited a number of cases for the proposition that a debtor may avoid a transfer of property owned by an LLC where the LLC was subject to the dominion and control of the debtor. *See* Plaintiff's Opposition to Duval's Motion for Judgment on the Pleadings 50-67, ECF No. 223. These decisions are not persuasive. Some of the cited decisions do not even involve property owned by an LLC or by a related-entity. *See CDR Creances SAS First Hotels & Resorts Inv., Inc.*, 2009 N.Y. Misc. LEXIS 4227 (Sup. Ct. Aug. 17, 2009) (finding transfer of property actually owned by a judgment debtor to and through various related single purpose companies was sufficient to demonstrate actual fraudulent intent); *Board of Managers of the Chocolate Factory Condominium v. Chocolate Partners LLC*, 2014 N.Y. Misc. LEXIS 2160 (Sup. Ct. May 13, 2014) (allowing a fraudulent conveyance action to be pursued against an SPE that was the debtor itself).

Three of the decisions cited by Stillwater Liquidating involved cases in which courts held that that "de facto" control of property was sufficient, under Texas and Florida law, to support a claim that property belonged to a debtor, even though legal title resided elsewhere. *See De La Pena Stettner v. Smith (In re IFS Fin. Corp.).*, 669 F.3d 255 (5th Cir. 2012) (affirming a bankruptcy court holding that a debtor was the "de facto" owner, under Texas law, of a bank account that the debtor controlled); *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 159 (5th Cir. 2015) (holding that under Texas law a bank account would be treated as property of a debtor where the debtor exercised such control over the account that it should be regarded as the de facto owner); *Welch v. Synovus Bank*, 517 B.R. 269 (N.D. Fla. 2014) (Florida law). However, these three decisions are specific to Texas and Florida law and to the unique facts of those cases. Each of the three cited decisions suggested that legal title had been placed in another entity in a fraudulent effort to conceal a debtor's true ownership of the property, and

48

that the conduct of the parties (for example, the extent to which a debtor exercised dominion and

control over a bank account that was not in its name) suggested that the true ownership of the

property differed from the purported ownership.  In that regard these cases are really just

examples of situations in which courts elected to ignore corporate forms.  There is no similar

allegation here that the ownership of properties by subsidiaries of the Delaware Fund was a

sham, or that the limited liability companies had been set up for fraudulent purposes.

Furthermore, the "control" that led those three courts to conclude that true ownership resided

elsewhere was dominion and control over specific property, not control over a corporation.  The

lesson that Stillwater Liquidating seeks to draw from these isolated cases – that "control" of a

corporate entity should be equated with ownership of that entity's assets – would eliminate all

corporate distinctions between parent companies and their wholly owned subsidiaries and would

be flatly contrary to countless other decisions, including the Supreme Court decision in *Dole* and

the other authorities cited above.

     The remaining cases cited by Stillwater Liquidating also relied upon some version of

either veil piercing or alter ego liability, and are not applicable here.  *Bash v. Textron Fin. Corp.*,

483 B.R. 630 (N.D. Ohio 2012); *In re Jenkins Landscaping & Excavating, Inc.*, 93 B.R. 84

(W.D. Va. 1988).

     The real properties that the limited liability companies owned were not owned by the

Delaware Fund itself, and buyers or lenders with respect to those real properties were not

"subsequent transferees" of properties that belonged to the Delaware Fund.

## XI.    The Alleged Transfers to Net Five Holdings

     The Amended Complaint alleges that all of the "Real Property Interests" formerly owned

by the Stillwater Funds were transferred to Net Five Holdings, LLC in May 2010 through an

Operating Agreement dated as of May 26, 2010.  Amended Complaint ¶¶ 7, 106, 113.

## A.      Were the Net Five Transfers "Initial Transfers" or "Subsequent Transfers"?

Counts one through four allege that each of the "Fraudulent Transfers" was a conveyance

"by" the Stillwater Funds that the Stillwater Funds may challenge under section 544 of the

Bankruptcy Code.  *Id.* ¶¶ 391, 395, 399, 403, 407, 411, 415, 418.  However, the premise of the

Amended Complaint is that all of the Stillwater Funds transferred their assets to Gerova.  If that

were correct, then it is difficult to understand how the Amended Complaint could properly allege

that Gerova's transfers to Net Five, in May 2010, were transfers "by" the Stillwater Funds

themselves.

The answer to this question may be found in paragraph 15 of the Amended Complaint,

which states that Counts I through IV are asserted against Net Five "to the extent that the

transfers to Gerova and then Net Five are collapsed."  *Id.* ¶ 15.  "Collapsing" transactions is a

concept frequently applied when leveraged buyouts are challenged on fraudulent transfer

grounds.  In such cases, the individual components of the leveraged buyouts are treated as part of

a single integrated transaction, rather than being viewed in isolation.  *See HBE Leasing Corp. v.

Frank*, 48 F.3d 623 (2d Cir. 1995) (describing the requirements for finding an integrated

transaction: (1) the consideration from the first transferee must be immediately reconveyed by

the debtor for less than fair consideration or with actual intent to defraud creditors; and (2) the

transferee in the leg of the transaction sought to be voided must have actual or constructive

knowledge of the entire scheme); *U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d

Cir. 1986) (finding that where loan proceeds merely pass through the debtor-borrower and

ultimately go to selling stockholders, they cannot be deemed consideration received by the

debtor-borrower).

Here, however, there are no allegations that would support a "collapsing" of the Gerova and Net Five transactions. The Amended Complaint does not allege that the Net Five joint venture was even contemplated in January 2010. Instead, it alleges that the idea for the joint venture did not arise until March 2010. Amended Complaint. ¶ 104.

What, then, does Stillwater Liquidating seek in the case of Net Five Holdings, if in fact it seeks anything at all? Remarkably, the Amended Complaint still is not clear on that point. Counts I through IV only name Net Five Holdings as a defendant to the extent that transactions are "collapsed," and Count V – which asserts claims relating to subsequent transfers – does not include the transfers to Net Five Holdings in the definition of "Subsequent Transfers" as to which the Amended Complaint seeks relief. On the other hand, paragraph 15(b) of the Amended Complaint suggests that Stillwater Liquidating seeks relief from Net Five Holdings pursuant to Count V.

While the pleadings are not nearly so clear as they should be (particularly after the number of briefs and amendments to which the claims have already been subjected), the Court will treat the claims against the Net Five entities as claims to recover "subsequent transfers" in those instances in which properties were first transferred to "Gerova," and as claims to recover "initial transfers" in those instances in which there were transfers to Net Five entities without any prior transfers to a separate Gerova company. This conclusion is consistent with paragraph 15 of the Amended Complaint and also with the definition of "Fraudulent Transfers," which included the transfers that were made to the Net Five companies.

### B.    The Net Five Transactions

The Amended Complaint alleges that properties were transferred pursuant to the Operating Agreement by which Net Five Holdings was formed. A copy of the Operating

Agreement (which may be an incomplete copy) was submitted as Exhibit 16 to the Supplement.

The Operating Agreement refers to a separate "Contribution Agreement" pursuant to which

Gerova Financial Group, Ltd. "has caused the Gerova Group to contribute *or is obligated to*

*contribute*" the assets and liabilities identified on Schedule A to the Operating Agreement.

Supplement to Complaint, Ex. 16, ¶ 2, ECF No. 131-16 (emphasis added).  The Operating

Agreement makes clear that the "Gerova Group" includes "those subsidiaries of Gerova who

directly or indirectly own the Gerova Real Estate Portfolio."  *Id.* at 8.  The Gerova Real Estate

Portfolio, in turn, included real estate "owned by direct and indirect Subsidiaries of Gerova" and

mortgage loans "held by direct and indirect Subsidiaries of Gerova."  *Id.*

The Contribution Agreement was supposed to be attached as Exhibit A to the Operating

Agreement, but it is not included with the copy of the Operating Agreement that Stillwater

Liquidating submitted as Exhibit 16 to the Supplement.  However, it is available as a publicly

filed document on the SEC website.[5]  In the Contribution Agreement, Gerova Financial Group

Ltd. agreed to transfer all of "its" right, title and interest in the Gerova Properties and to do so

prior to September 30, 2010.  As explained above, some properties were owned by subsidiaries

of Gerova Financial Group Ltd.  Whether the Contribution Agreement contemplated that Gerova

Financial Group would transfer ownership of the subsidiaries to Net Five Holdings, or that it

would cause the subsidiaries to transfer their assets directly to Net Five Holdings, is not clear.

The Amended Complaint alleges that deeds to real properties owned by the Delaware

Fund and all of its subsidiaries should have been re-recorded in the name of Net Five Holdings,

LLC at the time the Operating Agreement was executed.  Amended Complaint ¶¶ 10, 94, 149,

166, 167, 182, 183, 225, 239, 240.  However, Stillwater Liquidating acknowledges that in many

---

[5]    www.sec.gov/Archives/edgar/data/1407437/000114420410031347/v186890_ex10-36.htm

cases the properties were not transferred to Net Five Holdings and that ownership remained with

the Delaware Fund (which had adopted the new name of Gerova Asset Backed Holdings LP) or

with companies owned by it.  Amended Complaint ¶¶ 149-51.  In spite of the many general

allegations that the assets were transferred to Gerova and then to Net Five, the Amended

Complaint makes clear that many of the relevant properties were owned by the same entities

both before and after the alleged "Gerova" and "Net Five" transfers.  As a result there is a

peculiar circularity to Stillwater Liquidating's allegations.  Stillwater Liquidating alleges that

certain properties were *not* transferred to Net Five, and this is one of the linchpins of its

argument that the property records should have alerted later buyers and sellers of possible fraud.

Amended Complaint ¶¶ 10, 13, 150, 151, 157.  But if these properties were never transferred to

Net Five in the first place – if they continued to be owned by the re-named Delaware Fund and

its subsidiaries – then it is difficult to see anything "suspicious" in the fact that the non-existent

transfers were not reflected in property records.  Furthermore, if the re-named Delaware Fund

and its subsidiaries did not transfer certain assets to Net Five Holdings, then it is hard to see how

a fraudulent transfer to Net Five can properly be alleged, or how later buyers or lenders could be

accused of being subsequent transferees of Net Five Holdings.

Perhaps Stillwater Liquidating means to allege that some form of control over the

properties, or some kind of beneficial ownership of them, was transferred to Net Five Holdings.

The Operating Agreement contemplated that legal title might continue to be held in the names of

other entities, but that the books and records of Net Five Holdings would reflect properties as

belonging to it "irrespective of the name in which legal title to such assets is held."  Operating

Agreement ¶ 2.3(c).  But control is different from ownership, and getting control of an entity that

owns property is far different from acquiring ownership of the property itself.  The Amended

Complaint proceeds on the theory that the properties were transferred outright, and in many cases those allegations are flatly contradicted by allegations that properties stayed with the companies that had always owned them.

As to the Offshore Fund: the Amended Complaint alleges that the Offshore Fund sold its participation interests to a Gerova subsidiary, and it describes the agreement through which such transfers occurred. However, there is no similar identification of any assignments of those participation interests to any Net Five company. There is an allegation that parties agreed to make the transfers, but no description of how or whether the transfers actually were made. As described more fully in Part XII, the Amended Complaint also does not allege that the participation interests themselves were transferred by a Net Five entity to any other person.

## XII.    Nature of the Property Rights that the Offshore Fund Transferred

Stillwater Liquidating has confirmed that the only relevant assets that the Offshore Fund allegedly owned were participation interests in secured loans made by the Delaware Fund. The relevant participation agreements are referred to in the pleadings and incorporated by reference into them, and copies were provided to the Court with the Supplement. Each Participation Agreement is comprised of a "Master Loan Participation Agreement" and an attached Participation Certificate. *See, e.g.*, Supplement to Complaint, Ex. 10, ECF No. 131-10 ["St. Augustine Loan Participation Agreement"]. Stillwater Liquidating acknowledges that the relevant terms are identical in each agreement. Amended Complaint ¶ 69.

The Amended Complaint alleges that the Offshore Fund transferred its participation interests to Gerova AB Holdings, Ltd., and that there was a later agreement to transfer them to Net Five Holdings. However, there are no references in the Amended Complaint to any transaction or document pursuant to which the participation interests were actually transferred to Net Five Holdings or to any of its subsidiaries. In addition, the story of the participation interests

54

ends with the vaguely-described transfers to unspecified Net Five entities.  There are no

allegations about any subsequent transfers of the participation interests, or any allegation that the

buyer or lender defendants took assignments of those participation interests.  As a result, the

Amended Complaint does not allege that any of the buyer or lender defendants was a transferee

of the participation interests that the Offshore Fund previously owned.

Instead, the Amended Complaint focuses on the loans in which the Offshore Fund had a

participation interest and on the real properties that served as collateral for those loans, and treats

later transfers of those loans and real properties as though they were transfers of property that

formerly belonged directly to the Offshore Fund.  Stillwater Liquidating argues as follows:  (a)

the participation agreements constituted partial assignments, to the Offshore Fund, of the

underlying loans; (b) the Offshore Fund's partial ownership of a secured loan gave it a direct

property interest in the collateral that secured that loan (so that later transfers of that collateral

were transfers of the Offshore Fund's own property); and (c) the Offshore Fund's participation

interests in loans were further converted into partial ownership interests in real property in those

cases where the Delaware Fund foreclosed on collateral.

One would think – given the prevalence of participation interests in modern finance – that

the nature of the rights granted through a participation agreement would be clear and well-

settled.  Instead, courts have characterized participation interests in many different ways in

different cases.  *See, e.g.*, *In re Okura & Co. (America), Inc.*, 249 B.R. 596, 605 (S.D.N.Y. 2000)

("less than a partial assignment"); *In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr. S.D.N.Y.

1992) (disguised loan transaction); *In re Drexel Burnham Lambert Grp. Inc.*, 113 B.R. 830, 843-

44 (Bankr. S.D.N.Y. 1990) (trust as to payments actually collected by lead lender); *In re Alda

Commercial Corp.*, 327 F.Supp. 1315, 1318 (S.D.N.Y. 1971) (at most, an investment in the

originator's business); *Jefferson Sav. & Loan Ass'n v. Lifetime Sav. Loan Ass'n*, 396 F.2d 21, 24

(9th Cir. 1968) (foreclosed property held by lead lender as co-tenant and trustee for the

participant); *Franklin v. Comm'r of Internal Revenue*, 683 F.2d 125, 128 n.9 (5th Cir. 1982)

(assignment with agency as to percentage interest of the loan)**.**  In short, calling something a

"participation interest" has no automatic legal consequence.  The only way to figure out what a

participation interest is, and what rights it actually grants, is to look at the agreements

themselves.  *See In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993).

In this case, the terms of the Participation Agreements belie all three of Stillwater

Liquidating's contentions about the nature of its alleged rights.

<u>First</u>, it is plain from the agreements that the underlying secured loans themselves were

not assigned pursuant to the Participation Agreements, either in whole or in part.  It is true that

each Participation Agreement states in its recitals that the Offshore Fund desires to "purchase" a

"participation interest" in a loan, "which will evidence a fractional undivided interest in such

Loan."  *See* St. Augustine Loan Participation Agreement, at 1.  However, the term "Participation

Interest" is defined in each Participation Agreement as an "undivided beneficial interest" in the

"Payments" and the "Collateral" associated with a Loan.  "Payments" is defined in each

Participation Agreement as "the principal, interest and fee payments made pursuant to the Loan

Documents associated with each Loan."  "Collateral" is defined as "those assets, if any, that are

pledged as security for the satisfaction of each Loan."

The Delaware Fund did not purport to transfer (to the Offshore Fund) a direct ownership

interest in any Payments or Collateral, or in the underlying loans themselves.  Instead, the

Delaware Fund agreed to hold an undivided interest in the Payments and the Collateral "in trust"

for the Offshore Fund.  *Id.* § 3.1(a).  The parties similarly agreed that any Collateral for a Loan,

including Collateral that might later come into the possession of the Delaware Fund, would be "held by the [Delaware Fund] in its own name for the *pro rata* benefit" of both the Delaware Fund and the Offshore Fund. *Id.* § 3.5.

The Offshore Fund had the right to receive portions of Payments, but only to the extent that the Delaware Fund actually received such Payments. *Id.* § 3.1(b). The agreements did not give the Offshore Fund any right to pursue remedies for non-payment against a borrower. Instead, the Offshore Fund only was entitled to receive a share of what the Delaware Fund itself received. The Delaware Fund had day-to-day authority and control with respect to the Loan Documents, though it agreed not to release any of the Collateral without the consent of the Offshore Fund. *Id.* § 3.3. If a borrower defaulted, the Delaware Fund had the exclusive right – so long as it continued to pay any amounts due to the Offshore Fund under a Participation Agreement – to pursue all remedies under the Loan Documents, including the right "to succeed or designate a successor to Borrower's interest in the Collateral, whether by foreclosure, deed in lieu of foreclosure or otherwise." *Id*. § 5.1(a).

These provisions of the participation agreements established a trust arrangement, not an outright transfer. The Delaware Fund agreed to hold some of its own property rights in trust for the Offshore Fund. The Offshore Fund had beneficial interests in proceeds that the Delaware Fund actually received, but it acquired no direct ownership rights in the underlying loans and no direct rights against third parties.

Second, the Offshore Fund did not have a direct interest in the real property that served as "Collateral" for the loans in which it had participation interests. As a general matter a mortgage lien "creates no estate in the land but is simply security for the debt or other obligation of the mortgagor. The mortgagee has, by virtue of the mortgage, a mere chose in action secured by a

lien upon the land, and not an estate in the land mortgaged." *Matter of Caperonis*, 408 N.Y.S.2d 231, 234 (Surr. Ct. 1978); *see also Johnson v. Augsbury Organization, Inc.*, 563 N.Y.S.2d 339, 340 (App. Div. 1990) (holding that a real estate mortgage "is collateral security for the payment of a debt; it is person property, not real property" and does not create "an interest or estate in the mortgaged real property"); *Stickler v. Ryan*, 61 N.Y.S.2d 708, 709 (App. Div. 1946) (noting that a mortgage lien constitutes a personal property right and is not an interest in the underlying real property); 75 N.Y. Jur. 2d *Liens* § 5 (a lien is "a charge on property but "confers no general right of property or title upon the holder"). The same is true in states that use deeds of trust to evidence loans secured by real property: in those instances legal title passes to a trustee, but the holders of the deeds in trust do not have an ownership interest in the real property. 54A Am. Jur. 2d *Mortgages* § 121 (holders of deeds of trust have no ownership interest in property and hold legal title solely for the purpose of security, and in "practical effect, if not in legal parlance, a deed of trust is a lien on the property").

The Delaware Fund, as a maker of mortgage loans, had no direct ownership interests in the real properties that served as Collateral for those loans. The Delaware Fund therefore could not have conveyed such an ownership interest when it allegedly sold participation interests to the Offshore Fund. And even if the Delaware Fund had owned such interests, it did not agree to transfer them to the Offshore Fund. Instead, it only agreed to hold a portion of its interests (whatever they were) in trust for itself and for the Offshore Fund.

Third, Stillwater Liquidating did not acquire direct interests in real properties in those instances where the Delaware Fund foreclosed on Collateral. There are three provisions in the Master Loan Participation Agreement that relate to Collateral that is the subject of an exercise of remedies:

- Section 3.5 states generally that all Collateral, including Collateral that might later come into the possession of the Delaware Fund, would be "held by the [Delaware Fund] in its own name for the *pro rata* benefit" of both the Delaware Fund and the Offshore Fund.  St. Augustine Loan Participation Agreement § 3.5.

- Section 5.1(b) of each Participation Agreement states that if the Delaware Fund takes ownership of Collateral through an exercise of remedies, and if the Offshore Fund has been paid what was due to it, then the underlying mortgage loan would "continue in full force and effect as a direct loan" between the Delaware Fund (as borrower) and the Offshore Fund (as lender), with the principal balance reduced in proportion to the outstanding participation interest.

- Section 5.1(c) of each Participation Agreement states that if Collateral is sold, then the cash proceeds must be shared *pari passu* by the Delaware Fund and the Offshore Fund in accordance with their participation interests.  *Id.* § 5.1(c).

None of these provisions contemplates any circumstance under which the Offshore Fund would acquire an ownership interest in any real property.  The agreements contemplated that in some cases the Offshore Fund's participation interest would be converted into a loan to the Delaware Fund; in other cases the Delaware Fund would hold the Collateral in trust, and if the Collateral were sold then the proceeds would be shared with the Offshore Fund.  The Participation Agreements do not identify any circumstance in which the Offshore Fund would acquire a direct ownership interest in real property, and the Offshore Fund acknowledged during argument of the motions to dismiss that no such interest in real property was ever recorded.

Other features of the transactions confirm that the Participation Agreements did not constitute assignments of the Loans themselves and did not convey ownership interests in real

property.  Sections 8.2 and 8.3 of the Participation Agreements make clear that the arrangements

were structured to take advantage of the "Portfolio Interest Rules" for tax purposes.  *Id.* §§ 8.2,

8.3.[6]  The Portfolio Interest Rules allow foreign persons to earn US-source interest income

without paying federal income tax.  The exemption is not available unless the relevant income is

interest income that is earned by a foreign person on a debt instrument, and the debt instrument

must be "registered" in form.  *See* I.R.C. § 871(h)(2); 26 C.F.R. § 1.871-14(c).  The exemption

ordinarily is not available for income earned on secured real estate loans because such loans

normally are not "registered" in form.  However, the IRS confirmed in at least one private letter

ruling that if a lender agrees to hold the proceeds of a loan in trust, and if the trust issues and

records participation certificates or similar documents to foreign parties to evidence the foreign

parties' rights to payments from the trusts, those participation certificates may be considered to

be "registered" debt instruments for purposes of the Portfolio Interest Rules.  *See* I.R.S. Priv. Ltr.

Rul. 95-48-018 (June 30, 1995).

Note that the whole point of the foregoing tax arrangement is that the foreign party is

treated as earning interest income payable by the trust under the participation certificate, which is

treated as a debt instrument for tax purposes.  A direct (even partial) ownership of US mortgage

loans, or a direct ownership of US real property, would have been fatal to the desired tax

treatment.  In fact, at one point Stillwater Liquidating argued that the participation interests made

the Offshore Fund a "creditor" of the Delaware Fund, and that the Offshore Fund had the right,

as a creditor, to challenge fraudulent transfers made by the Delaware Fund.  *See* Plaintiff's

Supplemental Brief in Opposition to Motions to Dismiss 18, ECF No. 188.  However, Stillwater

---

[6]    These provisions are not included in the "Boggy Creek/Kissimmee" Participation
Agreement, which appears to have been one of the first entered into, Supplement to
Complaint, Ex. 12, ECF No. 131-12, but they appear in all the others.

Liquidating has abandoned that characterization of the participation interests because it would be fatal to its contention that the Offshore Fund is entitled to assert claims under section 544 of the Bankruptcy Code. This is because, as explained above, section 544 only applies to fraudulent transfer claims that are based on transfers of the debtor's own property, and not to claims that a debtor might assert, as a creditor of another entity, based on transfers of that other entity's property.

Stillwater Liquidating has cited to other decisions involving participation interests and has urged the Court to adopt the characterizations of the parties' rights set forth in those decisions. *See, e.g.,* Plaintiff's Supplemental Brief in Opposition to Motions to Dismiss 13-17, ECF No. 188. As explained above, however, the rights granted to the Offshore Fund can only be determined by its own contracts, and not by the contracts that were interpreted in other cases. Here the agreements did not give the Offshore Fund a direct ownership right in any of the properties owned by the Delaware Fund.

At other times Stillwater Liquidating has acknowledged and embraced the "trust" arrangement that is set forth in the participation agreements, but has nevertheless urged the Court to treat the assets held in trust as though they were owned directly by Stillwater Liquidating as beneficiary. Amended Complaint ¶¶ 2, 72-73; Plaintiff's Supplemental Brief in Opposition to Motions to Dismiss 12-17, ECF No. 188. This argument reflects a fundamental misunderstanding of the law of trusts, at least as applied in New York.

Each participation agreement states that it is governed by New York law, and New York law therefore governs the "trust" arrangement that the participation agreements created. New York law plainly states that a trust beneficiary does not own property that is held in trust. *See* N.Y. Est. Powers & Trusts Law § 7-2.1, practice commentaries (McKinney). The principle has

been applied by the New York courts in a wide variety of contexts. *See, e.g., Lawyers' Fund for Client Protection of the State of New York v. Gateway State Bank*, 658 N.Y.S.2d 705, 707 (App. Div. 1997) (trust beneficiary did not own trust property and therefore could not sue third party for alleged conversion); *Modjeska v. Greer*, 649 N.Y.S.2d 734, 735 (App. Div. 1996) (same); *Wynard v. Beiny*, 625 N.Y.S.2d 27, 28 (App. Div. 1995) (beneficiary's purported pledge of stock held in trust was invalid and could not be enforced because the beneficiary did not own the stock); *Cohn v. U.S. Trust Co.*, 512 N.Y.S.2d 37 (App. Div. 1987) (trust beneficiaries have no power to transfer trust assets because they "do not take a legal estate in the trust property").

The Offshore Fund's beneficial interests were property of its estate. The participation agreements stated that they were assignable (subject to certain limits), and the creditors of the Offshore Fund could have looked to those beneficial interests, and to payments made pursuant to them, as a source of payment of their claims. However, the Offshore Fund, as beneficiary, did not own the properties that the Delaware Fund owned, and did not own the rights to Payments and Collateral that the Delaware Fund agreed to hold in trust for itself and for the Offshore Fund. The rights held by the trustee were not properties that the Offshore Fund owned or that the Offshore Fund's creditors could have attached or applied to the payment of their claims.

In arguing the contrary, Stillwater Liquidating confuses a number of different and irrelevant propositions. For example, Stillwater Liquidating cites to decisions in which courts determined that trust beneficiaries retained such a degree of control over properties that were held in "land trusts" that the beneficiaries should be treated as the actual owners of the properties. *In re Langley*, 30 B.R. 595, 600 (Bankr. N.D. Ind. 1983); *In re Stowell*, 232 B.R. 823, 827-28 (Bankr. N.D.N.Y. 1998). These are decisions in which courts elected to recharacterize transactions, and to ignore the separation between a trust and its beneficiaries that

ordinarily would apply, because of the specific terms of the land trusts at issue.  They do not

stand for the proposition that all trust beneficiaries own the properties that are held in trust; if

that proposition were correct as a general matter, then there would have been no reason why the

courts would have considered the degree of control that the beneficiaries exercised over the land

trusts in the cited cases.  There are no allegations here that the Offshore Fund had the kind of

control over trust property that was decisive in *Stowell* or in *Langley*, and the participation

agreements make clear that the Offshore Fund did not have such control.

Stillwater Liquidating also cites to decisions holding that if a trust beneficiary has power

over a trust (including the right to invade the trust corpus), that power also becomes property of

an estate, with the result that the estate may invade the trust to the same extent that the debtor

could have done so.  *See In re Vanbuskirk*, 511 B.R. 220, 227 (Bankr. D. Mass. 2014) (where

debtors were both the settlors and the beneficiaries of a spendthrift trust, and where the debtors

had the right to revoke the trust, those rights became property of the estate and permitted the

estate to revoke the trust and to reach the property previously placed in trust); *In re

Thadikamalla*, 481 B.R. 232, 238-39 (Bankr. N.D. Ga. 2012) (where a debtor had the right to

revoke a partnership, that right became property of the estate, and the estate could revoke the

partnership).  But if a trust's assets automatically were treated as assets belonging to a

beneficiary (as Stillwater Liquidating contends), there would have been no reason in these cited

cases for the courts to have focused on the rights to revoke the trusts that the beneficiaries had

and that were transferred to their bankruptcy estates.  There is no allegation here that the

Offshore Fund, as trust beneficiary, was in control of the trusts established by the participation

agreements or had the power to revoke those trusts or to disregard them, and the participation

agreements make clear that the Offshore Fund had no such rights.

63

The premise of the Amended Complaint is that the participation interests owned by the

Offshore Fund constituted a partial ownership of the real properties that served as collateral for

loans made by the Delaware Fund or that were later acquired by the Delaware Fund, with the

result that every later buyer or lender with respect to those properties became an unwitting

"transferee" of the Offshore Fund's participation interests.  Those allegations cannot be squared

with the terms of the participation agreements.  The participation agreements conveyed

beneficial interests in the Delaware Fund's rights to Payments and Collateral, coupled with

agreements that the Delaware Fund would hold those items in trust for the payment of the shares

due to the Offshore Fund.  The "property" rights that the Offshore Fund owned, therefore, were

the rights of a trust beneficiary.  The Offshore Fund could pursue fraudulent transfer claims

against assignees of the participation interests themselves.  However, transfers of property by the

Delaware Fund, or by companies owned by the Delaware Fund, did not constitute transfers of

property owned by the Offshore Fund itself, and cannot support an assertion of claims under

section 544.

## XIII.    The Offshore Fund's Alleged Rights, as Trust Beneficiary, to Sue Transferees

In the briefs that it filed in connection with the motions to dismiss Stillwater Liquidating

also argued that the Offshore Fund has the right, as beneficiary of a trust, to sue to recover

transfers of the trust's property.  Stillwater Liquidating first raised this argument in June 2015

(after oral argument of some of the motions to dismiss), and it expanded on the contention in

papers that filed in October 2015.  *See* Plaintiff's Supplemental Brief in Opposition to Motions to

Dismiss 10-17, ECF No. 188; Plaintiff's Supplemental Brief in Opposition to SFN's Motion to

Dismiss 15-19, ECF No. 204.

Ordinarily, New York law requires that any lawsuit seeking recovery of property

belonging to a trust be commenced by the trustee.  *See Lawyers' Fund for Client Protection of*

64

the State of New York v. Gateway State Bank, 658 N.Y.S.2d 705, 707 (App. Div. 1997) (trust

beneficiary did not own trust property and therefore could not sue third party for alleged

conversion); *Modjeska v. Greer*, 649 N.Y.S.2d 734, 735 (App. Div. 1996) (trust beneficiary

could not sue third party for conversion of trust property; only the trustee could do so).

However, a trust beneficiary may have derivative rights to pursue a claim in the name of the trust

(not in its own right) if the trustee fails to act or if the trustee refuses to act.  106 N.Y. Jur. 2d

*Trusts* § 200 (trust beneficiary may assert derivative rights against third parties but only if the

trustee has refused to act).

Note that this theory of recovery could not be asserted under section 544 of the

Bankruptcy Code.  Section 544 only applies to claims that could have been asserted by creditors

of the Offshore Fund based on transfers of the Offshore Fund's property.  It does not apply to

claims that the Offshore Fund itself might have had the right to assert, as a trust beneficiary,

based on transfers made by a trustee.  Claims as a trust beneficiary, if asserted by the Offshore

Fund, therefore would not arise under the Bankruptcy Code and would give rise at most to

"related to" jurisdiction.

More fundamentally, though, there are many problems with Stillwater Liquidating's

assertion in its briefs that it has rights, as a trust beneficiary, to pursue claims to recover property

that the trustee (the Delaware Fund) transferred.

First, although Stillwater Liquidating briefed the issue in June and in October 2015, this

theory of recovery is not pleaded in the Amended Complaint that was filed in April 2016.  The

only claims asserted by the Offshore Fund against the buyer defendants are fraudulent transfer

claims that a creditor of the Offshore Fund might have been able to assert.  The lender

defendants are charged with conspiring to convert property or with aiding and abetting a

conversion, but those counts in the Amended Complaint do not accuse the lenders of being

holders of property as a result of any breach of trust.  The arguments made by Stillwater

Liquidating therefore are irrelevant to the claims that it has elected to pursue.

Second, the Offshore Fund is no longer a trust beneficiary; it sold its participation

interests to Gerova AB Holdings, Ltd. in 2010.  There is no allegation in the Amended

Complaint that the Offshore Fund has since reacquired those participation interests.  The

Offshore Fund seeks to undo the prior transfer of the participation interests on fraudulent transfer

grounds, but in the meantime the validity of the prior transfer is recognized, and the participation

interests and rights associated with them cannot be treated as property belonging to the Offshore

Fund unless and until they are recovered.  *See Fed. Deposit Ins. Corp. v. Hirsch (In re Colonial*

*Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *Sec. Investor Prot. Corp. v. Bernard L. Madoff*

*Investment Securities LLC*, 513 B.R. 222, 229 (S.D.N.Y. 2014) (holding that transferred property

is not property of a debtor, even if the debtor is seeking to recover the transferred property on

fraudulent transfer grounds); *Sec. Investor Prot. Corp. v. Madoff*, 490 B.R. 59, 68 (S.D.N.Y.

2013); 11 U.S.C. § 541 (a)(3) (property of the estate includes property that a trustee "recovers"

under section 550).  As the Second Circuit Court of Appeals held in *Hirsch*:

> If property that has been fraudulently transferred is included in the §541(a)(1)
> definition of property of the estate, then § 541(a)(3) is rendered meaningless
> with respect to property recovered pursuant to fraudulent transfer actions . . .
> the inclusion of property recovered by the trustee pursuant to his avoidance
> powers in a separate definitional subparagraph clearly reflects the
> congressional intent that such property is not to be considered property of the
> estate until it is recovered.

980 F.2d at 130 (internal quotation marks and citations omitted); *see also Picard v. Fairfield*

*Greenwich Ltd.*, 762 F.3d 199, 207 n.7 (2d. Cir. 2014) (holding that the decision in *Hirsch*

forecloses any contention that a debtor retains property rights in property that has been

transferred, and that fraudulently conveyed property may not be considered to be property of the

estate unless and until it is recovered); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 480 B.R. 179, 192 (S.D.N.Y. 2012) (holding that previously transferred property is not property of a debtor's estate); *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) (same); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 192 B.R. 73, 77 (S.D.N.Y. 1996) (explaining that accounts receivable transferred to and allegedly converted by defendant before the bankruptcy were "not to be considered property of the estate").

Third, the Amended Complaint makes clear that the trustee (the Delaware Fund) participated in all of the relevant transfers of property and consented to them. Stillwater Liquidating may wish to argue (though it has not done so in its current pleadings) that in doing so the trustee violated duties that it owed to the holders of the participation interests. However, under New York law a claim to recover trust property – based on an alleged breach of trust – cannot be asserted against a subsequent property owner who had no knowledge of the existence of the trust and of the breach of duty that allegedly was committed by the trustee. *Fleck v. Perla*, 339 N.Y.S.2d 246, 247-248 (App. Div. 1972) (liability only if one knows of the existence of a trust and knows that property was transferred in violation of a trustee's duties); *Behrmann v. Seybel*, 166 N.Y.S. 254, 259 (App. Div. 1917) (claim could not be asserted where there was no allegation that a later transferee had any knowledge of the existence of a prior trust); 106 N.Y. Jur. 2d *Trusts* § 243 (transferee of wrongfully transferred trust assets is liable only when the transferee "knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust"). Here, there is no allegation that the existence and terms of the trusts created by the participation agreements were ever disclosed to any other person, or that any of the buyer or lender defendants could possibly have been aware of the

existence of the participation interests, the trusts created thereby, or of any alleged breaches of

duties by the trustees.  Any claim asserted against the buyer and lender defendants therefore must

be based on other theories.

## XIV.   Fraudulent Transfer Claims Against the Moving Buyer and Lender Defendants

The lender and buyer defendants who have filed motions to dismiss, and the fraudulent

transfer claims asserted against them, are:

(1)     Paradigm Credit Corp., which is a lender that is accused of being a

"subsequent transferee" of the Kings Hotel Property and the St. Augustine Property;[7]

(2)     John R. and Yvette Daniel III, Stephen J. and Vicki McDonald, and

Calhoun Commercial Construction LLC, each of which is alleged to be a subsequent

transferee of a portion of the Calhoun Property; and

(3)     SFN DeKalb Holdings, LLC, which is alleged to be a subsequent

transferee of the Hillandale Property.

In addition to the problems discussed above the Amended Complaint is also replete with

inconsistencies and with plain factual and legal errors regarding the transfers of these properties

and the claims against these defendants.

### A.     Paradigm/The Kings Hotel Mortgage Loan

The Amended Complaint alleges that the Delaware Fund made a loan to Kings Hotel,

Inc. in 2006 that was secured by a mortgage on the Kings Hotel Property in Brooklyn, New

York.  The Offshore Fund purchased a 36.63% participation interest in the loan in 2008.

---

[7]     The Kings Hotel Property is not included in the list of "Subsequent Transfers" in Count V of
the Amended Complaint.  Amended Complaint ¶¶ 421-436.  However, all of the other
proceedings make clear that the Kings Hotel loan is one of the alleged "subsequent
transfers" and that the failure to include it in the supporting list is an oversight.

Amended Complaint ¶¶ 266-67.  Stillwater Liquidating alleges that the Kings Hotel loan was
transferred to Gerova in January 2010, but as noted above the Delaware Fund did not transfer
assets to Gerova.  However, the allegation that the loan was transferred to Net Five Holdings,
LLC appears to be correct, as a recorded assignment dated June 23, 2010 (recorded on June 29,
2010) is referred to and incorporated in the Amended Complaint.  *Id.* ¶ 271; Plaintiff's
Supplemental Brief in Opposition to Motions to Dismiss, Exs. 37, 42, ECF Nos. 189-37, 189-42.

Net Five Holdings assigned the Kings Hotel Loan and accompanying mortgage to
Sawtooth Capital, LLC in July 2010 to secure a $500,000 loan; the Kings Hotel Loan and
mortgage were assigned back to Net Five Holdings later that same month.  Amended Complaint
¶ 271; Plaintiff's Supplemental Brief in Opposition to Motions to Dismiss, Exs. 38, 39, ECF
Nos. 189-38, 189-39.  Net Five Holdings then assigned the loan and mortgage to a Florida
limited liability company named Net Five Holdings at Kings Hotel, LLC.  Net Five Holdings at
Kings Hotel, LLC used the loan and mortgage, and other collateral, as security for a $3.3 million
loan from Paradigm, and used part of the Paradigm loan proceeds to repay amounts that had been
borrowed from Sawtooth.  Amended Complaint ¶ 271; Plaintiff's Supplemental Brief in
Opposition to Motions to Dismiss, Exs. 40, 41, ECF Nos. 189-40, 189-40.  Approximately a year
later (on August 31, 2011), Paradigm's loan was repaid and its mortgage lien was released.
Amended Complaint ¶¶ 272-75, 281-82.  Net Five at Kings Hotel later assigned the Kings Hotel
loan and mortgage to other parties.  *Id.* ¶¶ 271, 287.

These allegations are not sufficient to support a "subsequent transferee" claim against
Paradigm on behalf of the Offshore Fund or the Delaware Fund.  As to the Offshore Fund: the
Amended Complaint does not allege sufficient grounds on which to conclude that the sale of
participation interests to a Gerova subsidiary was a fraudulent transfer, because (as noted above)

the buyer assumed all of the Offshore Fund's liabilities.  But even it that hurdle were to be

cleared, the Offshore Fund would only have the right to pursue subsequent transferees of the

property that the Offshore Fund actually owned – namely, the participation interests.  The

participation interests did not give the Offshore Fund a direct ownership interest in the

underlying loan or in the collateral for the reasons set forth in Part XII, above.  There is no

allegation that the participation interest formerly owned by the Offshore Fund was assigned to

Paradigm or to anyone else, and therefore no basis on which the Offshore Fund could assert a

claim against Paradigm.

As to the Delaware Fund: it has no right to assert claims under section 544, and in the

absence of that authority the Delaware Fund, as the alleged transferor of property, has no

standing to assert fraudulent transfer claims.  *See Eberhard v. Marcu*, 530 F.3d 122, 131 (2d. Cir.

2008) ("Fraudulent conveyances are binding on all non-creditors, including the transferor

himself."); *Pattison v. Pattison*, 92 N.E.2d 890, 894 (N.Y. 1950) ("The general rule, that courts

will, under such circumstances, extend no remedy to a grantor or vendor of property to recover

back from the grantee or vendee the property thus transferred, although the transfer is without

consideration, is too well settled to be now called in question." (citations omitted)).

In addition, the Amended Complaint would not state a valid claim under sections 544 and

550, even if the Delaware Fund or the Offshore Fund had the right to assert such claims.  The

Amended Complaint and supporting records make clear that the assignment of the mortgage loan

to Paradigm was for security purposes only, and that Paradigm's security interest in the mortgage

was released when Paradigm was later repaid.  Paradigm had only a temporary lien on the

mortgage loan and did not take ownership of it.  There is no allegation that Paradigm now holds

or retains any portion of the Kings Hotel loan and mortgage, or that Paradigm holds any property

that formerly belonged to the Delaware Fund or the Offshore Fund and that Paradigm should be

compelled to return, or that the Kings Hotel loan and mortgage were converted into other

property that Paradigm now holds.  Paradigm made a secured loan and released the security

when the loan was repaid.

It does not matter if Paradigm earned interest on its loan or otherwise profited from its

transactions.  The claim against it is to recover property that allegedly was transferred to it.

Paradigm is not a transferee of the loan.  Paradigm's lien (while it was in effect) gave Paradigm

contingent rights to foreclose on the collateral if a default occurred, but no such foreclosure

occurred and no transfer of the collateral to Paradigm occurred.  Paradigm is not properly

regarded as a "subsequent transferee" of collateral (the Kings Hotel mortgage loan) where

Paradigm merely held a temporary lien that ultimately was extinguished and that never resulted

in a transfer of the collateral to Paradigm.

### B.      Paradigm/The St. Augustine Property

The Amended Complaint alleges that in 2005 a Delaware limited liability company

named AUG Funding LLC made a loan to St. Augustine Hotel, LLC secured by the St.

Augustine Property, located in Florida.  AUG was owned by JPS Loan Holdings I, LLC, which

in turn was owed by Delaware Fund.  AUG took ownership of the property in May 2007

following a bankruptcy sale.  Amended Complaint ¶¶ 176-78.

The Offshore Fund allegedly acquired a participation interest in the AUG loan on July 1,

2009.  *Id.* ¶ 180.  This is a most peculiar allegation, since the Amended Complaint also alleges

that the "loan" in which the Offshore Fund allegedly bought a participation interest – the loan

made by AUG to St. Augustine Hotel, LLC – had been terminated more than two years earlier,

when the bankruptcy sale occurred in May 2007.  This timing inconsistency was pointed out in

connection with the initial motions to dismiss, but Stillwater Liquidating has doggedly adhered to the same allegations in each of its subsequent pleadings.

The participation agreement that relates to the St. Augustine Property was submitted as Exhibit 10 to the Supplement.  It is an agreement between the Delaware Fund and the Offshore Fund for the sale of a participation interest in the "JPS-AUG" loan, with no further description of what that is or of the parties to that loan.  Supplement to Complaint, Ex. 10, at 14, ECF No. 131-10.  It is not clear whether JPS had made a loan to AUG, or whether the "JPS-AUG" loan refers to the loan that AUG originally made, or if the reference is to something else.  Stillwater Liquidating alleges that the 2009 participation agreement was in reality a sale of a participation interest in the property that AUG had acquired two years earlier when it foreclosed on its prior loan, but the agreement does not provide for any such thing.

In fact, AUG was not even a party to the agreement in which the participation interest was sold.  There is no allegation as to how the Delaware Fund had any right to sell a participation interest in a loan it did not make or in a property that it did not own, or how the Offshore Fund could have validly acquired any interest in the St. Augustine Property through the participation agreement.

There are also serious inconsistencies and errors in Stillwater Liquidating's allegations about later transfers of the St. Augustine Property.  Stillwater Liquidating alleges that the St. Augustine Property was transferred to "Gerova" in early 2010 and then to "Net Five" in or about May 2010.  However, it also alleges that the deed to the St. Augustine Property remained with AUG and did not change at the time of the 2010 transactions with Gerova and with Net Five.  Amended Complaint ¶¶ 182-83.  The Amended Complaint alleges the following:

- AUG took out a mortgage loan on the property in May 2008, and the lender's interest was later assigned to an entity known as EWE Loan No. 4 LLC. *Id.* ¶¶ 158, 179. EWE later attempted to foreclose on its mortgage loan, which prompted AUG to file a bankruptcy case.

- AUG's bankruptcy case was dismissed as a bad faith filing, and AUG then transferred the property to an entity named Net Five at South Beach, LLC, in return for an amount that "likely" was enough to pay off the EWE loan. *Id.* ¶¶ 184-188.

- Paradigm made a loan to Net Five at South Beach that was secured by the St. Augustine Property and by other properties, and that was later repaid. *Id.* ¶¶ 190-94, 198.

These allegations are not sufficient to support a fraudulent transfer claim against Paradigm on behalf of any of the Stillwater Funds. The property was owned by AUG, not any of the Stillwater Funds. The participation agreement between the Delaware Fund and the Offshore Fund did not convey a property interest in the St. Augustine Property for the reasons set forth in Part XII and for the additional reasons that (a) the participation agreement only purported to sell a beneficial interest in a loan that no longer existed, and (b) in any event the Delaware Fund did not own the loan (or property) with respect to which the participation interest allegedly was sold. AUG had no rights to assert claims under sections 544 and 550 with respect to transfers of its assets, and neither the Offshore Fund nor the Delaware Fund has any right to do so. Similarly, there is no allegation that any Stillwater Fund was a creditor of AUG, or that AUG had other creditors (besides EWE), or that the transfer of the St. Augustine Property was a fraudulent transfer from the perspective of AUG or its creditors.

Furthermore, Paradigm did not take ownership of the St. Augustine Property.  Paradigm made a secured loan that was later repaid, at which time the mortgage lien was released. Paradigm did not receive, and does not now hold, any property that originally belonged to a Stillwater Fund.  The St. Augustine Property remained intact during the period the lien was in effect; no portion of it was converted into other property that Paradigm now allegedly holds. Paradigm's lien gave it a contingent right to foreclose on collateral, but that contingent right was never exercised and it was expunged when the Paradigm loan was repaid.  Paradigm is not properly regarded as a "subsequent transferee" of the St. Augustine Property where Paradigm merely held a temporary lien that ultimately was extinguished and that never resulted in a transfer of that property to Paradigm.

### C.    McDonalds, Daniels and Calhoun Construction/The Calhoun Property

The Amended Complaint alleges that on December 22, 2006, the Delaware Fund made a loan to Cohutta Water, Inc. secured by six tracts of land located in Georgia that the parties have referred to as the "Calhoun Property."  Amended Complaint ¶ 236.  In 2007 and 2008 the Offshore Fund purchased two participation interests in the Cohutta loan for a total participation of 79.92%.  *Id.* ¶ 237.  Later, in 2009, the Delaware Fund foreclosed on the Cohutta loan and became the record owner of the Calhoun Property.  *Id.* ¶ 238.

The Amended Complaint includes conclusory allegations that the Calhoun Property was transferred to "Gerova" in early 2010 and to "Net Five Holdings" in May 2010.  *Id.*  ¶ 239-40. As noted above, however, the Delaware Fund did not sell its assets to any Gerova entity. Instead, the Delaware Fund merged with a Gerova partnership, with the Delaware Fund as the surviving entity.  The Delaware Fund continued to own the Calhoun Property and did not transfer it to Gerova.

74

As to Net Five: the Amended Complaint alleges that there was an agreement to transfer all of the Calhoun Property to Net Five.  However, the supporting allegations and documents show that only one tract was actually transferred to a Net Five entity.  More specifically:

- In August 2012, tract 5 was sold to Stephen J. and Vicki McDonald.  Although the Amended Complaint alleges this sale was made by Net Five, the original Complaint correctly noted that the deed in the public records states that the Delaware Fund was in fact the grantor of the property.  *Compare* Amended Complaint ¶ 247 *with* Complaint ¶ 166.  The recorded deed is signed by Eric Halter, an individual connected with Net Five, but it is so signed in his capacity as an authorized agent of Gerova Asset Backed Holdings LP, the new name that the Delaware Fund adopted after the 2010 merger.  *See* Limited Warranty Deed, Gilmer County, Georgia, Deed Book. 1749, Page 79, dated Aug. 10, 2012, recorded Aug. 15, 2012.  Clearly, then, tract 5 of the property was transferred directly from the Delaware Fund to the McDonalds.  The fact that different entities may have controlled the Delaware Fund does not mean that the transfer to the McDonalds was preceded by any transfer to Gerova or to Net Five.

- In December 2012, tracts 1 and 3 were sold to John R. and Yvette Daniel.  The Amended Complaint alleges that this sale was made by Net Five, but the deed recorded in the property records shows that it was actually made by the Delaware Fund.  *See* Joint Tenancy with Survivorship Warranty Deed, Gilmer County, Georgia, Deed Book. 1776, Page 42-43, dated Dec. 13, 2012, recorded Dec. 21, 2012.  Again, Stillwater Liquidating acknowledged this fact in the first Complaint, but then (remarkably) rewrote the allegation in the Amended Complaint to set forth an

75

incorrect description of the transfer.  *Compare* Amended Complaint ¶ 248 *with*

Complaint ¶¶ 163, 165.

- In December 2013, tract 6 was transferred from the Delaware Fund's name into that of Net Five Holdings LLC.  On the same day, tract 6 was sold by Net Five Holdings LLC to Calhoun Commercial Construction LLC.  Amended Complaint ¶ 250.

In the case of tract 6, then, there was a transfer to Net Five Holdings.  However, the documentary records show plainly that the other alleged transfers (to Gerova and to Net Five) never occurred.  The Delaware Fund owned four of the tracts until they were transferred directly to the McDonalds and the Daniels, with no intervening transfers to any separate Gerova or Net Five entity.  Tract 6 was transferred to Net Five Holdings, but there was no prior transfer to any separate Gerova entity.

These facts are not sufficient to support the asserted claims.  The Offshore Fund's participation interest did not give it a direct ownership interest in the Cohutta Loan or in the Calhoun Property for the reasons set forth in Part XII, above.  In addition, the Delaware Fund has no standing to assert claims under section 544 of the Bankruptcy Code, and therefore has no standing to challenge alleged fraudulent transfers of the Delaware Fund's property.  Furthermore, the claims have been asserted on the theory that there was an initial transfer to "Gerova" and/or to "Net Five."  None of the claims could be sustained on the theory that was an initial transfer to "Gerova," because the documents and the allegations of the Amended Complaint make clear that there was no such transfer.  Only one of the fraudulent transfer claims (against Calhoun Construction) could be sustained on the theory that there was a prior transfer to a Net Five entity, because the Amended Complaint makes clear that the other tracts were not so transferred.

However, the Delaware Fund (and Stillwater Liquidating as its alleged assignee) was the transferor and has no standing to pursue that claim.

### D.    SFN/The Hillandale Property

The Amended Complaint alleges that on April 9, 2007, the Delaware Fund made an $18 million loan to Top Flight Investment LLC, secured by a "duly recorded security interest" in the Hillandale Property, which is located in Lithonia, Georgia.  In May 2007, the Offshore Fund purchased a 40% participation interest in the loan.  Amended Complaint ¶¶ 310, 314-15.

Stillwater Liquidating contends that the Hillandale loan was transferred to Gerova in January 2010 and then to Net Five in May 2010.  In fact, the Hillandale loan was owned by the Delaware Fund, and it did not transfer assets to Gerova; the allegations to the contrary are false characterizations of the transaction, as explained above.  On the other hand, the Amended Complaint alleges that Gerova Asset Backed Holdings, LP (the renamed Delaware Fund) assigned the loan to Net Five at Hallandate (*sic*), LLC, on March 1, 2010.  *Id.* ¶ 322.

Apparently the real estate taxes for the Hillandale property went unpaid, and a tax sale was held in May 2011.  At the tax sale the deed to the premises was transferred to an entity named FTTD3 LLC in return for a payment of the outstanding taxes.  FTTD3 later transferred the property to EHM Investments LLC.  *Id.* ¶¶ 323-25.  However, in November 2011 the property was redeemed by another creditor of Top Flight named by Ponce Collections LLC, which had purchased a mechanic's lien against Top Flight.  The parties agree that by virtue of this redemption, and under Georgia state law, the property was restored to Top Flight, though Ponce became the first priority lienholder.  *See* O.C.G.A. § 48-4-43.[8]

---

[8]    Stillwater Liquidating asserted fraudulent transfer claims against FTTD3 and EHM but later dismissed those claims.  Notice of Dismissal, ECF No. 191.

In January 2012, Ponce initiated foreclosure proceedings.  Also in January 2012, Net Five at Hallandate, LLC transferred its interest in the Hillandale Loan to Camden Real Estate Opportunity Fund I, LLC, who thereafter filed a written consent to the foreclosure.  Amended Complaint ¶ 335 n.86.  Stillwater Liquidating alleges that some parties may not have been given proper notice of the foreclosure case, *id.* ¶ 332, but it is clear that the Delaware Fund itself received direct notice by mail.  *Id.* ¶ 331.  While the foreclosure suit was pending, Ponce sold its interest to SFN Dekalb Holdings LLC, who replaced Ponce as the plaintiff and thereafter successfully purchased the Hillandale Property at a foreclosure sale on April 2, 2013.

These facts do not support a fraudulent transfer claim against SFN.  The Offshore Fund's participation interest gave it no direct ownership rights in the Hillandale Property for the reasons explained in Part XII.  The Delaware Fund transferred a mortgage loan, but the Delaware Fund has no rights under section 544 and therefore, as a transferor, no rights to assert fraudulent transfer claims under New York law.

In addition, the property that the Delaware Fund allegedly transferred to Net Five at Hallandate was a mortgage loan, not an ownership interest in the Hillandale Property.  SFN never bought that mortgage loan.  The Amended Complaint makes clear that Net Five at Hallandate transferred the loan to Camden, and that Camden then consented to the foreclosure.  There is no reasonable interpretation of this admitted sequence events that would make SFN a transferee of property that the Delaware Fund once owned.  The allegations to the contrary are based entirely on Stillwater Liquidating's misguided effort to treat secured loans (and/or participation interests in such secured loans) as though they represented ownership of the underlying real property itself.

Stillwater Liquidating also alleges that FTTD3, EHM, Ponce, and SFN are related entities who have previously engaged in similar schemes to obtain property pursuant to tax sales. *Id.* ¶ 340. But those allegations make no difference to the claims that have been asserted. The documents incorporated into the pleadings, and the pleadings make clear that the defendants are not transferees of the property (namely, the rights associated with the Hillandale Loan) that was formerly owned by the Stillwater Funds. If the loan was wrongly transferred to Camden, then it was Camden (not SFN) who was the transferee of property that the Delaware Fund once owned.

## XV.    The Alleged Automatic Stay Violation by SFN

The Amended Complaint also argues that SFN completed the foreclosure sale on the Hillandale Property in April 2013, which was after the filing of the Offshore Fund's chapter 11 petition and after the commencement of the chapter 15 cases by two Gerova entities. Footnote 87 to the Amended Complaint alleges that the foreclosure sale violated the automatic stay in the Offshore Fund's case, and notes that Stillwater Liquidating previously filed a motion seeking to void the foreclosure sale on that ground. This Court denied the motion on December 7, 2015. To the extent that any aspect of that requested relief is still being pursued in the Amended Complaint, the Court confirms that no such relief is available to Stillwater Liquidating. The contention that the foreclosure sale violated the automatic stay fails for two independent reasons.

First, the Offshore Fund's participation interest in the Hillandale Loan did not give the Offshore Fund a direct ownership interest in the Hillandale loan itself and did not convey a property interest in the underlying collateral (the Hillandale Property), for the reasons described in Part XII, above.

Second, even if the participation interest had conveyed such rights in the Hillandale Property, the participation interest was no longer owned by the Offshore Fund at the time of its bankruptcy filing in 2013. The Offshore Fund sold its assets (including these participation

interests) to a Gerova subsidiary in January 2010.  Stillwater Liquidating contends in this case that the transfer of the participation interest was fraudulent and can be undone.  However, that does not mean that the participation interest was still owned by Offshore Fund estate in 2013, or that it was property of the estate that was subject to the automatic stay.  It is well-settled in this Circuit that property transferred by a debtor is no longer property of the estate, and that is true even if the property is subject to an actual or potential fraudulent transfer claim.  *Fed. Deposit Ins. Corp. v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *Sec. Investor Prot. Corp. v. Madoff*, 490 B.R. 59, 68 (S.D.N.Y. 2013); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 192 B.R. 73, 77 (S.D.N.Y. 1996) (explaining that accounts receivable transferred to and allegedly converted by defendant before the bankruptcy were "not to be considered property of the estate" and that the automatic stay therefore did not apply to them); *see also* cases cited in Point XIII, above.  The whole premise of the fraudulent transfer claim, after all, is that that the property was transferred *out* of the debtor's estate.  If a fraudulent transfer claim is asserted, then the property may once again become property of the estate, but that happens only if and when the fraudulent claim is successful and the property actually is recovered.  *See* 11 U.S.C. § 541 (a)(3) (property of the estate includes property that a trustee "recovers" under section 550).

Stillwater Liquidating has also attempted to characterize the Gerova and Net Five transfers as a "conversion" or a "theft" of the Offshore Fund's property, in the hope that invoking differently-named tort theories might produce a different result.  However, the properties that the Offshore Fund once owned (namely, the participation interests) were separate from the underlying loans and were never transferred to SFN.  Similarly, the Delaware Fund itself never owned the Hillandale Property; it owned a mortgage loan that was sold to Camden

80

and then released by Camden.  SFN (as the current owner of the Hillandale Property) cannot

possibly be the owner of property that was "stolen" from the Stillwater Funds or that is properly

the subject of a "conversion" action by the Offshore Fund.

Stillwater Liquidating has also argued that it had rights, as a trust beneficiary, to

challenge transfers of properties that the Delaware Fund made.  *See* Plaintiff's Reply in Support

of Motion to Void Ab Initio Order Approving Foreclosure and Subsequent Transfers of Real

Property in Violation of the Automatic Stay 15-16, ECF No. 240.  However, the Offshore Fund

sold its participation interests, and thereby sold its beneficial trust interests, in 2010.  It seeks to

recover those interests on fraudulent transfer grounds, but as noted above the transfers are treated

as valid in the meantime.  Accordingly, at the time of its bankruptcy filing the Offshore Fund

was not a beneficiary of a trust.

Furthermore, even if (in 2013) the Offshore Fund had had the right, as a trust beneficiary,

to assert derivative claims, those claims would have related only to the property that the trust (the

Delaware Fund) previously owned and transferred.  The Delaware Fund never owned the

Hillandale Property and never transferred it.  The Delaware Fund made a loan that was secured

by the Hillandale Property, and it transferred that loan to Camden.  The property that SFN

acquired (the Hillandale Property) was never owned by the Delaware Fund or by the Offshore

Fund and was never part of the alleged trust.

## XVI.    Common Law Claims Against Paradigm

Paradigm is the only lender who filed a motion to dismiss and who remains as a

defendant.  Paradigm made secured loans with respect to the Kings Property and the St.

Augustine Property, as described above.  Stillwater Liquidating does not allege that Paradigm

had any role in the alleged January 2010 Gerova transfers.  However, it alleges that Paradigm

conspired with Net Five and with "Insider Defendants" to defraud the Stillwater Funds and to

convert their properties.  Amended Complaint ¶¶ 461-65.  Paradigm also allegedly "aided and abetted" a conversion of property by Net Five, Planet Five and "the Net Five Insiders."  *Id.* ¶¶ 467-70.  Finally, Paradigm allegedly aided and abetted a breach of fiduciary duty that Net Five owed to Gerova.  *Id.* ¶¶ 483-88.  In each instance Paradigm allegedly acted wrongfully by providing "funding" that it "knew or should have known" would be used to "grease" Net Five's scheme to strip the assets of their values and to remove them from the reach of creditors of the Stillwater Funds.  *Id.* ¶¶ 463, 468, 484.

Stillwater Liquidating and Paradigm each submitted briefs with respect to the motions to dismiss that assumed that the common law claims against Paradigm are governed by New York law.  It is not at all clear why New York law would govern these claims.  Perhaps the parties are in agreement that New York law sets forth the governing standards, or perhaps they agree that New York law is substantially the same as the laws of the other jurisdictions that might apply. Since the parties apparently are in agreement on the point the Court will address the merits of the asserted claims under New York law.  *See Tehran–Berkeley Civil & Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) ("[I]mplied consent to use a forum's law is sufficient to establish choice of law . . .").

### A.     Elements of the Conspiracy and Aiding and Abetting Claims

New York law does not recognize civil conspiracy to commit a tort as an independent cause of action.  Instead, such a claim stands or falls with an underlying tort.  *Hebrew Inst. for Deaf & Exceptional Children v. Kahana*, 870 N.Y.S.2d 85, 86 (App. Div. 2008).  Allegations of conspiracy are useful only as a pleading tool and permitted only to connect the actions of separate defendants with an otherwise actionable tort.  *Alexander & Alexander of New York, Inc. v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986).

82

The elements of a conspiracy are: (1) a corrupt agreement between two or more parties, (2) an overt act in furtherance of the agreement, (3) the parties' intentional participation in furtherance of a plan or purpose, and (4) resulting damage or injury. *Kashi v. Graatsos*, 790 F.2d 1050, 1055 (2d Cir. 1986) (citing *Suarez v. Underwood*, 426 N.Y.S.2d 208, 210 (Sup. Ct. 1980)). A conspiracy claim requires allegations that the defendant actually knew the wrongful nature of the primary actor's conduct and actually intended to participate in it. *See Pittman by Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998); 20 N.Y. Jur. 2d *Conspiracy—Civil Aspects* § 11 ("[A] person without knowledge of the alleged objective cannot be considered a conspirator.").

If an underlying tort is proved, and if the elements of a conspiracy to commit that tort have been established, then every act and declaration of each member of the confederacy in pursuance of the original plan is, in law, the act and declaration of them all so that all the conspirators are equally liable, jointly and severally, as tortfeasors. *Am. Transit Ins. Co. v. Faison*, 661 N.Y.S.2d 624, 625 (App. Div. 1997). This is true regardless of the amount of any direct benefit conferred upon the defendants through the allegedly fraudulent transaction. *Id.* (citing *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Arcturus Builders*, 552 N.Y.S.2d 287, 288-89 (App. Div. 1990)).

As with civil conspiracy claims, New York law does not recognize aiding and abetting a tort as an independent cause of action. *Small v. Lorillard Tobacco Co., Inc.*, 720 N.E.2d 892, 898 (N.Y. 1999). Aiding and abetting is a theory of derivative liability that must be connected to an otherwise actionable tort committed by another party. To adequately plead a claim for aiding and abetting liability, the plaintiff must allege the existence of the underlying wrong as well as the defendant's actual knowledge of and substantial assistance in aid of that wrong. *See Krys v. Butt*, 486 Fed. Appx 153, 157 (2d. Cir. 2012) (summary order); *Oster v. Kirschner*, 905

N.Y.S.2d 69, 72 (App. Div. 2010); *National Westminster Bank USA v. Weksel*, 511 N.Y.S.2d

626, 629 (App. Div. 1987); *Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 490 F.Supp.2d 536,

542 (S.D.N.Y. 2007) (noting that New York courts have "uniformly" required that a defendant

have "actual knowledge" of an alleged fraud in order to sustain a claim for aiding and abetting,

and that allegations of constructive knowledge or recklessness are not enough).

In addition, circumstances giving rise to mere constructive knowledge or notice where (as

here) the conspiracy and aiding and abetting claims require allegations of actual knowledge.

*Oster*, 905 N.Y.S.2d at 72; *Chemtex*, 490 F.Supp.2d at 546.  Allegations that a party had

suspicions of wrongdoing are not sufficient to support an allegation that the party had "actual

knowledge" of an ongoing fraud.  *Id.; see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d

Cir. 2006).

### B.    Allegations as to Paradigm's Alleged Knowledge

The Amended Complaint repeatedly alleges that Paradigm and other lenders "knew or

should have known" of various "irregular" circumstances, and that they were on notice of

"suspicious" circumstances that allegedly were "red flags" indicating possible fraud.  Amended

Complaint ¶¶ 14, 157, 463, 468, 484.  The allegations fall into three categories:  (1) allegations

of allegedly suspicious facts about Gerova of which Paradigm should have been aware, (2)

allegations specific to the Kings Hotel transactions, and (3) allegations specific to the St.

Augustine transactions.  As described below, the allegations either are mere conclusory

statements, or otherwise do not plausibly suggest that Paradigm had "actual knowledge" of any

of the underlying alleged torts.

### 1.    Allegations of "Red Flags" Regarding Gerova

Stillwater Liquidating alleges that Paradigm took liens on the Kings Hotel mortgage loan and the St. Augustine Property despite alleged "red flags" about Gerova that "should have raised concerns" in the minds of a sophisticated lender and purchaser. *Id.* ¶ 203. More particularly:

1.    "Gerova" failed to file financial statements after going public in 2009 and failed to complete an audit in 2010, and its new CEO and board chairman resigned in April 2010. *Id.* ¶¶ 14, 99, 129, 131, 203, 277. These facts supposedly were "red flags" – but red flags of what? If Paradigm actually knew of the alleged facts – which itself is not alleged – those facts might have suggested accounting troubles or financial troubles, or personnel disputes. There is nothing about these particular facts that reasonably should have suggested to anyone that Gerova, or anyone else, had defrauded the Stillwater Funds. And they certainly do not support an allegation that Paradigm had any reason to suspect (let alone that it had actual knowledge of) the alleged fraud or conversion of property, or the alleged breaches of fiduciary duty committed by Net Five against Gerova

2.    Some other "red flags" consisted of news articles and stock analyst reports that were published in early 2011 and that suggested that Gerova was guilty of accounting fraud. *Id.* ¶¶ 14, 203, 283. However, there is no allegation that Paradigm actually knew of these articles and stock reports, or even that Paradigm should have known of them. In addition, these allegations, which focus only on Gerova's alleged accounting problems, provide no support at all for the proposition that Paradigm should have known, or did know, of the alleged conspiracy by Net Five and others to convert property and to defraud the Stillwater Funds. The articles include allegations that the Stillwater Funds and their assets were severely overvalued at the time of the Gerova transactions, but those are allegations that question the integrity of the Stillwater Funds

85

and their managers, rather than suggesting that the Stillwater Funds were the victims of

an ongoing conspiracy to convert their assets.  And these articles certainly provide no

support for the suggestion that Paradigm had actual knowledge that Net Five allegedly

was breaching fiduciary duties that it owed to Gerova.

3.     Class actions and other lawsuits were filed in early 2011 that challenged

the Stillwater Funds' failure to pay redemption payments and various aspects of the

Gerova transactions.  *Id.*  However, there is no allegation that Paradigm actually knew of

these articles, stock reports and lawsuits, or even that Paradigm should have known of

them.

4.     The NYSE delisted Gerova's stock and halted trading in April 2010.

Stillwater Liquidating believes that a "sophisticated lender" whose collateral consisted, in

part, of a pledge of some Gerova stock "would be expected to perform due diligence

regarding this" and would have discovered "a lack of financial statements prepared in the

ordinary course."  *Id.* ¶ 278.  This, allegedly, was a "sure red flag." *Id.*  But a "red flag"

of what?  Paradigm does not stand accused of participating in an accounting fraud or of

conspiring to suppress the issuance of financial statements.  It stands accused of

conspiring to defraud and convert the property of the Stillwater Funds and of aiding and

abetting a later conversion of such property by Net Five, and a later breach of fiduciary

duty by Net Five.  The cited events are not "red flags" as to the existence of the torts that

are relevant to the claims Stillwater Liquidating has asserted.

These allegations are not sufficient to show that Paradigm had actual knowledge of the

alleged "Scheme" to convert property and to defraud the Stillwater Funds.  The very wording of

these allegations, including the repeated reference to "red flags," shows that they are an effort

86

merely to allege "constructive knowledge" rather than actual knowledge, and that is not enough.
*See Rosner v. Bank of China*, 349 Fed. Appx. 637, 639 (2d Cir. 2009) (summary order) (holding
that statements alleging that a defendant "*should* have known that something was amiss" with
transactions, even if pled with "conclusory statements . . . that [the defendant] *actually* knew
something" are "insufficient to support an aiding-and-abetting claim under New York law."
(citations omitted)); *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003) (constructive
knowledge is insufficient for aiding and abetting liability).  Even if "constructive knowledge"
were enough these allegations would fall short of the mark, because they are not suggestive of
the existence of the underlying torts that are the bases of Stillwater Liquidating's claims.

Furthermore, only some of these purported "red flags" were in existence prior to the
Kings Hotel loan (*i.e.,* Gerova's failure to file financial statements or to complete an audit, the
resignations of the new CEO and board chairman, and the delisting of Gerova's stock).  The
other alleged events post-dated the Kings Hotel loan and therefore could not support allegations
that Paradigm knew of fraud at the time of the Kings Hotel loan.

Finally, these particular allegations – all of which cast aspersions on Gerova – provide no
evidence at all as to Paradigm's alleged "knowledge" that Net Five was engaged in a scheme to
breach fiduciary duties that it owed to Gerova.

### 2.    Allegations Regarding The Kings Hotel Loan

As to the Kings Hotel loan, the allegations are as follows:

1.     Net Five Holdings provided additional collateral to support the Paradigm
loan, and "Gerova" provided a guaranty of Net Five's obligations.  This allegedly was
"suspicious" because Net Five, not Gerova, was the purported owner of the Kings
Property in August 2010.  Amended Complaint. ¶¶ 275-76.  However, "Gerova" was one

of the joint venture owners of "Net Five." It is not unusual for a corporate parent to guaranty an obligation of a subsidiary, and certainly a guaranty is not an event that by itself gives rise to any implication of fraud, conversion or breach of fiduciary duty.

2.    Gerova allegedly did not sign the note it purported to guaranty. *Id.* ¶ 276. However, there is no reason why a "guarantor" needed to "sign" the underlying note that was being guaranteed. It is perfectly appropriate for guarantees to be set forth in separate documents. Perhaps Stillwater Liquidating means to allege that Gerova did not sign its guaranty, but if so that is a sign that the parties were lax in collecting the closing documents, not a "red flag" suggesting wrongdoing of any kind.

3.    Stillwater Liquidating alleges "on information and belief" that the proceeds of Paradigm's loan with respect to the Kings Hotel property allegedly were used to pay expenses of Net Five ("possibly" including insider salaries) and for other purposes. *Id.* ¶ 159. However, there is no allegation that Paradigm knew how the loan proceeds would be used. Apparently Stillwater Liquidating itself is not so sure how the proceeds were used, having only made the allegation "on information and belief." There is also no clear explanation as to why Paradigm should have been concerned, even if it had known how the proceeds would be used. Affiliated companies transfer monies among themselves all the time, either as dividends or as intercompany loans, or as repayments of intercompany loans. The loan also was supported by other collateral (not just by the Kings Hotel property). The mere fact that the proceeds were distributed in the alleged manner is not itself an event that should have alerted Paradigm that a conspiracy to convert property of the Stillwater Funds had occurred or was underway or that Net Five was engaged in a conspiracy to cheat the Stillwater Funds or the Gerova companies.

4.      Certain documents executed in connection with the Paradigm loan allegedly constituted a "suspicious paper trail."  More specifically, a Gerova entity signed an assignment of rents in August 2010 with respect to the Kings Hotel Property.  The only reason the paper trail allegedly was "suspicious" is that Stillwater Liquidating believes that the interests in the Kings Hotel Property should have been assigned to Net Five three months earlier. *Id.* ¶ 279-80.  However, the Amended Complaint acknowledges that the Kings Hotel note and mortgage were not actually assigned to Net Five in May 2010.  ¶ 271.  Accordingly, there was nothing "suspicious" about the fact that Net Five did not execute the documents.  Nor is there any reason why a belated execution of an assignment of rents should have indicated anything more than a prior oversight.  It certainly is not something that a normal person would immediately interpret as a sign that Gerova had conspired to convert property belonging to the Stillwater Funds or that Net Five was engaged in a plot to injure Gerova.

The cited facts are not even sufficient to suggest that Paradigm "should have known" of the alleged scheme(s) to convert the Stillwater Funds' property and/or to defraud the Stillwater Funds or of the alleged breach of fiduciary duties owed to Gerova, and fall woefully short of supporting a contention that Paradigm had actual knowledge of the alleged torts.

### 3.    Allegations Regarding the St. Augustine Loan

The allegations regarding the St. Augustine loan are similarly deficient.  Stillwater Liquidating makes these allegations:

1.      Paradigm made a loan regarding the St. Augustine Property after it allegedly knew that AUG's bankruptcy case had been dismissed. *Id.* ¶ 158.  This supposedly gave Paradigm notice of "prior fraud and irregularities." *Id.*  However, there

89

is no allegation in the Amended Complaint that AUG's bankruptcy case was dismissed
for "fraud," or that the dismissal cast any doubt on AUG's ownership of the St.
Augustine Property, or that the dismissal should have cast any doubt on AUG's rights to
borrow money. Nor is there any allegation that the dismissal of the bankruptcy case had
anything to do with the torts that are the focus of the claims asserted against Paradigm
(namely, the alleged scheme to convert assets and to defraud the Stillwater Funds and the
alleged breaches of fiduciary duty by Net Five). Knowledge or suspicion of improper
conduct in a different matter (other than the one upon which a lawsuit is based) does not
raise a strong inference of actual knowledge of the actionable tort. *See In re Agape
Litigation*, 773 F.Supp.2d 298, 313 (E.D.N.Y. 2011) (citing *Lerner v. Fleet Bank, N.A.*,
459 F.3d 273, 293 (2d Cir. 2006)).

2.      The Amended Complaint alleges that the "Hard Money Lenders" (a
defined term that includes Paradigm) "in many cases" did little due diligence or "turned a
blind eye" to what they found. Amended Complaint. ¶¶ 160-61. These allegations are
entirely conclusory and therefore carry no weight. *See Ashcroft v. Iqbal*, 556 U.S. 662,
679 (2009) (the tenet that a court must accept a complaint's allegations as true is
inapplicable to threadbare recitals of a cause of action's elements, supported by mere
conclusory statements).

3.      Paradigm's mortgage loan regarding the St. Augustine Property allegedly
was documented through "suspect" documents that were signed "by representatives of
Gerova, among other suspicious, irregular and unusual transfer items." Amended
Complaint. ¶¶ 193, 200, 279. The only thing that was allegedly "suspect" about the
documents, however, is that AUG's transfer documents were signed on behalf of AUG

by a special vice president of "Gerova," though the property "had already in theory been
transferred from Gerova to Net Five." *Id*. ¶ 189.  As noted above in Part X(C), this is a
peculiar and circular allegation: Stillwater Liquidating acknowledges that the property
was owned by AUG and was not actually transferred to Net Five in May 2010, but it then
simultaneously contends that it was somehow "suspicious" that Net Five did not sign the
transfer deeds. *Id.* ¶¶ 189, 193, 200-201.  Of course, there was nothing "suspicious"
about the fact that Net Five did not pretend to be the owner of the property, because it
was not the owner – the property belonged to AUG.  There is no allegation that the
transfer documents were signed by someone who did not have actual authority to act for
AUG, and so there is no basis on which to treat this as a "suspicious" circumstance.
Furthermore, it is hard to see how these allegations would have been a sign that a
fraudulent conversion of property, or a breach of fiduciary duty, was underway.  The fact
that AUG executed the deed (and that Net Five did not do so) hardly suggests that Net
Five was converting AUG's property or that Net Five was breaching duties allegedly
owed to a parent company of AUG.

    4.    Paradigm's loan with regard to the St. Augustine Property was made on
the same day that Net Five SB acquired the property from AUG, and the loan "appears"
to have been used to "support a related party 'sale' between Net Five entities that was
significantly below market." *Id.* ¶¶ 190-91.  There are no specific allegations as to the
terms of the purported "below-market" sale, or of Paradigm's knowledge of those terms,
or of why such terms should have made Paradigm question the propriety of the loan it
made.  The property was transferred by AUG, and the Amended Complaint makes clear
that in return AUG received enough funds to repay the prior loan that it owed to EWE

with respect to the St. Augustine Property. *Id.* ¶¶ 184-88. There is no allegation that AUG had other creditors or of any other reason why the terms of AUG's transfer of the property should have alerted Paradigm to the existence of a fraud. There is not even any allegation sufficient to support an inference that AUG was defrauded in any way.

5.      Paradigm allowed the loan to be paid off at end of August 2011 despite a declaration of default two months earlier. *Id.* ¶ 282. However, there is no allegation as to why the default should have suggested that a "fraud" or a conversion of property was underway. Nor does a lender's short-term forbearance constitute a sign that the lender has decided to join in the commission of a separate tort.

6.      Stillwater Liquidating argues that in the briefs filed with this Court Paradigm was not as clear as another party had been in describing later defaults on the loan that Paradigm had made with respect to the St. Augustine Property and in describing the date of the payoff of the loan. *Id.* ¶ 198. This is "suspicious" only to someone who is doggedly bent on finding everything that happens to be "suspicious." The briefs filed in this Court in 2015 plainly have nothing to do with what Paradigm knew in 2011 when the loan was made.

7.      Paradigm allegedly knew Rohan and/or Net Five from prior loans, including the Kings Hotel loan, and therefore was "on notice of the questionable and irregular conduct and suspect documentation and Net Five's fraudulent Scheme." *Id.* ¶ 202. To the extent this is an allegation that Paradigm allegedly knew of the underlying "Scheme" as a result of the Kings Hotel loan, that allegation is deficient for the reasons set forth above. In other respects, the allegation is merely conclusory and entitled to no weight. In addition, mere prior familiarity with an alleged wrongdoer does not suffice to

support a claim. *See In re Agape Litigation*, 773 F.Supp.2d 298, 315 (E.D.N.Y. 2011) (a

close relationship between a bank employee and the perpetrators of a Ponzi scheme is

insufficient, without more, to infer the employee's actual knowledge of the alleged Ponzi

scheme).

These allegations, both individually and collectively, are not sufficient to support even an

allegation of "constructive" knowledge, let alone an allegation of actual knowledge. They have

been dressed up with scores of accusatory adjectives, but they do not suggest that a reasonable

person "should" have known of the particular torts that are alleged in the Amended Complaint,

let alone that Paradigm had actual knowledge of them. *See Renner v. Chase Manhattan Bank*,

No. 98 CIV. 926 (CSH), 1999 WL 47239, at *12 (S.D.N.Y. Feb. 3, 1999).

### C.    Other Defects as to the Alleged Conspiracy to Convert Property

Stillwater Liquidating in Count VI that Gerova and its principles converted the Stillwater

Funds' property, but it does not include Paradigm as a defendant in that claim, and does not

accuse Paradigm of having any connection with Gerova or any participation in the transfers to

Gerova. Instead, Count VIII of the Amended Complaint alleges that Net Five took actions that

were designed to put assets further out of the reach of the Stillwater Funds, and that this

constituted a continued or additional "conversion" of the Stillwater Funds' assets. Amended

Complaint ¶ 469. Paradigm is accused of joining a conspiracy to accomplish this continued or

additional "conversion."

There are many defects with the allegations that Paradigm conspired to convert property.

First, one of the two properties that is relevant to the claims against Paradigm (the St.

Augustine Property) was never owned by a Stillwater Fund. Instead, it was owned by AUG

Funding, LLC. If there was a conversion of the St. Augustine Property, that was not a

conversion of property belonging to a Stillwater Fund.  Stillwater Liquidating does not claim that

AUG ever assigned claims to it or that it has any authority to pursue "conversion" claims on

behalf of AUG.

Second, the allegations in Count VIII presume that a previous conversion of property

occurred (with Gerova as the tortfeasor) and that Paradigm conspired with Net Five to put that

previously-converted property further out of reach of the Stillwater Funds.  Neither the Kings

Hotel Property (which was owned by the Delaware Fund) nor the St. Augustine Property (which

was owned by AUG) was transferred when the Delaware Fund merged with another Gerova

company.  *See* Parts X(B) and XIV(B), above.  It makes no sense to say that Paradigm conspired

to put previously-converted properties out of reach, because the alleged initial conversions

plainly did not occur.

Third, "conversion" is a tort theory that applies only to personal property, not real

property.  *Garelick v. Carmel*, 529 N.Y.S.2d 126, 128 (App. Div. 1988); *Boll v. Town of*

*Kinderhook*, 472 N.Y.S.2d 496, 498 (App. Div. 1984).  It therefore is a tort that cannot be

asserted as to the alleged transfer of the St. Augustine property.

Fourth, the allegations of the Amended Complaint are not sufficient to show that the

alleged transfers to Gerova constituted a conversion of property.  "Conversion" or "theft" occurs

only when property is taken without the consent of the owner.  Restatement (Second) of Torts

§ 252; *Employers' Fire Ins. Co. v. Cotton*, 156 N.E. 629, 630 (N.Y. 1927) ("Conversion is an

*unauthorized* assumption and exercise of the right of ownership over goods belonging to another

to the exclusion of the owner's rights."  (emphasis added)).  The Amended Complaint alleges that

the transfers to Gerova were the products of fraud, and it apparently seeks as a result to treat the

transfers as conversions of property as a result of the fraud, but the allegations needed to support

94

such a fraud claim are entirely missing. Despite all of the repeated references to Gerova's

alleged wrongdoing there is no allegation, anywhere in the Amended Complaint, that Gerova

made any specific fraudulent statements to any representative of the Stillwater Funds. Similarly,

there is no allegation that the representatives of the Stillwater Funds were "fooled" by such

representations. To the contrary, the Amended Complaint alleges that the managers of the

Stillwater Funds were participants in the alleged fraud. Amended Complaint ¶ 1. There are

allegations that the Stillwater Funds did not receive the shares that were contractually promised

to them (Amended Complaint ¶¶ 4, 98, 102, 114, 441, 443, 452-454), but those allegations just

support breach of contract claims, not claims for conversion. 23 N.Y. Jur. 2d *Conversion* § 20

(an action for conversion "cannot be predicated on a mere breach of contract or nonpayment of a

debt. It is imperative that a complaint in conversion should, by appropriate language, charge that

the acts were wrongful or unlawful as distinguished from a mere violation of contract rights.")

Fifth, there is no reasonable basis on which to allege that Paradigm's loans somehow

were designed to help Net Five to put properties "further out of reach" of the Stillwater Funds.

Paradigm's mortgage loans were publicly recorded and fully disclosed. The loans did not

conceal the properties or their locations. The mortgage loans themselves also did not result in

any transfers of the underlying properties that the Stillwater Funds had owned.

Sixth, the allegations of the Amended Complaint are not sufficient to support a claim that

Paradigm actually agreed and intended to join a conspiracy. The Amended Complaint alleges

that Paradigm and other parties "acted with the intentional and common purpose of enabling and

perpetrating the fraudulent Scheme to convert the Real Property Interests, stripping such assets

of all value and equity, and further diverting those Interests from the Stillwater Funds, thereby

damaging the Stillwater Funds and their creditors and investors." Amended Complaint ¶ 464. However, this allegation is purely conclusory and entitled to no weight.

When this issue was raised in the motions to dismiss, Stillwater Liquidating argued that the various loan documents between Paradigm and Net Five demonstrate an agreement to join a conspiracy. It cited *Minpeco, S.A. v. ContiCommodity Servs, Inc.*, 552 F. Supp. 327, 330 (S.D.N.Y. 1982) for the proposition that "one who finances a conspiracy with the *intent* of participating in and aiding the conspiracy may be liable." This citation conveniently leaves out the first clause of that quotation, however, which states that "the mere act of lending money to a conspirator does not cause one to be a co-conspirator." *Id*. The court in *Minpeco* only found sufficient allegations of a conspiracy because the plaintiff in that case had alleged both the financier's intent to further the conspiracy and its more active participation in the conspiracy above and beyond merely lending money. *See id.* at 330 n.2.

More typically, loan documents, with nothing else, are not demonstrative of the requisite agreement. *See Albion Alliance Mezzanine Fund, L.P. v. State Street Bank and Trust Co.*, 797 N.Y.S.2d 699, 707 (Sup. Ct. 2003), *aff'd*, 767 N.Y.S.2d 619 (App. Div. 2003) (dismissing claim for civil conspiracy for failure to allege any agreement between lender and his fraudster borrower). Moreover, in *Albion* the court found that a lender's suspicion of his borrower's fraud, without any communication regarding said fraud, was insufficient to establish a corrupt agreement between the lender and borrower. *Id*. Thus, Stillwater Liquidating's bare bones allegation that Paradigm's loan to Net Five demonstrates a corrupt agreement to defraud the Stillwater Funds is insufficient.

96

**D.      Other Defects as to the Alleged Conspiracy to Defraud the Stillwater Funds**

Stillwater Liquidating contends that the same alleged conspiracy to put assets further out

of the reach of the Stillwater Funds was also a conspiracy to "defraud" the Stillwater Funds.  *See*

Count VIII.  However, the only "frauds" alleged in this regard are the allegedly fraudulent

transfers.  There is no cause of action under New York law for aiding and abetting an alleged

fraudulent conveyance or for allegedly conspiring to commit a fraudulent transfer.  *Chemtex,*

*LLC v. St. Anthone Enters.,* 490 F.Supp.2d 536, 548 (S.D.N.Y. 2007); *Lippe v. Bairnco Corp.*,

218 B.R. 294, 303 (S.D.N.Y. 1998); *Atlanta Shipping Corp. v. Chemical Bank*, 631 F.Supp. 335,

348 (S.D.N.Y. 1986); *Fed. Deposit Ins. Corp. v. Porco*, 552 N.E.2d 158, 160 (N.Y. 1990)

(Under New York law, there is no "creditor's cause of action in conspiracy, assertable against

nontransferees or nonbeneficiaries solely for assisting in the conveyance of a debtor's assets.").

Count VIII does not allege that Net Five Holdings made any misrepresentations to the

Stillwater Funds, or that Paradigm had any knowledge of any such misrepresentations.  The

alleged "conspiracy to defraud" is just another name for the alleged "conspiracy to convert

property," and the allegations are deficient for the reasons stated above.

**E.      Other Defects as to the Alleged Aiding and Abetting of Conversion**

Count IX alleges that Paradigm aided and abetted the same "conversion" of property that

is described in Count VIII.  Many of the problems cited above with respect to the conspiracy

claim also are defects in the aiding and abetting claim, namely:

- The St. Augustine Property was never owned by a Stillwater Fund, and allegations
  about that property cannot support a claim that property of a Stillwater Fund was
  converted.

97

- The allegations in Count IX are to the effect that Paradigm aided and abetted a continuation of a previous conversion of property that occurred at the time of the Gerova transactions, and helped to put the previously-converted property further out of reach of the Stillwater Funds.  However, the Delaware Fund owned the Kings Hotel mortgage loan, and AUG owned the St. Augustine Property, both before and after the Gerova transactions.  It makes no sense to say that Paradigm aided and abetted the continuation of a conversion that never happened.

- "Conversion" is a tort theory that applies only to personal property, not real property. It therefore is a tort that cannot be asserted as to the alleged transfer of the St. Augustine property that served as collateral for the loans that Paradigm made.

- The Amended Complaint does not sufficiently allege that the Gerova transactions constituted a "conversion" of property as opposed to a breach of contract or a fraudulent transfer.

- An aiding and abetting claim cannot be sustained without allegations showing that a party provided substantial assistance to the underlying alleged tort.  Here, there is no reasonable basis on which to allege that Paradigm's loans helped Net Five to put properties "further out of reach" of the Stillwater Funds.  Paradigm's mortgage loans were publicly recorded and fully disclosed.  The loans did not conceal the properties or their locations.  The mortgage loans themselves also did not result in any transfers of the underlying properties that the Stillwater Funds had owned.

### F.    The Alleged Aiding and Abetting of a Breach of Fiduciary Duty

Count XI fails because the Amended Complaint fails to allege facts sufficient to show that Paradigm had actual knowledge of an alleged breach of fiduciary duty, as discussed in

subpart (B) above.  In addition, the Amended Complaint fails to allege that Paradigm provided

substantial assistance to the alleged breach of duty.  Paradigm loaned money, and the loans were

later repaid.  Despite the repeated and strident allegations that the loans "greased" the alleged

scheme, it is difficult to see how a loan (and later repayment) provided substantial assistance to a

purported diversion of assets.  The loans provided cash, on a temporary basis, but that was all.  If

diversions of property occurred, those diversions were accomplished by other transfers among

the Net Five entities or by the Net Five entities to other persons, not through the loans.

## XVII.    Unjust Enrichment Claims

The Amended Complaint asserts unjust enrichment claims against all of the defendants.

"The essential inquiry in any action for unjust enrichment is whether it is against equity and good

conscience to permit the defendant to retain what is sought to be recovered."  *Mandarin Trading

Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (quoting *Paramount Film Distrib. Corp.

v. State of New York*, 285 N.E.2d 695, 698 (N.Y. 1972)).  A plaintiff must show that (1) the other

party was enriched, (2) at that party's expense, and (3) that it is against equity and good

conscience to permit the unjustly enriched party to retain what is sought to be recovered.  *Id.*

(citations omitted).

The allegations are not sufficient to sustain a claim for unjust enrichment.

First, under New York law a claim for unjust enrichment may not be asserted with

respect to transactions that are governed by contracts.  *See Clark-Fitzpatrick, Inc. v. Long Island

R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written

contract governing a particular subject matter ordinarily precludes recovery in quasi contract for

events arising out of the same subject matter.").  Here, the Amended Complaint makes clear that

all of the challenged transfers were governed by written agreements.  Stillwater Liquidating's

remedies must lie in fraudulent transfer claims or other theories, and not in claims alleging unjust

enrichment.

Second, although privity is not required for an unjust enrichment claim, a claim will not

be supported if the connection between the parties is too attenuated. *Sperry v. Crompton Corp.*,

863 N.E.2d 1012, 1018 (N.Y. 2007). To survive a motion to dismiss, a claim for unjust

enrichment must plead facts that indicate some relationship between the parties that could have

caused reliance or inducement. *Mandarin Trading*, 944 N.E.2d at 1111. Mere allegations of

awareness of the other party are not sufficient. *Georgia Malone & Co., Inc. v. Rieder*, 973

N.E.2d 743, 747 (N.Y. 2012). The parties must have actually had some dealings with each other.

*Id*. The New York Court of Appeals has declined to impose a rule that "would require parties to

probe the underlying relationships between the businesses with whom they contract and other

entities tangentially involved but with whom they have no direct connection." *Id*. at 748.

Stillwater Liquidating has alleged no interaction at all between the Stillwater Funds, on the one

hand, and Paradigm, Calhoun, SFN, the Daniels, and the McDonalds, on the other hand.

According to the Plaintiff these individuals and entities dealt only with Net Five-related entities

because all of the properties at issue had been transferred to Net Five-related entities.

Third, some of the defendants (including Paradigm and SFN) are not the current owners

of the properties that the Stillwater Funds allegedly once owned. Under New York law, a

plaintiff may not recover against a defendant for unjust enrichment where the defendant did not

retain the benefit allegedly received. *See Paramount Film Distributing Corp. v. State*, 285

N.E.2d 695, 698 (N.Y. 1972); *Clifford R. Gray, Inc. v. LeChase Const. Services, LLC*, 819

N.Y.S.2d 182, 187 (App. Div. 2006) ("The essence of [an unjust enrichment] cause of action is

that one party is in possession of money or property that rightly belongs to another."); *Fulton v.*

*Hankin & Mazel, PLLC*, 18 N.Y.S.3d 654, 658 (App. Div. 2015) (dismissing, for failure to state

a claim, unjust enrichment cause of action brought by plaintiff guarantor against defendant law

firm where the firm did not retain the guarantor's money and instead, transferred the money to

the seller pursuant to the escrow provisions in the agreement of sale).

## XVIII.    Constructive Trust Claims

All of the property transfers that are alleged in the Amended Complaint were documented

in writing.  Under New York law a constructive trust is not an appropriate remedy where the

rights of the parties are governed by a written agreement.  This principle stems from a series of

cases that held that claims for unjust enrichment cannot exist in the face of a valid and

enforceable written agreement.  *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d

190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a

particular subject matter ordinarily precludes recovery in quasi contract for events arising out of

the same subject matter.").  In *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377

F.3d 209, 213-14 (2d Cir. 2004), the Second Circuit extended this principle to constructive trust

claims.  *See also Abraham v. American Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 235

(E.D.N.Y. 2013) ("It is well established that the existence of a contract precludes a claim for a

constructive trust."); *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC,* 842 F. Supp. 2d

502, 514 (S.D.N.Y. 2012).

Stillwater Liquidating also has failed to state a claim for constructive trust against the

buyer and lender defendants.  New York courts have set forth four elements that generally must

exist in order to impose a constructive trust: (1) a confidential or fiduciary relationship; (2) a

promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment.  *See Marini v.

Lombardo*, 79 A.D.3d 932, 934 (App. Div. 2010).  The standard of proof for establishing a

constructive trust is clear and convincing evidence.  *See Bower v. Bower*, No. 13/1752, 2014 WL

837146, at *3 (N.Y. Sup. 2014).  Here, there was no confidential or fiduciary relationship

between the Stillwater Funds and the buyer and lender defendants.  The buyers and lenders are

not alleged to have made any "promise" to the Stillwater Funds or to have had any dealings with

them at all.  The Stillwater Funds also did not part with their properties in "reliance" on any

actions by the buyers and lenders.

    New York courts have held that a confidential or fiduciary relationship, and other usual

elements of a constructive trust, are not always required, and that a constructive trust may be

imposed so long as "continued holding of the property in question by the defendant be deemed

unconscionable and inequitable, and the return of the property be necessary to prevent unjust

enrichment." *Ackerman v. Ventimiglia (In re Ventimiglia)*, 362 B.R. 71, 86 (Bankr. E.D.N.Y.

2007); *see also Marini*, 912 N.Y.S.2d at 696 ("[T]hese elements serve only as a guideline, [and]

a constructive trust may still be imposed even if all the elements are not established."); 106 N.Y.

Jur. 2d *Trusts* § 166 (noting that "the constructive trust doctrine is not rigidly limited by the four

commonly stated elements").  Constructive trust remedies therefore may be invoked in

appropriate cases involving fraud, conversion, or duress.  *See, e.g., Robinson v. Day,* 960

N.Y.S.2d 397 (App. Div. 2013); *Duran v. Bautista*, No. 654261, 2015 WL 1567020 (N.Y. Sup.

Apr. 7, 2015); 106 N.Y. Jur. 2d *Trusts* § 233.  However, Stillwater Liquidating has failed to

allege facts sufficient to support a claim that the buyer and lender defendants committed fraud,

conversion or duress.

    In addition, as noted above, some of the defendants (including Paradigm and SFN) are

not the current owners of the properties that the Stillwater Funds allegedly once owned.

Stillwater Funds cannot impress a "constructive trust" on such properties as to defendants which

do not currently hold such properties.

## XIX.    Claims for Accounting

Under New York Law, courts have jurisdiction to order an accounting when four factors

exist: (1) a fiduciary relationship; (2) entrustment of money and property; (3) no other remedy;

and (4) a demand and refusal of an accounting.  *See In re Mary XX.*, 822 N.Y.S.2d 659, 661

(App. Div. 2006).  The right to an accounting is premised upon the existence of a confidential or

fiduciary relationship and a breach of duty imposed by that relationship respecting property in

which the party seeking the accounting has an interest.  *See Kern v. Robert Currie Assocs.*, 632

N.Y.S.2d 75 (App. Div. 1995) (ruling that plaintiff was entitled to judicial accounting in view of

fiduciary relationship between plaintiff and defendant).  In the absence of a confidential

relationship, one party has no cause of action for accounting against another.  *See, e.g.*, *Saunders

v. AOL Time Warner*, Inc., 794 N.Y.S.2d 342, 344 (App. Div. 2005) (finding that subscribers had

no cause of action for accounting, or for imposition of constructive trust against cable television

company, in absence of confidential or fiduciary relationship).

Here, the buyer defendants had no fiduciary or confidential relationship with the

Stillwater Funds, and the accounting claims against them must be dismissed.  Stillwater

Liquidating argues that persons who knowingly participate in the breach of a fiduciary's duties

may be required to provide an accounting if they hold the proceeds of such wrongdoing, but of

the moving defendants only Paradigm is accused of being such a participant, and as explained

above Paradigm does not hold any property that fairly could be characterized as having once

belonged to the Offshore Fund or to the Delaware Fund.

## XX.    Claims Against the Net Five Defendants

Net Five Holdings, its subsidiaries who have been named as defendants, and Messrs.

Rohan and Halter did not file separate motions to dismiss, but instead joined in portions of the

motions filed by some of the buyer and lender defendants.  *See* Net Five, et al.'s Joinder to

Motion to Dismiss, ECF No. 133; Net Five, et al.'s Joinder to Briefs of Paradigm et al., ECF No. 190.[9]  More particularly, the Net Five Defendants joined in the motion of former defendant Camden Real Estate Opportunity Fund I, LLC "specifically with regard to the arguments that Plaintiff Stillwater Liquidating LLC lacks standing to make claims under section 544 of title 11 of the United States Code."  Net Five, et al.'s Joinder to Motion to Dismiss, ECF No. 133.  Later, the Net Five Defendants joined in a supplemental brief filed by Paradigm "regarding Participation Interests, Attributions of Intent, Sufficiency of 'Red Flag' Allegations, and 'Good Faith Defenses – Standards and Pleading Burdens."  Net Five, et al.'s Joinder to Briefs of Paradigm et al., ECF No. 190.

As to fraudulent transfer claims: some of the rulings set forth above (for example, as to the rights of the Stillwater Funds to assert claims under section 544 and the nature of the Offshore Fund's "participation interests" in properties) may apply to the extent that the Amended Complaint asserts fraudulent transfer claims against the Net Five companies.  As to common law claims, however, the only such claims that were the subject of motions to dismiss by other parties were the common law claims asserted against Paradigm.  The Net Five Defendants joined in Paradigm's submissions regarding the legal requirement that actual knowledge be alleged in the context of a conspiracy claim and an aiding and abetting claim, but the Amended Complaint identifies different facts and makes different allegations as to the Net Five Defendants' alleged knowledge and participation in various torts, and the Net Five Defendants have not challenged the sufficiency of those allegations.  In addition, the Net Five Defendants are accused of being primary wrongdoers (not just conspirators or aiders and abettors) with respect to some claims, such as the allegations about a further conversion of property and the allegations about breaches

---

[9]    Mr. Laubach also joined these motions, but he has since settled with the Plaintiff.

of fiduciary duties that were owed to Gerova.  The motions to dismiss by other parties did not

address those claims.

The joinder in other motions and briefs, therefore, offers no reason to dismiss the

common law claims that have been asserted against the Net Five Defendants.

*          *          *          *

The movants raised other issues in their motions to dismiss (for example, contentions that

as a matter of law they acquired property in good faith, and contentions that Stillwater

Liquidating is barred from asserting common law claims on grounds of *in pari delicto*), but in

light of the rulings above it is not necessary to reach those issues.

For the foregoing reasons all of the claims asserted against Paradigm, Calhoun, the

Daniels, the McDonalds and SFN should be dismissed.  The fraudulent transfer claims against

Net Five entities should be dismissed to the extent they are based on alleged transfers of

properties other than transfers of the participation interests that the Offshore Fund owned.  The

other claims against the Net Five Defendants have not really been put in issue by the Net Five

Defendants' limited joinders in other motions and will not be dismissed.

One question is whether the dismissals should be with prejudice or whether Stillwater

Liquidating should be provided yet another opportunity to amend its pleadings.  The Court will

hold a conference on September 27, 2016 at 11:00 a.m. at which the parties may present

argument on this question.  Any party who wishes to submit a memorandum in connection with

that issue may do so, but (a) no such memorandum shall exceed ten pages in length, and (b) any

such memorandum must be submitted no later than 5:00 p.m. on September 20.  Defendants are

encouraged to cooperate in the submission of a joint memorandum to the extent they can do so.

At the conference on September 27, 2016 the parties should also be prepared to discuss how to proceed as to the remaining defendants.  To the extent that other buyer and lender defendants wish to make motions to dismiss, motions for judgment on the pleadings, or motions for summary judgment, they should confer with Stillwater Liquidating prior to September 27 and attempt to agree on a schedule for such motions.

Dated: New York, New York
        September 2, 2016

                              **/s/ Michael E.  Wiles**
                              UNITED STATES BANKRUPTCY JUDGE