**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re Stillwater Asset Backed Offshore Fund Ltd., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 12-14140 (MEW) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| **Stillwater Liquidating LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | Adv. Pro. No. 14-02245 (MEW) |
| | ) | |
| | ) | |
| **Net Five at Palm Point, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**OPINION ON MOTION FOR ORDER COMPELLING**
**DOCUMENT PRODUCTION AND IMPOSING SANCTIONS**

A P P E A R A N C E S:

FOLEY & LARDNER LLP
New York, New York
*Counsel to Stillwater Liquidating LLC*
   By:  David B. Goroff, Esq.
         Katherine R. Catenese, Esq.

POSTILLION LAW GROUP, LLC
Jacksonville, Florida
*Counsel to Paul Rohan*
   By:  Bryce Krampert, Esq.
         Christopher J. Kinnaman, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

      Plaintiff Stillwater Liquidating LLC ("**Stillwater Liquidating**") has moved for an Order

directing defendant Paul Rohan to comply with document requests and imposing sanctions upon

Rohan for his prior destruction of documents. The Court held an evidentiary hearing on the motion

(the "**Motion**") on January 25, 2017, at which time the parties presented exhibits, live testimony

1

and testimony by depositions. For the reasons stated on the record on January 25, 2017 and explained in further detail below, the Court finds that it is appropriate to impose sanctions against Rohan based on his willful destruction of subpoenaed documents, but that the full nature of the sanctions to be imposed should be decided later. Rohan also will be directed to comply with prior subpoenas and documents requests to the extent he has possession, custody or control of any responsive documents that have not already been turned over to Stillwater Liquidating.

**I.    Relevant Events**

In October 2012 a group of US investment funds filed an involuntary bankruptcy petition against an entity known as Stillwater Asset Backed Offshore Fund Ltd (the "**Stillwater Offshore Fund**"). The petition was granted and an Order for Relief was entered on January 31, 2013. One year later, in February 2014, the Unsecured Creditors' Committee filed a motion seeking discovery pursuant to Fed. R. Bankr. P. 2004 from Mr. Rohan and from various companies with whom Mr. Rohan had worked; those companies collectively are referred to here as the "Net Five Companies." *In re Stillwater Asset Backed Offshore Fund Ltd.*, Case No. 12-14140, Dkt. No. 123. The documents related generally to transactions through which the Committee believed that assets belonging to the Stillwater Offshore Fund had been fraudulently transferred, first to the "Gerova" Group of companies, then to the Net Five Companies, and then (in some cases) to other parties. The Committee explained that the requested documents were relevant to claims that might be pursued on behalf of the estate:

> Given the significant claims of actionable conduct in connection with the foregoing transfers to Net Five without fair consideration, the lack of transparency or disclosure with respect to these transfers, the lack of information with respect to where funds and assets flowed and the extent that Net Five and its insiders hold and/or control any such assets and/or the fruits of such assets, and any related improper or actionable conduct by Net Five and its subsidiaries, insiders and affiliates (and those acting in concert with any of such parties) (the "Discovery Parties"), the Committee respectfully submits

2

> that cause exists for entry of the attached order authorizing and directing examinations and production of documents against Net Five and its various insiders.

*Id.*, ¶ 4 (footnote omitted); *see also* ¶¶ 26-31 (outlining matters that suggested actionable conduct by Net Five).

The Committee's motion left little doubt that it contemplated potential litigation by the estate against Net Five to recover assets that Net Five had received from various Stillwater entities. The proposed Rule 2004 subpoena sought twenty categories of documents that were believed to be relevant to these potential claims. PX 7, 9-12. Among other things, the Committee sought:

- All articles of incorporation, operating agreements, bylaws and amendments and modifications for the Net Five Companies;

- All documents that related to the Offshore Fund, or to transfers of property or liabilities that once belonged to the Offshore Fund, or to Gerova;

- All balance sheets, income statements, general ledgers, cash disbursements reports and other documents relating to the financial condition of the Net Five Companies;

- All bank account records and tax returns for the Net Five Companies; and

- All documents that related to any of the Assets once owned by the Offshore Fund and to transfers of those Assets to or by the Net Five Companies.

*Id*. Rohan received notice of the motion and of the terms of the proposed discovery on or about March 12, 2014, by first-class mail at his home and business addresses. PX 15, 1.

Judge Gropper granted the Rule 2004 motion on March 26, 2014 and authorized the Committee to issue subpoenas to Rohan and others. PX 7, 13-14. Rohan was served with the Court's Order, a subpoena directed to him personally, and subpoenas addressed to the Net Five Companies on April 11, 2014. P's Br. 4; PX 7, 1; PX 8, 6:22-8:15, 10:22-11:12.

3

In early 2014 (when the discovery motion was filed) many documents belonging to the Net Five Companies were held in two storage units in Ponte Vedra Beach, Florida. The documents had been moved there in May 2013, when the Net Five Companies were evicted from their Florida offices for nonpayment of rent. PX 12, 24:17-24. Rohan rented the storage units and signed the rental contracts. PX 1, 1; PX 2, 1; PX 12, 21:15-24:5, 29:4-8.

The first storage unit was rented on May 24, 2013, and the second storage unit was rented on August 15, 2013. PX 1, 1; PX 2, 1. Rohan and his assistant, Toni Kara, were present when the contents of the office were moved into the storage units. PX 12, 20:19-21:1. The evidence submitted to the court and presented at the Hearing made clear that the contents of the storage units included business records of the Net Five Companies, and may also have included documents relating to other businesses Mr. Rohan owned, along with office furniture and miscellaneous items. PX 1, 1; PX 2, 1; PX 8, 19:13-23; PX 12, 14:3-15:16; 18:7-21, 40:17-41:1; Transcript, January 25, 2017 ("**Hr'g Trans.**") 26:1-32:17, 67:21-68:3. Toni Kara testified that the stored records included bank statements, real estate documents, financial documents and tax returns of the Net Five Companies. PX 12, 14:3-19, 18:13-21, 19:21-24, 20:14-18. Rohan and other Net Five employees took some documents home with them, but most were put in storage. PX 12, 25:18-26:4.

Rohan fell behind on his payments for the storage units. PX 3. On April 8, 2014 – after Rohan had been notified of the discovery motion and after the Court had issued an Order approving the motion, but before the subpoenas had been served on Rohan – Rohan contacted the operator of the storage units to ask if it was possible to "get rid of the stuff in the 2 units." PX 3, 9. However, the storage unit operator said it would be impossible to access the unit, or to remove or discard their contents, until the remaining balance on the account had been paid. *Id.* The documents

4

therefore remained in the storage units on April 11, 2014, when the Court's discovery order and the subpoena were served on Rohan. P's Br. 4; PX 7, 1; PX 8, 10:22-11:12.

Rohan did not make any further payments on the storage units. PX 3. The storage unit operator then notified Rohan of its intent to auction the contents of the two units to the public. PX 3; PX 8, 22:12-24. Rohan and Toni Kara then arranged for Toni Kara's husband, Malek Kara, to attend the auction and to purchase the contents of the storage units. PX 13, 16:17-23, 19:16-20:2. Malek Kara did so on April 16, 2014, and successfully acquired the contents of the two storage units. PX 5; PX 6; PX 13, 19:16-20:2.

After the auction, Malek Kara, Toni Kara and Rohan loaded the entire contents of the two storage units into a U-Haul truck that Rohan had rented. PX 12, 41:2-42:2; PX 13, 23:20-24:3; Hr'g Trans. 47:18-23. The contents included the Net Five business documents and records that had been placed in the storage units. PX 12, 40:10-42:2; Hr'g Trans. 47:18-23, 58:21-62:2. Toni Kara testified at her deposition that "[e]verything that was in the two storage units" was placed into the truck. PX 12, 40:21.

Rohan then arranged to sell the furniture and to destroy the documents taken from the storage units. PX 12, 44:2-17. Shortly after the auction, Toni Kara hired a truck containing a portable document-shredding unit. PX 12, 44:10-45:7; PX 13, 23:20-24:3. Rohan and Malek Kara then drove the U-Haul truck containing documents to a vacant lot under a bridge, where the portable document-shredding unit had also been brought. PX 12, 47:2-7; PX 13, 23:23-24:3, 27:13-25; Hr'g Trans. 47:18-48:3. While the furniture remained on the truck during that time, the entire documentary contents of the U-Haul truck were shredded. PX 13, 29:12-19. The boxes of documents that were destroyed were the same boxes as those that had been previously loaded from the storage units into the truck. PX 12, 49:24-50:8; PX 13, 29:6-30:8; Hr'g Trans. 76:7-77:2.

5

Only a few weeks later, on May 7, 2014, Rohan appeared for a deposition pursuant to the subpoena he had received. PX 8, 1. Rohan had previously produced five binders containing some documents that were responsive to the discovery subpoena. P's Br. 5; DX A, 2; PX 7, 1; PX 8, 10:22-11:12, 27:25-28:4. At the deposition, Rohan was asked what he had done to comply with the document subpoena. PX 8, 10:22-25. He testified under oath that he had "looked for whatever documents [he] could – [he] had available to [himself], dropped them off." *Id.* at 11:1-4. Rohan was asked whether Net Five had hard copy documents, and Rohan testified that such documents had once existed but that they had been put in storage (except for documents located in the New York offices), and that the stored documents had been sold at auction because the storage bill had not been paid. *Id.* at 19:13-23. Rohan also testified that he did not remember whether or not he received advance notice of the auction. *Id.* at 22:21-23:2.

At the deposition, Rohan was also asked about the contents of the storage units. He testified that "I honestly never looked at it [the storage unit] once we closed the office down. I am assuming computers. I am assuming desks." *Id.* at 23:5-7. Rohan added that the five three-ring binders of material he had produced had been found in a box in his garage, but that he did not "have possession or control over any other documents" responsive to the subpoena. *Id.* at 27:25-28:24.

During the deposition, Rohan made no mention of his initial contact with the storage unit operator, his inquiry as to whether the contents of the storage units could be destroyed, his involvement in Malek Kara's purchase of the documents at the auction, or his own role in transporting and then shredding the documents that had been in the storage units. He gave deliberately false testimony as to his knowledge of the documents and their disposition.

In May and June 2014 the Stillwater Offshore Fund, and many of its affiliates, entered into a series of agreements through which they assigned, to Stillwater Liquidating, any claims that they

had relating to the transactions with the "Gerova" companies and with the "Net Five" companies. Amended Complaint ¶ 1 n.4, Dkt. No. 297. On October 2, 2014, Stillwater Liquidating filed this adversary proceeding against the Net Five Defendants and other defendants, alleging (among other things) that they had participated in fraud and in various fraudulent transfers. Dkt. No. 1. Claims against some other defendants were later dismissed, and some claims against the Net Five Defendants have been dismissed, though others remain pending. Dkt. No. 324.

## II. The Parties' Contentions

Stillwater Liquidating claims that Rohan intentionally shredded Net Five Documents in order to prevent other parties from inspecting them. *See, e.g.*, Motion, at 10. It contends that Rohan's conduct warrants either an entry of default judgment against Rohan, or at a minimum a strong adverse inference against him. *Id.* at 11-15, 16-18. Stillwater Liquidating further requests that the Court compel Rohan to respond to an additional discovery request that Stillwater Liquidating served on Rohan on May 13, 2015. *Id.* at 15; *see also* PX 9, 1-16. Finally, Stillwater Liquidating seeks monetary sanctions and reimbursement of the costs of pursuing this Motion. Motion, at 15-16.

Rohan, in his papers and at the Hearing, contended that no Net Five Documents were among the destroyed documents or, if there were, that other copies of such documents are available from other parties. *Defendant Paul Rohan's Response to Stillwater Liquidating LLC's Motion for an Order Compelling Compliance with Request for Production of Documents and Request for Sanctions against Paul Rohan* (the "**Response**"), Dkt. No. 399, at 3-4; Hr'g Trans. 24:6-21, 42:13-23. Rohan claims that he has no other documents and also that any further discovery of him would not be probative of any outstanding claims in the bankruptcy case. Response, at 3-4. He argues that monetary sanctions should be denied because Stillwater Liquidating is unable to produce

7

evidence to demonstrate that Net Five documents were destroyed or that the destruction of documents was undertaken with the degree of culpability necessary for monetary sanctions. *Id.* at 4. Finally, Rohan claims that a default judgment would be inappropriately harsh. *Id.* at 5-6.

### III. Rohan Willfully Destroyed Net Five Documents that He Had a Duty to Preserve

The evidence makes clear that Rohan knowingly and willfully destroyed documents that he knew were the subject of a pending discovery request.

#### A. The Destroyed Documents Included Net Five Documents

In May 2014, Rohan testified that Net Five documents had been contained in the storage units. At the Hearing in this Court, however, Rohan's testimony shifted. Rohan first argued that he did not know what documents were in the stored boxes and did not know if they contained any Net Five documents at all, and that he had never looked inside the boxes before destroying their contents. PX 8, 22:8-23:7; Hr'g Trans. 41:17-42:15, 51:23-52:11. When pressed on this point, Rohan testified that he actually had "looked through everything" and therefore knew that there were no Net Five documents that had been destroyed. Hr'g Trans. 43:24. When pressed further, however, he acknowledged that he did not look inside every box. Hr'g Trans. 44:8-13, 20-24, 51:23-52:11, 58:21-62:2. The best Rohan could say was that he could not say for sure whether he had destroyed any Net Five documents or (if he did so) whether those documents were available anywhere else, because he had not checked all of the documents before destroying them. *Id.* at 53:3-24.

These statements are internally inconsistent. They also are not credible. Rohan's prior deposition testimony, in May 2014 – only a few weeks after he had destroyed the documents – confirmed that the stored documents included Net Five documents. Toni Kara's testimony also confirms that the storage units contained Net Five documents. Of course, it is impossible now to

confirm just what Rohan destroyed, since Rohan by his own admission destroyed boxes of documents without cataloging their contents. But the testimony of Rohan himself, and of Ms. Kara, made clear that Net Five documents were among the destroyed materials, and the Court finds that the destroyed documents included documents that belonged to the Net Five Companies.

It is also plain that the destroyed documents included documents that were responsive to the subpoenas and that were relevant to potential litigation. Toni Kara testified that the stored documents included bank statements, real estate records, tax filings and financial reports, all of which were covered by the subpoenas. The Committee had made clear that it wanted to identify and track transfers of properties that had once been owned by the Stillwater entities or transfers of the proceeds of sales of such properties, to which Net Five's real estate records and bank records would have been particularly relevant.

Rohan's most strenuous objection at the Hearing was that it did not really matter if he had destroyed Net Five documents, because other people also had copies of various documents, and that Stillwater Liquidating therefore should still be able to get them from other sources. Hr'g Trans. 24:18-21, 42:13-23, 44:9-14. However, Rohan can hardly be sure that this is true, since he testified that he took no inventory of the stored documents before destroying them. It is highly improbable that each and every one of the destroyed documents will be found elsewhere, given the testimony that as many as 100 boxes of documents had been placed in storage. *See Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 890 (S.D.N.Y. 1999) (despite assertions that documents which had been produced were sufficient to meet discovery requirements, and that requested documents were available from other sources, court found this "improbable" in light of destruction of 3,000 boxes of documents by spoliator). The stored documents also could well have included handwritten notations that might not be found on other copies of the documents. In any

9

event, Rohan had his own discovery obligations, and he cannot escape them by empty speculation that some of the destroyed documents might still be recoverable from other sources. *See Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 73-74 (S.D.N.Y. 1991) ("a party's discovery obligations are not satisfied by relying on non-parties to preserve documents").

### B. Rohan Had a Duty to Preserve the Stored Net Five Documents

Parties have a duty to preserve documents that they know or should know could be "relevant to pending, imminent, or reasonably foreseeable litigation." *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 889 (S.D.N.Y. 1999); *see also Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d. 423, 436 (2d Cir. 2001) (obligation to preserve when party knows or should know that evidence is relevant to pending or future litigation); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (same). This obligation attaches even before the service of a complaint or the service of a formal discovery request. *Id.; Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D. Cal. 1984). It is particularly clear that the duty of preservation attaches once a formal discovery request has actually been served. *See Turner*, 142 F.R.D. at 73 ("Of course, a party is on notice once it has received a discovery request.").

The Committee's Rule 2004 motion made clear that further litigation against the Net Five Companies was not merely possible, but likely. Rohan was served with a copy of the Committee's motion for Rule 2004 discovery of these documents, which included a statement of the reasons why the Committee believed that the documents were relevant to potential litigation claims that the estate might pursue against the Net Five Companies. The estate later assigned those litigation claims to Stillwater Liquidating, and those are the precise claims that are being asserted in this adversary proceeding. The Rule 2004 motion provided Rohan with clear notice that these litigation claims were likely to be pursued, and therefore imposed an obligation to preserve evidence that

10

could be relevant to the litigation. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1998) (duty to preserve documents arises when litigation is pending or "reasonably foreseeable"); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F.Supp.2d 456, 466 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. Port Auth. of N.Y. and N.J.*, 685 F.3d 185 (2d Cir. 2012) (duty to preserve evidence when "a party reasonably anticipates litigation"); *Zubulake*, 220 F.R.D. at 217-18 (obligation to preserve records attached prior to filing of EEOC charge to the extent that corporation knew of likely litigation); *Wm. T. Thompson Co.*, 593 F.Supp. at 1455.

Furthermore, Rohan was served with the actual Rule 2004 order, and subpoenas, while the Net Five documents were still in storage. The subpoenas called for the production of all documents related to transactions among the various Stillwater companies, the Gerova companies, and the Net Five Companies, as well as organizational documents, bank statements, financial statements and other corporate records of the Net Five Companies. The formal service of the court-authorized discovery subpoenas plainly imposed upon Rohan an affirmative obligation to preserve and to produce the subpoenaed materials. *See Turner*, 142 F.R.D. at 72; *In re Rosenthal*, 2008 U.S. Dist. LEXIS 122017, at *30 (S.D. Tex. 2008) (subpoena imposed obligation to preserve documents that were the subject of the subpoena); *Flatow v. Islamic Republic of Iran*, 196 F.R.D. 203, 209 (D.D.C. 2000) (recipient of a subpoena has a duty to safeguard documents that are the subject of the request).

The above facts are sufficient to show that Rohan knew that the documents needed to be preserved. However, the Court also takes judicial notice of several class actions that had been filed prior to the bankruptcy case and that related to the transfers of Stillwater assets. *See In re Stillwater Capital Partners Inc. Litigation*, Case No. 11-CV-2737 (S.D.N.Y.) (class action by

11

Stillwater investors alleging breaches of fiduciary duty by Net Five and others); *Goldberg, et al. v. Gerova Financial Group, Ltd., et al.*, Case No. 11-CV-07107 (S.D.N.Y.) (class action in which plaintiffs sought, among other things, an accounting as to Net Five's dealings with Gerova). The plaintiffs in the *Goldberg* action moved for a preliminary injunction seeking (among other things) an order preventing any destruction of documents, books and records of the Net Five entities. Rohan plainly was aware of the *Goldberg* litigation and of this application, because he submitted a declaration in opposition to some aspects of the relief that the *Goldberg* plaintiffs sought. *See id.*, at Dkt. No. 75. The motion for an injunction was resolved by a stipulation in 2012, pursuant to which Net Five agreed that it would "preserve all books, records, documents, or other tangible evidence" that was related to its business and assets. *See* Stipulation filed in *In re Stillwater Capital Partners Inc. Litigation*, Case No. 11-CV-2737 (S.D.N.Y.), at Dkt. No. 117.

From the foregoing, it is plain that Rohan's duty to preserve the shredded documents was triggered well before Rohan actually destroyed the documents.

### C.   Rohan Acted With Willful Disregard of His Obligations

Two weeks after being served with the 2004 Order, Rohan placed a call to the storage unit operating company asking if it would discard the contents of the storage units. PX 3, 9. He then made arrangements to purchase the stored items through a surrogate, and then made further arrangements to destroy the records his surrogate has purchased. Rohan himself participated in the document destruction, and arranged and paid for the equipment and for the assistance of others in accomplishing that objective. In short, there was nothing accidental about the destruction of the documents. Their destruction plainly was Rohan's objective.

The timing of Rohan's actions, and his false testimony about them in May 2014, further belie any contention that Rohan was unaware of the relevance of the destroyed documents or that

14-02245-mew    Doc 427    Filed 05/10/17    Entered 05/10/17 12:46:20    Main Document
Pg 13 of 18

he acted innocently in destroying them. Rohan's inquiry as to whether the storage operator could destroy the documents came only two weeks after he received a copy of the Committee's Rule 2004 motion. The actual purchase, and destruction, of the documents occurred after Rohan had been served with subpoenas that plainly called for the production of the documents. It is quite evident from the record, and the Court so finds, that Rohan simply did not want the burdens and potential risks of holding and turning over a large volume of discoverable material, and elected instead to dispose of it. That decision was conscious, deliberate, and knowingly in violation of what the subpoenas commanded Rohan to do.

Rohan's excuses for his actions are without merit. Rohan claims that he failed to preserve these documents because he could not afford to pay the rent for the storage units. However, if that had been his concern he plainly could have addressed it by notifying the Committee of the existence of the documents and by permitting the Committee to make its own arrangements to purchase them or otherwise to ensure their preservation. *See Silvestri v. GMC,* 271 F.3d 585, 591 (4th Cir. 2001) (citing *Andersen v. Schwartz,* 687 N.Y.S.2d 232, 234-35 (N.Y. Sup. Ct. 1999)) ("If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation . . ."). Similarly, once the documents had been purchased at auction there were no longer any storage charges that would accrue; Rohan's only obligation at that point was to turn over the materials. He elected instead to destroy them, which he was not entitled to do.

Rohan's false testimony about his actions also belies the excuses he more recently has offered. If Rohan truly had believed that he had not destroyed any Net Five documents, or that the destroyed documents were entirely duplicative of documents that could be found elsewhere, or

13

that the documents had to be destroyed for other reasons, then he ought to have testified openly and honestly to that effect when he gave sworn deposition testimony only a few weeks after the document destruction occurred. Rohan chose instead to lie about his knowledge of the documents, and about his surrogate's involvement in the auction of the contents of the storage units. He sought to create the false impression that a third party storage operator had sold the documents to an unknown buyer in a transaction in which Rohan himself did not participate and of which Rohan had no knowledge, and his testimony on those points was flatly untrue.

**IV.    The Scope of the Appropriate Sanctions Should Be Decided Later**

A failure to preserve evidence once a party is under an obligation to preserve evidence is a spoliation of evidence that is subject to sanction. *See, e.g., Arista Records LLC v. USENET.com*, 633 F.Supp.2d 124, 138 (S.D.N.Y. 2009); *see generally Black's Law Dictionary* (10th ed. 2014) (spoliation as the intentional, as compared to accidental, destruction of evidence); 7-37 Moore's Federal Practice – Civil § 37.120 (2016) (a knowing failure to preserve property for use as evidence once an obligation to preserve attaches is a spoliation of evidence). Rule 37 of the Federal Rules of Civil Procedure (made applicable in this adversary proceeding by Fed. R. Bankr. P. 7037) permits the Court to impose sanctions for willful failures to comply with discovery obligations. The destruction of documents that are subject to subpoena also is punishable by contempt sanctions. *See* Fed. R. Civ. P. 45(g) (the court may "hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it"); *O'Toole v. Wrobel (In re Sledziejowski)*, 2015 Bankr. LEXIS 1523, at *20-22 (Bankr. S.D.N.Y. May 4, 2015) (Drain, J.) (holding party in contempt for violating court order to produce documents); *Middleton v. Green Cycle Hous., Inc.*, 2017 U.S. Dist. LEXIS 25627, at *2-3 (S.D.N.Y. Feb. 22, 2017) (party held in contempt for failing to obey subpoena without adequate excuse). In addition, a court has

the inherent power to impose sanctions for the discovery of evidence in order to preserve the integrity of the judicial process. *See generally* 7-37 Moore's Federal Practice – Civil § 3.120 (2016); *see also Shepherd v. Am. Broad Companies, Inc.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995); *Arista*, 633 F.Supp.2d at 138.

Sanctions for the willful destruction of evidence may include monetary penalties, or adverse inferences about the missing documents and the issues to which they were relevant, or in extreme cases the imposition of a default judgment. *Pension Comm.*, 685 F.Supp.2d at 469. For the most part, the court has wide discretion in deciding whether to impose a sanction for the destruction of evidence, and also as to how severe the sanction should be. *Arista*, 633 F.Supp.2d at 138; *see also Chambers v. Nasco*, 501 U.S. 32, 44-45 (1991); *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 268 (8th Cir. 1993). However, the case law imposes some limitations. When only monetary damages or compensation for costs are sought, it may be sufficient to demonstrate that relevant evidence was destroyed, so long as the destruction was at least negligent. *Turner,* 142 F.R.D. at 77-78. But, as sanctions become more severe, courts begin to investigate how responsible the spoliating party was for its actions, the degree of prejudice suffered by the opposing party, and whether less harsh sanctions would adequately punish the spoliator. *Shamis*, 34 F.Supp.2d at 887. Courts tailor the appropriate punishment with regard to these factors.

Accordingly, for example, an adverse inference may be appropriate if (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed, (2) the records were destroyed "with a culpable state of mind," and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Mere negligence may suffice to constitute a "culpable" state of mind for

15

this purpose. *Id*. at 108. However, in order to support an adverse inference the "relevance" of the destroyed materials requires more than merely that the materials were subject to discovery or that they were admissible under Rule 401 of the Federal Rules of Evidence. *Id.* Instead, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Id.* (internal quotation marks omitted); *see also Pension Comm.*, 685 F.Supp.2d at 467 ("[t]he innocent party must also show that the evidence would have been helpful in proving its claims or defenses -- *i.e.,* that the innocent party is prejudiced without that evidence.").

Courts nevertheless must not hold the prejudiced party to too strict a standard of proof regarding the contents of the destroyed evidence, because doing so "would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." *Residential Funding Corp.*, 306 F.3d at 109 (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)). Courts recognize the difficulty of 'proving a negative,' and do not permit a spoliator to benefit from the fact that the evidence which would demonstrate their culpability was destroyed by the spoliator's own actions. *See, e.g., Turner*, 142 F.R.D. at 74. Courts have also held that where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder may conclude that the missing evidence was unfavorable to that party. *Residential Funding Corp.*, 306 F.3d at 109. Nevertheless, an adverse inference still is a sanction that "should not be imposed lightly." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008).

Cases have imposed further limits on the circumstances in which the most extreme sanction (entry of a default judgment) is appropriate. Courts typically require a finding of bad faith or

16

willfulness before a default judgment may be proper. *Arista*, 633 F.Supp.2d at 138-39; *Rambus*, 645 F.3d at 1328-29; *Shamis*, 34 F.Supp.2d at 887; *see also Pension Comm.*, 685 F.Supp.2d at 469-70. Issuance of a default judgment also requires a determination that no lesser sanction is sufficient, and that the non-spoliating party suffered severe prejudice as a result of the spoliation. *See, e.g., Turner*, 142 F.R.D. at 74.

Rohan has caused Stillwater Liquidating to incur the expenses of pursuing this motion, and the Court agrees that Rohan should reimburse Stillwater Liquidating for that cost. The Court will issue a separate order setting a deadline for the submission of supporting information documenting such costs and will hold such further proceedings as may be necessary to resolve any issues over those costs.

However, it is too early in these proceedings to determine the precise nature of other sanctions to be imposed as a result of Rohan's actions. It is entirely possible that Rohan's conduct may increase the costs of discovery, by forcing Stillwater Liquidating to reconstruct collections of documents (or to reconstruct them from electronic sources) that should have been available more easily. For example, the Court was recently informed that the server containing many Net Five documents had been located, and the Court has ordered that a copy be provided to Stillwater Liquidating. However, it is not yet known (and will not be known until discovery is completed) whether Rohan's actions have caused Stillwater Liquidating to incur additional expense (or whether its discovery from other sources would have proceeded anyway), or the amounts of such additional expense.

While it might be permissible for the Court to impose an "adverse inference" based simply on Rohan's willfulness in destroying documents, the Court believes it would be preferable to wait until discovery is completed, and the case is ready for trial, before determining the scope of any

adverse inference, the issues to be encompassed by it, and whether the adverse inference would apply only to Mr. Rohan or would also apply to the Net Five Companies. Too much still remains unknown for it to be appropriate to make a final decision on those points at this stage. It would also be improper to impose a default judgment at this point, because the full degree of prejudice that Stillwater Liquidating might have suffered is not known, and will not be known until after Stillwater Liquidating has exhausted other discovery options that are available to it.

The authorities cited above make clear that it is appropriate to punish wrongful conduct, but that the nature of the punishment also must be tailored to the circumstances and must take account of the actual effects of the misconduct. Courts should exercise their discretion to "always impose the least harsh sanction that can provide an adequate remedy." *Pension Comm.*, 685 F.Supp.2d at 469. This Court will wait until the availability of other materials, the prejudice suffered by Stillwater Liquidating, and the costs incurred by Stillwater Liquidating have been further clarified before determining the further sanctions that ought to be imposed as a result of Mr. Rohan's willful destruction of evidence.

A separate Order will be entered as to the disposition of this matter.

Dated:  New York, New York
        May 10, 2017

                                              **s/Michael E. Wiles**
                                              Hon. Michael E. Wiles
                                              United States Bankruptcy Judge